EXHIBIT 2-1

**1822-CC10883**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT, ST. LOUIS CITY**

**JEFFERSON COUNTY, CAPE GIRARDEAU
COUNTY, CHRISTIAN COUNTY, CITY OF
JOPLIN, CRAWFORD COUNTY, GREENE
COUNTY, IRON COUNTY, JASPER COUNTY,
STONE COUNTY, TANEY COUNTY,
WASHINGTON COUNTY,**

        **Plaintiffs,**

  **V.**

**PURDUE PHARMA L.P.**
Serve: The Prentice-Hall Corporation
   251 Little Falls Drive
   Wilmington, DE 19808

**THE PURDUE FREDERICK COMPANY
CEPHALON, INC.**
Serve:  The Prentice-Hall Corporation
   251 Little Falls Drive
   Wilmington, DE 19808

**TEVA PHARMACEUTICALS USA, INC.**
Serve: Corporate Creations Network Inc.
   12747 Olive Blvd., Ste. 300
   St. Louis, MO 63141

**JANSSEN PHARMACEUTICALS, INC.**
Serve: CT Corporation
   120 S. Central
   St. Louis, MO 63105

**JOHNSON & JOHNSON**
Serve: CT Corporation
   120 S. Central
   St. Louis, MO 63105

**Cause No.**

**Division No.**

**JURY TRIAL DEMANDED**

- 1 -

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC. N/K/A JANSSEN**
**PHARMACEUTICALS, INC.**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**JANSSEN PHARMACEUTICA INC. N/K/A**
**JANSSEN PHARMACEUTICALS, INC.,**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**NORAMCO, INC.**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**ENDO HEALTH SOLUTIONS INC.**
**Serve: Missouri Secretary of State**
  **600 West Main Street**
  **Jefferson City, MO 65102**

**ENDO PHARMACEUTICALS INC.**
**Serve: Missouri Secretary of State**
  **600 West Main Street**
  **Jefferson City, MO 65102**

**ALLERGAN PLC F/K/A ACTAVIS PLC**
**Serve: Corporate Creations Network Inc.**
  **12747 Olive Blvd., Ste. 300**
  **St. Louis, MO 63141**

**WATSON PHARMACEUTICALS, INC. N/K/A**
**ACTAVIS, INC.**
**Serve: Corporate Creations Network Inc.**
  **12747 Olive Blvd., Ste. 300**
  **St. Louis, MO 63141**

**WATSON LABORATORIES, INC.**
**Serve: Corporate Creations Network Inc.**
  **12747 Olive Blvd., Ste. 300**
  **St. Louis, MO 63141**

**ACTAVIS LLC, ACTAVIS PHARMA, INC.**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**F/K/A WATSON PHARMA, INC.,**
**Serve: Corporate Creations Network Inc.**
  **12747 Olive Blvd., Ste. 300**
  **St. Louis, MO 63141**

**MALLINCKRODT, PLC,**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**MALLINCKRODT LLC**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**SPECGX LLC**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**MCKESSON CORPORATION**
**Serve: Corporation Services Company**
  **221 Bolivar St.**
  **Jefferson City, MO 65101**

**CARDINAL HEALTH, INC.**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**AMERISOURCEBERGEN DRUG**
**CORPORATION**
**Serve: CT Corporation**
  **120 S. Central**
  **St. Louis, MO 63105**

**EXPRESS SCRIPTS PHARMACY, INC.,**
**Serve: Corporation Services Company**
  **221 Bolivar St.**
  **Jefferson City, MO 65101**

**EXPRESS SCRIPTS HOLDING COMPANY**
**Serve: Corporation Services Company**
  **221 Bolivar St.**
  **Jefferson City, MO 65101**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**WALGREENS COMPANY**
Serve: The Prentice-Hall Corporation System
     221 Bolivar St.
     Jefferson City, MO 65102

**MISSOURI CVS LLC**
Serve: CT Corporation System
     120 South Central Ave
     Saint Louis, MO 63105

**CVS PHARMACY INC.**
Serve: CT Corporation System
     120 South Central Ave
     Saint Louis, MO 63105

**CVS HEALTH CORPORATION**
Serve: Corporation Trust Center
     1209 Orange Street
     Wilmington, DE 19801

**AMERISOURCEBERGEN COMPANY**
Serve: CT Corporation
     120 S. Central
     St. Louis, MO 63105

**MYLAN PHARMACEUTICALS INC.**
Serve: Corporation Service Company
     600 N. 2nd St., Ste. 401
     Harrisburg, PA 17101

**MYLAN N.V.**
Serve: Corporation Service Company
     600 N. 2nd St., Ste. 401
     Harrisburg, PA 17101

**DEPOMED, INC.**
Serve: Arthur J. Higgins
     7999 Gateway Blvd., Ste. 300
     Newark, CA 94560

**INSYS**
Serve: CT Corporation
     120 S. Central
     St. Louis, MO 63105

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**PHARMA, INC., OPERATING AS INSYS
THERAPEUTICS, INC.**
**Serve: CT Corporation**
       **120 S. Central**
       **St. Louis, MO 63105**

**GURPREET S. PADDA, M.D.**
**Serve: Harjot Padda**
       **3915 Brannon Ave.**
       **St. Louis, MO 63109**

**INTERVENTIONAL CENTER FOR PAIN
MANAGEMENT, P.C., d/b/a CENTER FOR
INTERVENTIONAL PAIN MANAGEMENT**
**Serve: Harjot Padda**
       **3915 Brannon Ave.**
       **St. Louis, MO 63109**

**PADDA INSTITUTE**
**Serve: Harjot Padda**
       **3915 Brannon Ave.**
       **St. Louis, MO 63109**

**CENTER FOR INTERVENTIONAL PAIN
MANAGEMENT, d/b/a COMPREHENSIVE
PAIN ASSOCIATES, LLC**
**Serve: Harjot Padda**
       **3915 Brannon Ave.**
       **St. Louis, MO 63109**

**EXPRESS SCRIPTS, INC.**
**Serve: CSC –Lawyers Incorpating Service**
       **221 Bolivar St.**
       **Jefferson City, MO 65101**

**CVS HEALTH CORPORATION**
**Serve: The Corporation Trust Company**
       **1209 Orange Street**
       **Wilmington, DE 19801**

**CAREMARK RX, L.L.C.**
**Serve: The Corporation Trust Company**
       **1209 Orange Street**
       **Wilmington, DE 19801**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**CAREMARKPCS HEALTH, L.L.C.**
**Serve: CT Corporation System**
      **4701 Cox Road, Ste. 285**
      **Glen Allen, VA 23060**

**CAREMARK, L.L.C.**
**Serve: CT Corporation System**
      **4701 Cox Road, Ste. 285**
      **Glen Allen, VA 23060**

**UNITED HEALTH GROUP INCORPORATED**
**Serve:  CT Corporation System**
      **120 South Central**
      **St. Louis, MO 63105**

**OPTUM, INC.**
**Serve:  CT Corporation System**
      **120 South Central**
      **St. Louis, MO 63105**

**OPTUMRX, INC.**
**Serve:  CT Corporation System**
      **120 South Central**
      **St. Louis, MO 63105**

**UNITED HEALTHCARE OF THE MIDWEST, INC.**
**Serve:  CT Corporation System**
      **120 South Central**
      **St. Louis, MO 63105**

**CAREMARK, LLC.**
**Serve:  CT Corporation System**
      **120 South Central**
      **St. Louis, MO 63105**

           **Defendants.**

## <u>PETITION</u>

COME NOW Plaintiffs and for their Petition allege as follows:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

## I.    INTRODUCTION

This Petition, filed on behalf of 10 Missouri counties and one city ("Communities") against 49 named Defendants who are the manufacturers, distributors, pharmacies and Prescription Benefit Managers of opioids.  This Petition seeks damages on behalf of Plaintiffs and their residents for reimbursement of public costs expended fighting this opioid epidemic and a claim for future costs in continuing attempts to finance community efforts in stopping the problem repairing what harm has been done.  The misbranding and overabundance of opioids has caused death, abuse, addiction, crime and social and familial destruction in each of these counties and city.  Plaintiffs have paid for and will continue to pay the costs, including but not limited to, of:  law enforcement, public safety, incarceration, medical care, costs of treatment, counseling and withdrawal, family protective services and autopsies.  These public expenditures could have been avoided if not for the conduct of Defendants.

This Petition places Defendants into five categories: (1) Manufacturers; (2) Distributors; (3) Pharmacies; (4) Prescription Benefit Managers (PBM); and (5) "Pill Mills."

Within these Defendants there are two levels of liability.  First, there is the "off label", i.e. "misbranding' marketing of these dangerous drugs.  These Defendants, mostly manufacturers and distributors, misled Plaintiffs' communities, doctors and residents about opioids by claiming: (1) Opioids were the proper treatment for chronic pain; (2) Opioids were not addictive; (3) Instructed doctors that patients who were addicted to opioids were "pseudo addicted" and not really addicted to the drug, (4) That non-steroid anti-inflammatories (NASAIDS) were less effective than opioids for chronic pain; (5) There were no withdrawal symptoms associated with opioids; (6) That a patient could be fully functional when taking opioids; (7) Representing the

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

drug OxyContin was a 12 hour pain relief pill and it was not; and (8) That raising the dosage would not increase the probability that a patient would become addicted to opioids.  In order to spread these false and misleading claims, Defendants, acting in concert with each other, engaged in and are still actively engaging in using advertising and marketing of opioids through the use of deceptive ads, representatives who knowingly described the drugs in inaccurate or misleading ways, use of Key Opinion leaders ("KOL') in the community, use of bogus front groups created and funded by the Defendant manufactures and distributors, and corrupted scientific literature and studies (taking them out of context through "cherry picking" and misleading claims about the drugs).  This Petition alleges the Defendants worked together, in "concert of action" and in a civil conspiracy.

The second level of liability centers on all of the Defendants' violations of state and federal laws requiring any entity who manufactures, distributes , sells, or prescribes opioids to report any and all suspicious orders to the Missouri State Pharmaceutical Board and Drug Enforcement Agency (DEA), so as to avoid the illegal diversion of opioids from prescription drugs meant for patients, to illegal drugs sold on the street, to those already abusing and addicted to all opioids, including heroin.  During the last 15 years opioids have literally flooded these counties and city, enslaving an unsuspecting public in the horror of opioid addiction, and none of the Defendants ever reported suspicious orders to any of these communities.  The result is what we have today: thousands dead, addicted, and Plaintiffs' communities straining in managing this problem.

This Petition contains six Counts, which include: Count I - Public Nuisance; Count II - Negligence Per Se-Illegal Diversion; Count III – Negligence; Count IV. Fraud in the Omission; Count V. - Fraud; and Count VI - Negligent Misrepresentation.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

## II.    FACTS – THE ORIGIN OF THIS EPIDEMIC

1.    Plaintiffs Jefferson County, Cape Girardeau County, Christian County, City of Joplin, Crawford County, Greene County, Iron County, Jasper County, Stone County, Taney County, and Washington County, in their capacity as city and county governmental entities created under the statutory authority of the State of Missouri, hereby bring this cause of action against the above-named Defendants.

2.    Hydrocodone is the most frequently prescribed drug in the United States.

3.    Oxycodone is a semi-synthetic narcotic analgesic.  Oxycodone is marketed as OxyContin, Percodan, Darvocet, as well as its generic name Oxycodone.

4.    Hydrocodone and oxycodone are opiate pain-relieving medications having an addiction forming or addiction sustaining quality.

5.    By the 1990s, Defendants were confronting the limited market for opium-like painkillers ("opioids").

6.    Defendants knew that opioids were effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.  Yet they also knew—and had known for years—that opioids were addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort.  Defendants further knew—and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

7.    Defendants also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

8.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone, are narcotics.  They are derived from or possess properties similar to opium and heroin, which is why they are regulated as controlled substances.  Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain.  Opioids also can create a euphoric high, which can make them addictive.  At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

9.     Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances.  Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest.  The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety.  Opioids generally had been categorized as Schedule II or Schedule III drugs.  Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence.  21 U.S.C. § 812.  Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by a pharmacist who both must be licensed by their state and registered with the DEA.  21 U.S.C. § 829.  Opioids that have been categorized as Schedule II drugs include morphine (Avinza, Embeda, Kadian, MS Contin), fentanyl (Duragesic, Actiq, Fentora), methadone, oxycodone (OxyContin, Percocet, Percodan, Tylox), oxymorphone (Opana), and hydromorphone (Dilaudid, Palladone).

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

10.     Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.  21 U.S.C. § 812.  Schedule III drugs may not be dispensed without a written or oral prescription, which may not be filled or refilled more than six months after the date of the prescription or be refilled more than five times.  21 U.S.C. § 829.  Some opioids had been categorized as Schedule III drugs, including forms of hydrocodone and codeine combined with other drugs, like acetaminophen.  However, in October 2013, the FDA, following the recommendation of its advisory panel, reclassified all medications that contain hydrocodone from Schedule III to Schedule II.  *See* 21 C.F.R. § 1308.

11.     In order to expand the market for opioids and realize blockbuster profits, Defendants needed to change medical and public perception that would permit the use of opioids not just for acute and palliative care, but also for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches – in other words, chronic pain.

12.     Defendants, in conspiracy with each other and/or acting in concert through a sophisticated and highly deceptive marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids.  Chronic opioid therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

13.     To accomplish this reversal, Defendants spent hundreds of millions of dollars: (a) developing and disseminating seemingly truthful scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids used long-term to treat chronic pain; (b) deploying sales representatives who visited doctors and other prescribers and delivered misleading messages about the use of opioids; (c) recruiting prescribing physicians

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

as paid speakers, as a means of both securing those physicians' future "brand loyalty" and extending their reach to the physicians' peers; (d) funding, assisting, encouraging, and directing certain doctors, known as "key opinion leaders" ("KOLs"), not only to deliver scripted talks, but also to misleading studies, presenting, preparing or funding, continuing medical education programs ("CMEs") that were deceptive and lacked balance, and serve on the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy; and (e) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups, like the American Pain Foundation which was primarily funded by Defendants (referred to hereinafter as "Front Groups") that developed educational materials and treatment guidelines that were then distributed by Defendants, which urged doctors to prescribe and patients to use opioids long-term to treat chronic pain.

14.     These efforts, executed, developed, supported, and directed by Defendants, were designed not to present a fair view of how and when opioids could be safely and effectively used, but rather to convince doctors and patients that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients.  Defendants, and the ostensibly neutral third parties whom they recruited and supported, both profited handsomely through their dissemination of these deceptions.  KOLs and Front Groups saw their stature in the medical community elevated dramatically due to Defendants' funding, and Defendants saw an equally dramatic rise in their revenues.

15.     Working individually and with and through these Front Groups and KOLs, Defendants pioneered a new and far broader market for their potent and highly addictive drugs— the chronic pain market.  Defendants persuaded doctors and patients that what they had long

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

understood—that opioids are addictive drugs, unsafe in most circumstances for long-term use—was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids. Ignoring the limitations and cautions in their own drugs' labels, Defendants:  (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured their serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms.  There was, and is, no reliable scientific evidence to support Defendants' marketing claims, and there was, and is, a wealth of scientific evidence that these claims are false.  Defendants also deceptively and unfairly marketed the drugs for indications and benefits that were outside of the drugs' labels and not supported by substantial evidence.

16.     Even Defendants' KOLs initially were very cautious about whether opioids were appropriate to treat chronic pain.  Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far.  Yet despite the voices of renowned pain specialists, researchers, and physicians who have sounded the alarm on the overprescribing of opioids to treat chronic pain, Defendants continue to disseminate their misleading and unfair marketing claims to this day.

17.     Defendants' efforts were wildly successful.  In 2012, health care providers wrote 259 million prescriptions for opioid painkillers—enough to medicate every adult in America around the clock for a month.  Twenty percent of all doctors' visits in 2010 resulted in the prescription of an opioid, nearly double the rate in 2000.  Opioids—once a niche drug—are now

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs. While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.  Together, opioids generated $8 billion in revenue for drug companies in 2012 and until recently, have been increasing at a record pace.

18.     It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse.

19.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the nation has been swept up in an opioid-induced "public health epidemic."  According to the CDC, prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012.  One Defendant's own 2010 internal data shows it knew that the use of prescription opioids gave rise to 40% of drug-related emergency department visits in 2010 and 40% of drug poisoning deaths in 2008, and that the trend of opioid poisonings was increasing from 1999-2008.  For every death, more than 30 individuals are treated in emergency rooms.  By 2017, it has been reported that there are over 60,000 opioid related deaths in the U.S.

20.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors.  When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

21.     Defendants' opioid related misconduct causes heroin abuse.  A 2015 study found 4 out of 5 heroin users reported that their addiction started with opioid pain relievers (National Safety Council-Prescription Nation:  Addressing America's Drug Epidemic, 2016).  Defendants

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

created a re-birth in the heroin industry by starting patients or any end user on the "gateway" drug of opioids.  This in turn forces once opioid users into illegal heroin users and abusers.

22.     As alleged in this Petition, because of the manufacturing, distributing, pharmacy and pharmacy benefit managers, defendants purposely or recklessly failing to monitor their supply chain as required by state and federal law and distributing drugs into plaintiffs cities and counties, "pain mills" came into existence, such as the one owned and operated by Defendant Gurpreet Padda, MD, as will be described herein.

23.     Efforts by doctors to reverse course for a chronic pain patient already on opioids long-term involve managing the physical suffering and psychological distress a patient endures while withdrawing from the drugs.  This process is often thwarted by a secondary criminal market well-stocked by a pipeline of drugs that is diverted to supply them.  Even though they never would have prescribed opioids in the first place, many doctors feel compelled to continue prescribing opioids to patients who have become dependent on them.

24.     According to the CDC, more than 12 million Americans age 12 or older have used prescription painkillers without a prescription in 2010, and adolescents are abusing opioids in alarming numbers.

25.     Opioid abuse has not displaced heroin, but rather triggered resurgence in its use, imposing additional burdens on the Plaintiffs and local agencies that address heroin use and addiction.  According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002-2004 to 45.2% in 2011-2013 and has continued to grow.

26.     Countless residents of Plaintiffs' counties and city suffer from chronic pain, which takes an enormous toll on their health, their lives, and their families.  These patients deserve both appropriate care and the ability to make decisions based on accurate, complete

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

information about treatment risks and benefits.  But Defendants' deceptive and unfair marketing campaign deprived Missouri patients and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype.  Defendants deprived patients, their doctors, and health care payors of the chance to exercise informed judgment and subjected them to enormous costs and suffering.

27.     Defendants' course of conduct,  individually and/or in concert with the Key Opinion Leaders ("KOLs") and Front Groups with which they allied, has violated and continues to violate local, state, and common law.

28.     To redress and punish these violations, the Plaintiffs seek a judgment requiring Defendants to pay (a) restitution, (b) out of pocket costs, (c) disgorgement, (d) damages to abate the nuisance, and (e) punitive damages, and (g) any other relief to which the City may be entitled.  Plaintiffs also request that the Court enjoin Defendants' unlawful promotion of opioids and order them to correct their misrepresentations.

### III.     PARTIES

**A.     Plaintiffs.**

29.     Plaintiff Jefferson County is a county organized under Missouri law, R.S.Mo. §46.099.  Jefferson County is designated as a first-class county under R.S. Mo. §48.020. According to the Missouri Department of Health and Senior Services (MDHSS) statistics between the years 2012-2016, 302 people died due to opioid overdoses in Jefferson County.  The county also had 1,806 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

30.     Plaintiff Cape Girardeau County is a county organized under Missouri law, R.S.Mo. §46.065.  Cape Girardeau County is designated as a first-class county under R.S.Mo.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

§48.020. Between 2012-16, 6 people died due to opioid overdoses.in Cape Girardeau County. The county also had 306 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

31.     Plaintiff Christian County is a county organized under Missouri law, R.S.Mo. §46.071.  Christian County is designated as a first-class county under R.S.Mo. §48.020. Between 2012-2016, 28 people died due to opioid overdoses in Christian County.  The county also had 310 emergency room visits by county residents between 2011 and 2015 due to opioid misuse. For purposes of this Petition, Plaintiff Christian County is not bringing any claim against Defendants Walgreens and CVS, including their subsidiaries.

32.     Plaintiff City of Joplin is a municipal corporation organized under Missouri law. The City of Joplin has all the powers of local self-government and home rule and all other powers available to a city under the constitution and laws of Missouri, which are exercised in the manner prescribed by the City of Joplin Home Rule Charter.

33.     Plaintiff Crawford County is a county organized under Missouri law, R.S.Mo. §46.077.  Crawford County is designated as a third-class county under R.S.Mo. §48.020. Between 2012-16, 18 people died of opioid overdoses in Crawford County.  The county also had 269 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

34.     Plaintiff Greene County is a county organized under Missouri law, R.S.Mo. §46.088.  Greene County is designated as a first-class county under R.S.Mo. §48.020. Between 2012-16, 171 people died of opioid overdoses in Greene County.  The county also had 1,955 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

35.     Plaintiff Iron County is a county organized under Missouri law, R.S.Mo. §46.096. Iron County is designated as a third-class county under R.S.Mo. §48.020.  Between 2012-16, 6

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

people died of opioid overdoses in Iron County.  The county also had 147 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

36.     Plaintiff Jasper County is a county organized under Missouri law, R.S.Mo. §46.098.  Jasper County is designated as a first-class county under R.S.Mo. §48.020.  Between 2012-16, 10 people died of opioid overdoses in Jaspar County.  The county also had 624 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

37.     Plaintiff Stone County is a county organized under Missouri law, R.S.Mo. §46.153.  Stone County is designated as a third-class county under R.S.Mo. §48.020.  Between 2012-16, 11 people died of opioid overdoses in Stone County.  The county also had 161 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

38.     Plaintiff Taney County is a county organized under Missouri law, R.S.Mo. §46.155.  Taney county is designated as a first-class county under R.S.Mo. §48.020.  Between 2012-16, 11 people died of opioid overdoses in Taney County.  The county also had 423 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

39.     Plaintiff Washington County is a county organized under Missouri law, R.S.Mo. §46.159. Washington County is designated as a third-class county under R.S.Mo. §48.020. Between 2012-16, 17 people died of opioid overdoes in Washington County.  The county also had 186 emergency room visits by county residents between 2011 and 2015 due to opioid misuse.

**B.     Defendants.**

I.     MANUFACTURING DEFENDANTS

40.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware.  Purdue Pharma Inc. is a Delaware corporation with its principal place of business in

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

41.     Purdue is primarily engaged in the manufacture, promotion, and distribution of opioids nationally and in cities and counties in Missouri, including the following:

(a) OxyContin (oxycodone hydrochloride extended release) is a Schedule II opioid agonist tablet first approved in 1995 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, OxyContin was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(b) MS Contin (morphine sulfate extended release) is a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, MS Contin was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(c) Dilaudid (hydromorphone hydrochloride) is a Schedule II opioid agonist first approved in 1984 (injection) and 1992 (oral solution and tablet) and indicated for the "management of pain in patients where an opioid analgesic is appropriate."

(d) Dilaudid-HP (hydromorphone hydrochloride) is a Schedule II opioid agonist injection first approved in 1984 and indicated for the "relief of moderate-to-severe pain in opioid-tolerant patients who require larger than usual doses of opioids to provide adequate pain relief."

(e) Butrans (buprenorphine) is a Schedule III opioid partial agonist transdermal patch first approved in 2010 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, Butrans was indicated for the "management of moderate to severe pain

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(f) Hysingla ER (hydrocodone bitrate) is a Schedule II opioid agonist tablet first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

(g) Targiniq ER (oxycodone hydrochloride and naloxone hydrochloride) is a Schedule II combination product of oxycodone, an opioid agonist, and naloxone, an opioid antagonist, first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

42.     OxyContin is Purdue's largest-selling opioid, in both Missouri and the nation. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

43.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million—at the time, one of the largest settlements with a drug company for marketing misconduct.  Pursuant to its settlement, Purdue operated under a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services, which required the company, *inter alia*, to ensure that its marketing was fair and accurate, and to monitor and report on its compliance with the Agreement.

44.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon, Inc. is registered to do business in Missouri, however, because of its failure to produce annual registration reports, the Missouri Secretary of State has administratively revoked Cephalon, Inc.'s Missouri registration

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

45.    TEVA PHARMACEUTICALS INDUSTRIES, LTD. (Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tivka, Israel.  In 2011, Teva Ltd. Acquired Cephalon, Inc.

46.    TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly-owned subsidiary of Teva Ltd, an Israeli corporation.  Teva USA is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011. Teva USA can be served at Corporate Creations Network Inc., 12747 Olive Blvd., Ste. 300, St. Louis, MO 63141.

47.    Teva USA and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States.  Teva USA conducts Teva Ltd.'s sales and marketing activities for Cephalon in the United States and has done so since Teva Ltd.'s October 2011 acquisition of Cephalon.  Teva USA holds out Actiq and Fentora as Teva products to the public.  Teva USA sells all former Cephalon branded products through its "specialty medicines" division.  The FDA approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Missouri, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.  (Teva USA and Cephalon, Inc. collectively are referred to herein as "Cephalon.")

48.    Cephalon has been in the business of manufacturing, selling, and distributing the following opioids, nationally and in Missouri:

> (a) Actiq (fentanyl citrate) is a Schedule II opioid agonist lozenge (lollipop) first approved in 1998 and indicated for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

> (b) Fentora (fentanyl citrate) is a Schedule II opioid agonist buccal tablet (similar to plugs of smokeless tobacco) first approved in 2006 and indicated for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

49.    In November 1998, the FDA granted restricted marketing approval for Actiq, limiting its lawful promotion to cancer patients experiencing pain.  The FDA specified that Actiq should not be marketed for off-label uses, stating that the drug must be prescribed solely to cancer patients.  In 2008, Cephalon pleaded guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million in fines, damages, and penalties.

50.    Teva USA is also in the business of selling generic opioids, nationally and in Missouri, including a generic form of OxyContin from 2005 through 2009.

51.    On September 29, 2008, Cephalon entered into a five-year Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services.  The agreement, *inter alia*, required Cephalon to send doctors a letter advising them of the settlement terms and giving them a means to report questionable conduct of its sales representatives; disclose payments to doctors on its web site; and regularly certify that the company has an effective compliance program.

52.    JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.  Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica Inc.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Defendant ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  Johnson & Johnson is the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and it corresponds with the FDA regarding Janssen's products.  Upon information and belief, Johnson & Johnson controls the sale and development of Janssen Pharmaceutical's drugs, and Janssen Pharmaceuticals, Inc.'s profits inure to Johnson & Johnson's benefit.  (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and Johnson & Johnson collectively are referred to herein as "Janssen.")

53.     Janssen manufactures, sells, and distributes a range of medical devices and pharmaceutical drugs in Missouri and the rest of the nation, including Duragesic (fentanyl), which is a Schedule II opioid agonist transdermal patch first approved in 1990 and indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

54.     Defendant Noramco is a Delaware Corporation headquartered in Wilmington, DE and was a wholly owned subsidiary of Johnson and Johnson until July 2016 when it was sold, and was responsible for processing and manufacturing the active ingredients in Johnson and Johnson and Janssen's opioid products and is a manufacturer of opioid products.

55.     Until January 2015, Janssen also developed, marketed, and sold Nucynta and Nucynta ER:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

(a) Nucynta ER (tapentadol extended release) is a Schedule II opioid agonist tablet first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, Nucynta ER was indicated for the "management of moderate to severe chronic pain in adults [and] neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."  The DPN indication was added in August 2012.

(b) Nucynta (tapentadol) is a Schedule II opioid agonist tablet and oral solution first approved in 2008 and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older."

56.     Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.  Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

57.     DEPOMED, INC. ("Depomed") is a California corporation with its principal place of business in Newark, California.  Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system (CNS) conditions.  Depomed develops, markets, and sells prescription drugs in Missouri and nationally.  Depomed acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to a January 15, 2015 Asset Purchase Agreement.  This agreement closed on April 2, 2015.

58.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  ENDO PHARMACEUTICALS, INC. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  (Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. collectively are referred to herein as "Endo.")

59.     Endo develops, markets, and sells prescription drugs, including the following opioids, in Missouri and nationally:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

(a) Opana ER (oxymorphone hydrochloride extended release) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Opana ER was indicated for the "relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time."

(b) Opana (oxymorphone hydrochloride) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "relief of moderate to severe acute pain where the use of an opioid is appropriate."

(c) Percodan (oxycodone hydrochloride and aspirin) is a Schedule II opioid agonist tablet first approved in 1950 and first marketed by Endo in 2004 and indicated for the "management of moderate to moderately severe pain."

(d) Percocet (oxycodone hydrochloride and acetaminophen) is a Schedule II opioid agonist tablet first approved in 1999 and first marketed by Endo in 2006 and indicated for the "relief of moderate to moderately severe pain."

60.    Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.  Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and it alone accounted for 10% of Endo's total revenue in 2012.  Endo also manufactures and sells generic opioids, nationally and in Missouri, both itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

61.    ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in March 2015. Prior to that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012; the combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis plc in October 2013.  WATSON LABORATORIES, INC. is a Nevada corporation with

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

its principal place of business in Corona, California, and is a wholly owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).  ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC.  ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States.  Upon information and belief, Allergan plc exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.  (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter collectively are referred to as "Actavis.")

62.     Actavis engages in the business of marketing and selling opioids in Missouri and across the country, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.  Kadian (morphine sulfate extended release) is a Schedule II opioid agonist capsule first approved in 1996 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, Kadian was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."  Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

63.     MALLINCKRODT, PLC is an Irish public limited company.  Mallinckrodt PLC's headquarters are in the United Kingdom. MALLINCKRODT LLC is a limited liability company organized and existing under the laws of the State of Delaware and licensed to do

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

business in Missouri. Mallinckrodt LLC's headquarters are in St. Louis, MO.  Consequently, Mallinckrodt LLC is a citizen of the state of Missouri for diversity of jurisdiction purposes. Mallinckrodt LLC may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. Mallinckrodt LLC is a wholly owned subsidiary of Mallinckrodt, plc. SPECGX LLC is a limited liability company existing under the laws of the State of Delaware and licensed to do business in Missouri. SpecGx LLC may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. SpecGx LLC is a wholly owned subsidiary of Mallinckrodt plc. Mallinckrodt LLC and SpecGx LLC are licensed drug distributors in Missouri and operate distribution centers in Missouri. Mallinckrodt, plc, Mallinckrodt LLC, and SpecGx LLC are referred to collectively as "Mallinckrodt."

64.    MYLAN PHARMACEUTICALS INC. ("Mylan") is a Dutch corporation headquartered in Canonsburg, Pennsylvania.  Mylan Pharmaceuticals Inc. is a wholly owned subsidiary of Mylan N.V., a Dutch corporation headquartered in Canonsburg, Pennsylvania. Mylan Pharmaceuticals Inc. and Mylan N.V are referred to collectively as "Mylan."  Mylan manufactures Fentanyl Trans Dermic System, which is an opioid skin patch, a generic product, which is the equivalent of the Johnson and Johnson product, Duragesic.

65.    INSYS PHARMA, INC. is a Delaware corporation headquartered in Arizona and operating in Missouri as INSYS THERAPEUTICS, INC.  INSYS Pharma, Inc. and INSYS Therapeutics, Inc. are collectively referred to as "INSYS."  INSYS may be served at CT Corporation System, 120 South Central, St. Louis, MO 63105.  INSYS manufacturers, sells and distributes the drug Subsys, a fentanyl patch, in Missouri.

II.    DISTRIBUTION DEFENDANTS

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

66.     CARDINAL HEALTH, INC. ("Cardinal") operates as a licensed pharmacy wholesaler and drug distributor in Missouri.  Cardinal is registered with the Missouri Secretary of State as an Ohio corporation.  Cardinal operates distribution centers in Missouri.  Cardinal may be served at CT Corporation System, 120 South Central, St. Louis, MO 63105.

67.     MCKESSON CORPORATION ("McKesson") operates as a licensed pharmacy wholesaler and drug distributor in Missouri. McKesson is registered with the Missouri Secretary of State as a Delaware corporation with its principal place of business in San Francisco, California. McKesson operates distribution centers in Missouri. McKesson may be served at Corporation Services Company, 221 Bolivar Street, Jefferson City, MO 65101.

68.     AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") operates as a licensed pharmacy wholesaler and drug distributor in Missouri. AmerisourceBergen is registered with the Missouri Secretary of State as a Delaware corporation with its principal place of business in Pennsylvania.  AmerisourceBergen operates distribution centers in Missouri.  AmerisourceBergen may be served at CT Corporation System, 120 South Central, St. Louis, MO 63105.

69.     The Distributor Defendants listed above are all engaged in the wholesale distribution of opioids.  The Distributor Defendants listed above are collectively referred to herein as the "Distributor Defendants."

70.     The Distributor Defendants purchased opioids from manufacturers, such as the Manufacturer Defendants herein, and sold them to pharmacies throughout Missouri.  The Distributor Defendants played an integral role in opioids being distributed throughout Missouri.

III.     PHARMACY DEFENDANTS

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

71.     EXPRESS SCRIPTS PHARMACY, INC. is a Delaware corporation with its principal place of business in Missouri, located at One Express Way, St. Louis, MO 63121. Express Scripts Pharmacy, Inc. operates as a licensed pharmacy in Missouri. Express Scripts Pharmacy, Inc. is a wholly owned subsidiary of Express Scripts Holding Company. Express Scripts Pharmacy, Inc. and Express Scripts Holding Company are referred to collectively as "Express Scripts." Express Scripts may be served at Corporation Services Company, 221 Bolivar Street, Jefferson City, MO 65101.

72.     WALGREEN COMPANY ("Walgreens") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreens operates as a licensed pharmacy in Missouri. Walgreens may be served at The Prentice-Hall Corporation System, Inc., 221 Bolivar Street, Jefferson City, MO 65101.

73.     MISSOURI CVS LLC is a Missouri limited liability corporation operating as a licensed pharmacy throughout Missouri, including at least four locations in the City of St. Louis. Missouri CVS LLC may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105 for diversity of citizenship purposes CVS LLC is a citizen of the state of Missouri. CVS PHARMACY, INC. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy, Inc. operates as licensed pharmacy in Missouri. CVS Pharmacy, Inc. is registered to do business in Missouri and may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. CVS Pharmacy, Inc. is a licensed drug distributor in Missouri and operates distribution centers in Missouri. Both Missouri CVS LLC and CVS Pharmacy, Inc. are wholly owned subsidiaries of CVS HEALTH CORPORATION, a Rhode Island corporation with its principal place of business in

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Woonsocket, Rhode Island. CVS Health Corporation, CVS Pharmacy, Inc., and Missouri CVS LLC are collectively referred to as "CVS."

74.     Defendants Walgreens CVS and Express Scripts acted as both distributor and pharmacy.  They played a dual role in creating this epidemic.  Their operations distributed the opioids through their vast networks to their pharmacies, or pharmacy mailing distribution centers and then dispensed the drugs to their customers either through delivery or over the pharmacy counter.  All three Defendants were in a unique position to see how widespread the problem was and the inordinate amount of opioids flooding plaintiff counties and point of first injury.  They also had duties under state and federal law to report any suspected diversions of opioids.

IV.     PHARMACY BENEFIT MANAGER DEFENDANTS

75.     Defendant, EXPRESS SCRIPTS HOLDING COMPANY ("ESHC"), is a Delaware corporation with its principal place of business in St. Louis, Missouri.  ESHC may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

76.     Defendant, EXPRESS SCRIPTS, INC. ("ESI"), is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri.  ESI is a pharmacy benefit management company, and a wholly-owned subsidiary of ESHC, for diversity of citizenship purposes ESI is a citizen of the state of Missouri.

77.     Defendant CVS HEALTH CORPORATION ("CVS"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island.  CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

78.     Defendant, CAREMARK RX, L.LC., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.  On information and belief, CVS Health is the direct parent company of CAREMARK RX, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories." CAREMARK RX, L.L.C. may be served through its registered agent: The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

79.     Defendant CAREMARKPCS HEALTH, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.  On information and belief, CVS Health is the direct or indirect parent company of CAREMARKPCS HEALTH, L.L.C. CAREMARKPCS HEALTH, L.L.C. is registered to do business in Virginia and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Ste. 285, Glen Allen, Virginia 23060.

80.     Defendant CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health.  On information and belief, CAREMARK RX, L.L.C. is the sole member of CAREMARK, L.L.C.  CAREMARK, L.L.C. is registered to do business in Virginia and may be served by its registered agent: CT Corporation.

81.     OPTUMRX, INC. is a California corporation with its headquarters in Irvine, California. OptumRx, Inc. is registered to do business in Missouri and may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. OptumRx, Inc. is a wholly owned subsidiary of UNITEDHEALTH GROUP, a Delaware corporation with its headquarters in Minnetonka, Minnesota.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

82.     CAREMARK, LLC is a limited liability corporation organized under the laws of California with its headquarters in Woonsocket, Rhode Island. Caremark, LLC is a wholly owned subsidiary of CVS Health Corporation. Caremark, LLC is registered to do business in Missouri and may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. The CVS Caremark Customer Care service center is located in Lee's Summit, MO.

83.     UNITED HEALTHCARE OF THE MIDWEST, INC. is a Missouri corporation with its headquarters in Maryland Heights, Missouri. United Healthcare of the Midwest, Inc. may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105 for diversity of citizenship purposes United Healthcare of the Midwest, Inc. is a citizen of the state of Missouri. United Healthcare of the Midwest, Inc. is a wholly owned subsidiary of UNITEDHEALTH GROUP, a Delaware corporation with its headquarters in Minnetonka, Minnesota.

84.     These prescription benefits managers (PBMs) Defendants are responsible for over 95% of the management of the United States population lives (23 million).  PBMs control drug formularies setting the criteria and terms in which pharmaceutical drugs are reimbursed.  They control prescription drug flow and use.

85.     PBMs require and receive incentives from the Manufacturer Defendants to keep certain drugs on and off formularies.  These incentives include the payment of rebates by Manufacturer Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets and the payment of lucrative administrative fees to maximize PBMs' profits. This activity is not transparent and rarely does the entity using the PBM know that such arrangements are in place.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

86.    PBMs are the intermediary between manufacturers, pharmacies and the public, all residents of Plaintiffs' counties and cities.  They control what drugs are available and what drugs are not available.

87.    PBMs Defendants in this action have undertaken a campaign to purposely hide their illegal conduct by manipulating and distorting public information, facts and by failing to make public information which they had exclusive control, which would have revealed their role in the opioid crisis.

88.    In addition, as will be described, the PBMs failed to monitor, track and not fill suspicious orders of opioids as required by law, thereby contributing further to the epidemic and damages of Plaintiffs' counties and cities.

IV.    PILL MILL DEFENDANT

89.    GURPREET S. PADDA, M.D. is a physician licensed to practice medicine in Missouri.  Dr. Padda's primary business address is 5203 Chippewa Street, Suite 301, St. Louis, MO 63109. According to his website, Dr. Padda is board certified in anesthesiology and pain medicine. Dr. Padda serves as the President, Secretary, and Director of Interventional Center for Pain Management, P.C. ("Interventional Center"), a Missouri professional corporation. Interventional Center operates under the fictitious name of Padda Institute, Center for Interventional Pain Management ("Padda Institute"), located at 5203 Chippewa Street, Suite 301, St. Louis, MO 63109, of which Dr. Padda is the Medical Director. Interventional Center also owns Comprehensive Pain Associates, LLC, a Missouri limited liability corporation.  These entities are all citizens of the state of Missouri for diversity of citizen of the state of  Missouri. Interventional Center and Comprehensive Pain Associates, LLC may be served at Harjot S. Padda, 3915 Brannon Ave, St. Louis, MO 63109.

90.     At all times herein Defendants were actual and/or apparent agents for each other.

91.     All of the Defendants either transferred, marketed, promoted, shipped or sold their product in the State of Missouri.  Additionally, Plaintiffs Jefferson County, Cape Girardeau County, Iron County, Washington County and Crawford County were first injured in the City of St. Louis, MO.  The manufacturing, distributing, pharmacy and PBMs Defendants have a duty, pursuant to Missouri Code of State Regulations 20 C.S.R. 2220 5. 030.5 to set up reporting procedures for proper detection of the "diversion" of drugs is occurring.  Defendants failed in this regard and manufactured, shipped distributed and sold an overabundance of opioids to Missouri, and specifically St. Louis.  There is a corresponding requirement under federal law. This flooding of the City of St. Louis with opioids created an illegal diverted market of opioids, opening up a street trade of prescribed opioids.  The result of this was Jefferson, Cape Girardeau, Crawford, Iron, and Washington county residents already addicted to their prescribed opioids due to Defendants' misrepresentation, are forced to buy opioids on the street market, or purchase from an individual who was "sourcing" from the City of St. Louis.

92.     As alleged in this Petition, because of the manufacturing and distributing defendants in purposely or recklessly failing to monitor their supply chain and distributed drugs into plaintiffs cities and counties, "pill mills" came into existence, such as the one owned and operated by Defendant Gurpreet Padda, MD, as will be described herein.

93.     Likewise for Defendant Gurpreet Padda, M.D. who operated a pill mill in the City of St. Louis, whereby Dr. Padda, under the guise of a pain management clinic, dispensed prescriptions for opioids at a high rate.  By 2015, approximately 48% of his patients were prescribed oxycodone and another 23% OxyContin.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

94.     The claims in this case present common questions of fact and law, concerning, among other things, (a) what information the manufacturers of this drug knew concerning the harmful effects of opioids, (b) what information they disclosed to physicians and patients about the false information regarding full functioning of a patients on opioids, (c) their concealment of the links between long term use of opioids and addition, (d) their misrepresentation that opioid addiction can be "managed" misrepresented addiction dangers by collectively labeling it as a "pseudo addiction," (e) falsely claimed withdrawal is easily managed misrepresented the dangers of higher doses of opioids, (f) deceptively minimized the adverse effects of opioids and overstated the high risks of non-steroid anti-inflammatory medications, (g) failed to disclose that Oxycontin was not a 12 hour pain relief pill, (h) that the manufacturing and distributing Defendants, working together by pooling funds and resources deceptively the minimized adverse effects of opioids and overstated risks of non-steroid anti-inflammatories (NSAIDs).  The previous stated misrepresentations, (i) the manufacturing, distributing, and PBMs, Defendants failed, in violation of Missouri Code of State Regulations 20 CSR 2220 5.030.5 and U.S.C. §823 (b)(1) by failing to set up a procedure for proper detection of where it is known that suspected diversion of the drugs is occurring, and (j) failed to report "diversion."

95.     Plaintiffs are properly joined pursuant to Missouri Rule for Permissive Joinder Rule, Rule 52.05 (a).  Plaintiffs' claims are logically related in that all Plaintiffs' claim that Defendants' opioid products were deceivingly marketed, distributed and sold in that all of the Defendants failed to provide adequate information and warnings regarding the grave dangers of opioids.  All of these Plaintiffs have suffered damages both past, present and future, including, but not limited to: (a) Law enforcement and public safety; (b) Medical care and other treatments, including overdoses and deaths, and for drug exposed babies; (c) Costs for treatments,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

counseling and rehabilitation services, including stress of drug courts; (d) Juvenile court costs, both in delinquency and care and protection, including foster care; (e) Educational costs; (f) Medical examiner for the cost of autopsies; and (g) Costs to abate the nuisance.

96.     Defendants' wrongful conduct was common to each Plaintiff and it resulted in Plaintiffs' damages is common to all Plaintiffs and includes Defendants' misrepresentations as to efficacy, addictive qualities and danger of the opioids.  Defendants' conduct in designing, developing, marketing, manufacturing, and distributing opioids, relates to all of the Plaintiffs and makes up a common universe of facts underlying Plaintiffs' claims, such that Plaintiffs' claims against Defendants arise from the same transaction or occurrence or the same transactions or occurrences.  Because Jefferson, Cape Girardeau, Iron, Crawford and Washington Counties were first injured in the City of St. Louis, and the claims of Christian, Jasper, Greene, Taney, Stone and the City of Joplin are properly joined in the City of St. Louis.

## IV.    JURISDICTION AND VENUE

97.     Jurisdiction is proper in Missouri Circuit Courts in that Defendant Mallinckrodt LLC maintains its U.S. headquarters in St. Louis County and has an opioid manufacturing plant located in the City of St. Louis. Mallinckrodt also maintains its registered agent in Clayton, Missouri. Defendant Express Scripts has its principal place of business and headquarters in St. Louis County, and therefore is a citizen of the state of Missouri for diversity of citizenship purposes.  United Healthcare of the Midwest is a Missouri corporation and, therefore, a Missouri citizen for diversity of citizenship purposes.  Missouri CVS is a Missouri corporation with locations in the City of St. Louis, and therefore, is a Missouri citizen.  Likewise for Defendant Gurpeet Padda, M.D. doing business in the City of St. Louis and is a licensed physician licensed

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

to practice medicine and his primary business address at 5203 Chippewa Street in St. Louis City. Defendant Interventional Center for Pain Management, P.C. is a Missouri corporation, and therefore, is a citizen of the state of Missouri for diversity purposes, and therefore, there is no federal subject matter jurisdiction because no federal question is raised.  All of Plaintiffs are "residents" of Missouri, therefore, this Court has personal jurisdiction over them.

98.     Venue is proper in the City of St. Louis pursuant to RSMO 508.010 (6) in that any action where a county is plaintiff the action may be bought in any county in which the defendant resides, or can be found.  As stated, Mallinckrodt can be found in the City of St. Louis at their complex on North 2nd street. Likewise, Defendant Gurpreet Padda, MD is doing business in and can be found in the city of St. Louis.  Furthermore, Defendant Interventional Center for Pain Management, P.C., which operates the fictitious name, Padda Institute, whose registered agent is Harjot Padda, is located at 3915 Brannon, St. Louis, MO 63119 and therefore, is a resident of St. Louis City pursuant to RSMO 351.375.2.  The address of Interventional Center for Pain Management, P.C. is located at 5203 Chippewa in the City of St. Louis.

99.     In addition, or in the alternative, venue is proper in the City of St. Louis pursuant to RSMO 508.010 (4) in that the injury first occurred in the city.  As stated, due to Defendant Mallinckrodt's negligent, intentional or reckless failure to properly monitor the distribution of opioids manufactured in Mallinckrodt's St. Louis plant, the City of St. Louis became an open market for the illegal sale and distribution of opioids diverted from their intended legitimate use for patients, and then sold on the black market to residents of Jefferson, Cape Girardeau, Crawford,  Washington and Iron counties.  These residents then returned to their respective counties and either used or distributed these diverted opioids.  The City of St. Louis became a "source" city because of Defendant Mallinckrodt failure to monitor and control their inventory.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Further, this injury was propounded by the negligent and or intentional actions of the Pharmacy and PBM Defendants, including Express Scripts, to adequately supervise their distribution of opioids into the City of St. Louis and the respective plaintiff counties.  Pharmacy and PBM Defendants failed to monitor, report, halt shipment these massive orders of opioids despite having indicia of suspicion of diversion, drug abuse and fraud and misuse of these Schedule II narcotics.

100.    Plaintiffs were also first injured in the City of St. Louis due to the actions of all Defendants, including Mallinckrodt, Express Scripts and Dr. Padda. Dr. Padda's operation of a "pill mill" would not have been possible without the failure of Defendant to properly monitor and report their highly suspicious number of pills being distributed to the public.  Defendants failure created an opportunity for Padda and the creation of the opioid "diverted" market.  Failure to monitor and report their suspicious orders, allowed Doctors like defendant Padda to prescribe and inordinate amount of opioids, leading to  the diversion of those pills from  the named patient to the illegal black market for opioids.

## V.    FACTUAL ALLEGATIONS

**A.    The Science behind Pain Medicine.**

### 1.    Safe and Effective Treatment of Chronic Pain Hinges on Informed Risk Management.

101.    The practice of medicine hinges on informed risk management.  Prescribers must weigh the potential risks and benefits of each treatment option, as well as the risk of non-treatment.  Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risks of prescribing opioids against both (a) the relative benefits that

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

may be expected during the course of opioid treatment and (b) the risks and benefits of alternatives.

102.     This bedrock principle of full disclosure is particularly important in the context of chronic opioid therapy because of the risk that patients will become physically and psychologically dependent on the drugs and find it difficult to manage or terminate their use.

103.     The FDA-approved drug labels on each of Defendants' opioids do not attempt to advise physicians how to maximize the benefit and minimize risk for patients on long-term chronic opioid therapy.  The labels contain no dosing cap above which it would be unsafe for any doctor to prescribe to any patient.  Nor do any of the labels provide a duration limit, after which the risks to a patient might increase.  Thus, doctors and patients rely more heavily on educational materials, such as treatment guidelines, CMEs, scientific and patient education articles and websites, to inform their treatment decisions.

104.     Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.  The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," the result of an excessive dose.

105.     Most patients with more than a few weeks of opioid therapy will experience withdrawal symptoms if opioids are discontinued (commonly referred to as "dependence").  Once dependent, a patient experiences deeply unpleasant symptoms when his or her current dose of opioids loses effect and is not promptly replaced with a new dose.  Among the symptoms reported in connection with opioid withdrawal are:  severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

may persist for months after a complete withdrawal from opioids, depending on how long opioids were used.

106.    Dr. Andrew Kolodny, Chief Medical Officer for Phoenix House, a national addiction treatment program, has explained the effect of opioids as akin to "hijack[ing] the brain's reward system," which in turn convinces a user that "the drug is needed to stay alive."  A patient's fear of the unpleasant effects of discontinuing opioids combined with the negative reinforcement during a period of actual withdrawal can drive a patient to seek further opioid treatment—even where ineffective or detrimental to quality of life—simply to avoid the deeply unpleasant effects of withdrawal.

107.    When under the continuous influence of opioids over a period of time, patients grow tolerant to their analgesic effects.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction he or she has become accustomed to—up to and including doses that are considered to be frighteningly high. At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction.  The FDA has acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects.

108.    Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses.  As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects.  Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

109.    Further, "a potential side effect from chronic use [of opioids] can be abuse and addiction . . . . [i]n fact, correct use and abuse of these agents are not polar opposites—they are complex, inter-related phenomena."  It is very difficult to tell whether a patient is physically dependent, psychologically dependent, or addicted.  Drug-seeking behaviors, which are signs of addiction, will exist and emerge when opioids are suddenly not available, the dose is no longer effective, or tapering of a dose is undertaken too quickly.

110.    Studies have shown that between 30% and 40% of long-term users of opioids experience problems with opioid use disorders.

111.    Each of these risks and adverse effects—dependence, tolerance, and addiction—is fully disclosed in the labels for each of Defendants' opioids (though, as described below, not in Defendants' marketing).  Prior to Defendants' deceptive marketing scheme, each of these risks was well-recognized by doctors and seen as a reason to use opioids to treat chronic pain sparingly and only after other treatments had failed.

112.    Opioids vary by duration.  Long-acting opioids are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours.  Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian are all examples of long-acting opioids.  In addition, opioids may be taken in short-acting formulations, which last for approximately 4-6 hours.  Short-acting opioids may be taken in addition to long-acting opioids to address "episodic pain."  Cephalon's Actiq and Fentora are particularly fast-acting drugs that are explicitly indicated only for use in conjunction with continuous opioid therapy.  Defendants promoted the idea that pain should be treated first by taking long-acting opioids continuously and then by taking short-acting, rapid-onset opioids on top of that.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

113.    While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited.  OxyContin's label now states, as do all labels of Schedule II long-acting opioids, that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death."  The FDA has required extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" on the basis that they present "a serious public health crisis of addiction, overdose, and death."

114.    In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the "grave risks" of opioids, the most well-known of which include addiction, overdose, and even death.  The FDA further warned that "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death."  The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels.  Thus, the FDA confirmed what had previously been accepted practice in the treatment of pain—that the adverse outcomes from opioid use include "addiction, unintentional overdose, and death" and that long-acting or extended release opioids "should be used ***only when alternative treatments are inadequate***."

115.    Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids.

## 2.    The Benefits Offered by Long-Term Opioid Use Are Unproven and Contradicted.

116.    Despite the fact that opioids now are routinely prescribed, there never has been evidence of their safety and efficacy for long-term use.  Defendants always have been aware of these gaps in knowledge.  While promoting opioids to treat chronic pain, Defendants have failed

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

to disclose the lack of evidence to support their use long-term and have failed to disclose the contradictory evidence that chronic opioid therapy actually makes patients sicker.

117.    There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function long-term.  The first random, placebo-controlled studies appeared in the 1990s, and revealed evidence only for short-term efficacy and only in a minority of patients.  A 2004 report reviewed 213 randomized, controlled trials of treatments for cancer pain and found that, while opioids had short-term efficacy, the data was insufficient to establish long-term effectiveness.  Subsequent reviews of the use of opioids for cancer and non-cancer pain consistently note the lack of data to assess long-term outcomes.  For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited, if any, efficacy for back pain and that evidence did not allow judgments regarding long-term use. Similarly, a 2011 systematic review of studies for non-cancer pain found that evidence of long-term efficacy is poor.  One year later, a similar review reported poor evidence of long-term efficacy for morphine, tramadol, and oxycodone, and fair evidence for transdermal fentanyl (approved only for use for cancer pain).

118.    Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

119.    As a pain specialist noted in an article titled *Are We Making Pain Patients Worse?*, "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning.  Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

120.    This is true both generally and for specific pain-related conditions.  Studies of the use of opioids long-term for chronic lower back pain have been unable to demonstrate an improvement in patients' function.  Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity.  This is due partly to addiction and other side effects.

121.    As many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches.  Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users.  A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

122.    The lack of evidence for the efficacy of opioid use long-term has been well-documented nationally in the context of workers' compensation claims, where some of the most detailed data exists.  Claims involving workers who take opioids are almost four times as likely to reach costs of over $100,000 than claims without opioids, as these patients suffer greater side effects and are slower to return to work.  Even adjusting for injury severity and self-reported pain score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would be on work disability one year later.  A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.

123.    In 2018, the first randomized clinical trial, which is the gold standard for evidence medicine, which made a head to head comparison between opioids and other pain non-narcotic

pain medication and found no significant difference in pain management function between the two groups over 12 months as reported March 6, 2018 in JAMD.

### 3.   Defendants' Impact on the Perception and Prescribing of Opioids.

124.   Before Defendants began their marketing campaign, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care.  In those instances, the risks of addiction are low or of little significance.

125.   In 1986, the World Health Organization ("WHO") published an "analgesic ladder" for the treatment of cancer pain.  The WHO recommended treatment with over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs ("NSAIDs") first, and then use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted.  The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain—because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

126.   Studies and articles from the 1970s and 1980s made clear the reasons to avoid opioids.  Scientists observed negative outcomes from long-term opioid therapy in pain management programs:  opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

127.   In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

time serving as a top spokesperson for drug companies, published an article reporting that [f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy.

128.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> The traditional approach to chronic nonmalignant pain does not accept the long-term administration of opioid drugs.    This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction.  According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter.  It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life.  *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects.  There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*

According to Portenoy, these problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."

129.    For the reasons outlined by Dr. Portenoy, and in the words of one researcher from the Harvard Medical School, "it did not enter [doctors'] minds that there could be a significant number of chronic pain patients who were successfully managed with opioids."  Defendants changed that perception.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**B.    Defendants Promoted Their Branded Products Through Direct Marketing to Prescribers and Consumers.**

130.    Defendants' direct marketing proceeded on two tracks, serving two related purposes.  First, Defendants worked through branded and unbranded marketing to build confidence in long-term opioid use by overstating its benefits and downplaying its risks, and thereby expand the chronic pain market.  In addition, Defendants worked through their own staffs of sales representatives, physician speakers whom those representatives recruited, and advertising in medical journals to claim their share of that broader market.  Defendants directed all of this activity through carefully designed marketing plans that were based on extensive research into prescriber habits and the efficacy of particular sales approaches and messages.

**1.    Defendants Relied Upon Branded Advertisements.**

131.    Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs.  Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*.  Defendants' advertising budgets peaked in 2011, when they collectively spent more than $14 million on medical journal advertising of opioids, nearly triple what they spent in 2001.  The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

132.    A number of these branded advertisements deceptively portrayed the benefits of opioid therapy for chronic pain.  As just one example, a 2005 Purdue advertisement for OxyContin that ran in the *Journal of Pain* touted the drug as an "around-the-clock analgesic . . . for an extended period of time."  The advertisement featured a man and boy fishing and proclaimed that "There Can Be Life With Relief."  This depiction falsely implied that OxyContin

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

provides both effective long-term pain relief and functional improvement, claims that, as described below, are unsubstantiated and contradicted in the medical literature.

> ### 2. Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers.

133.    Each Defendant acting in conspiracy with each other and/or acting in concert with each other and promoted the use of opioids for chronic pain through "detailers"— sales representatives who visited individual physicians and their staff in their offices—and small group speaker programs.  By establishing close relationships with doctors, Defendants' sales representatives were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns about prescribing opioids for chronic pain.  Representatives were trained  on techniques to build these relationships, with Actavis even rolling out an "Own the Nurse" kit  as a "door opener" to time with doctors.

134.    Defendants developed sophisticated plans to select prescribers for sales visits based on their specialties and prescribing habits.  In accordance with common industry practice, Defendants purchase and closely analyze prescription sales data from IMS Health that allows them to track, precisely, the rates of initial prescribing and renewal by individual doctor of every manufacturer of opioids, which in turn allows them to target, tailor, and monitor the impact of their appeals.

135.    Defendants' sales representatives have visited hundreds of thousands of doctors, including thousands of visits to Missouri prescribers, including in St. Louis City and Plaintiffs' counties and Defendant Padda, and as described herein, spread misinformation regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. These representatives

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

also appeared in the Plaintiff Counties and Joplin. This misinformation includes deceptive and unfair claims regarding the risks of opioids for chronic pain, particularly the risks of addiction, withdrawal, and high doses, as well as the benefits.

136.    Each Defendant carefully trained its sales representatives to deliver company-approved messages designed to generate prescriptions of that company's drugs in particular and opioids in general.  Pharmaceutical companies exactingly direct and monitor their sales representatives—through detailed action plans, trainings, tests, scripts, role-plays, supervisor tag-alongs, and other means—to ensure that individual detailers actually deliver the desired messages and do not veer off-script.  Pharmaceutical companies likewise require their detailers to deploy sales aids reviewed, approved, and supplied by the company and forbid them to use, in industry parlance, "homemade bread"—*i.e.*, promotional materials not approved by the company's marketing and compliance departments.  Sales representatives' adherence to their corporate training typically is included in their work agreements.  Departing from their company's approved messaging can and does lead to severe consequences, including termination of employment.

137.    Besides carefully training their sales representatives, Defendants also used surveys of physicians—conducted by third-party research firms—to assess how well their core messages came across to prescribers.  These "verbatim" recollections of detailers' messages are an integral tool in ensuring consistent message delivery.  They also help Defendants gauge physicians' perceptions of, and willingness to prescribe, a particular Defendant's drugs.

138.    In addition to making sales calls, Defendants' detailers also identified doctors to serve, for payment, on Defendants' speakers' bureaus and to attend programs with speakers and meals paid for by Defendants.  Defendants almost always select physicians who are "product

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

loyalists," since one question they will be asked is whether they prescribe the drug themselves. Endo, for instance, sought to use specialists in pain medicine —including high prescribers of its drugs—as local thought leaders to market Opana ER to primary care doctors.  Such invitations are lucrative to the physicians selected for these bureaus; honorarium rates range from $800 to $2,000 per program, depending on the type of event, and even speaker training typically is compensated at $500 per hour.

139.    These speaker programs and associated speaker training serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; a forum in which to further market to the speaker him or herself; and an opportunity to market to the speaker's peers.  Defendants grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage.  Defendants also track the prescribing of event attendees, with Endo noting that "physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than before."   It would make little sense for Defendants to devote significant resources to programs that did not increase their sales.

140.    Like the sales representatives who select them, speakers are expected to stay "on message"—indeed, they agree in writing to follow the slide decks provided to them.  Endo's speaker rules, for example, provide that "all slides must be presented in their entirety and without alterations . . . and in sequence." This is important because the FDA regards promotional talks as part of product labeling, and requires their submission for review.  Speakers thus give the appearance of providing independent, unbiased presentations on opioids, when in fact they are presenting a script prepared by Defendants' marketing departments.  Although these meal-based speaker events are more expensive to host and typically have lower attendance than CMEs, they

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

are subject to less professional scrutiny and thus afford Defendants greater freedom in the messages they present.

141.    Defendants devoted massive resources to these direct sales contacts with prescribers.  In 2014, Defendants collectively spent $168 million on detailing branded opioids to physicians nationwide.  This figure includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis.  The total figure is more than double Defendants' collective spending on detailing in 2000.  Detailers' role in Defendants' overall promotional efforts was also carefully calibrated; Endo, for example, found that devoting 61% of its marketing budget to sales representatives reflected an "[a]ppropriate combination of personal . . . and non-personal . . . selling initiatives."

142.    Defendants have spent hundreds of millions of dollars promoting their opioids through their respective sales forces because they understand that detailers' sales pitches are effective.  Numerous studies indicate that marketing can and does impact doctors' prescribing habits, and face-to-face detailing has the highest influence on intent to prescribe.  Defendants could see this phenomenon at work not only in the aggregate, as their sales climbed with their promotional spending, but also at the level of individual prescribers, whom they targeted for detailing and who responded by prescribing more of Defendants' drugs.

   **3.    Defendants Directed These Promotional Efforts Through Detailed Marketing Plans.**

143.    Defendants guided their efforts to expand opioid prescribing through comprehensive marketing and business plans for each drug.  These documents, based on the companies' extensive market research, laid out ambitious plans to bring in new prescribers and increase overall prescribing of Defendants' opioids.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

a.    Targeting categories of prescribers

144.    Defendants targeted, by zip codes and other local boundaries, individual health care providers for detailing.  Defendants chose their targets based on the potential for persuading a provider to prescribe, ease of in-person access, and the likelihood of higher numbers of prescriptions at higher doses, with no correlation to demonstrated need or demand for opioid therapy, or to risk of abuse.  Plaintiffs, based on information and belief, will show in discovery of Defendants own data, combined with the DEA's automation of reports and consolidated orders system (ARCOS), that each manufacturing and distributing Defendant knew the pill when and how many units were being shipped to each Plaintiffs city and county.

145.    Collectively, Defendants' marketing plans evince dual strategies, which often operated parallel to one another.  Defendants' sales representatives continued to focus their detailing efforts on pain specialists and anesthesiologists, who are the highest-volume prescribers of opioids but are also, as a group, more educated than other practitioners about opioids' risks and benefits.  Seeking to develop market share and expand sales, however, Defendants also targeted increasing numbers and types of prescribers for marketing.

146.    This expanded market of prescribers was, as a group, less informed about opioids and, market research concluded, more susceptible to Defendants' marketing messages.  These prescribers included nurse practitioners and physician assistants, who, a 2012 Endo business plan noted, were "share acquisition" opportunities because they were "3x times more responsive than MDs to details" and wrote "96% of [their] prescriptions . . . without physician consult."

147.    The expanded market also included internists and general practitioners who were low- to mid-volume prescribers. Actavis, for example, rolled out a plan in 2008 to move beyond "Kadian loyalists" to an "expanded audience" of "low morphine writers."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

b.    Increasing "direct to consumer" marketing

148.    Defendants knew that physicians were more likely to prescribe their branded medications when patients asked for those medications.  Endo's research, for example, found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials.  These took the form of pamphlets, videos, or other publications that patients could view in their physician's office, as well as employer and workers' compensation plan initiatives to, as Endo put it, "[d]rive demand for access through the employer audience by highlighting cost of disease and productivity loss."

149.    Defendants also knew that one of the largest obstacles to patients starting and remaining on their branded opioids—including by switching from a competitor's drug—was out-of-pocket cost.  They recognized they could overcome this obstacle by providing patients financial assistance with their insurance co-payments, and each of the Defendants did so through vouchers and coupons distributed during detailing visits with prescribers.  A 2008 Actavis business review, for example, highlighted co-pay assistance, good for up to $600 per patient per year, as a way to drive conversions to Kadian from competitor drugs like Avinza and MS Contin. In 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

c.    Differentiating each brand

150.    Purdue's OxyContin was the clear market leader in prescription opioid therapy, with 30% of the market for analgesic drugs in 2012.  Meanwhile, by 2010, Defendants faced increasing pushback from the medical community and regulators based on the growing problems of opioid addiction and abuse.  Both market conditions prompted Defendants to pursue product

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

differentiation strategies—and particularly an emphasis on their products being less subject to diversion, abuse, and addiction—as a means of grabbing market share from Purdue and other competitors.

> d.    Moving beyond office visits

151.    Defendants sought to reach additional prescribers by expanding beyond traditional sales calls and speaker events to new channels for their messages.  For their sales forces, these included marketing to prescribers through voice mail, postcards, and email—so-called "e-detailing."  Defendants also created new platforms for their speakers by implementing "peer to peer" programs such as teleconferences and webinars that were available to prescribers nationally.  These programs allowed Defendants to use this more seemingly credible vehicle to market to, among other hard-to-reach audiences, prescribers at hospitals, academic centers, and other locations that limit or prohibit in-person detailing.  Employing these new approaches, each Defendant relied heavily on speakers to promote its drugs.

> **4.    Defendants Marketed Opioids in Missouri Using the Same Strategies and Messages They Employed Nationwide.**

152.    Defendants employed the same marketing plans and strategies and deployed the same messages in Missouri as they did nationwide.  Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters.  This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory.  Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

153.    Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide desks, and supervisors rode along with them periodically to both check on their performance and compliance.

154. As they did nationwide, Defendants extensively tracked the prescribing behavior of Missouri-area health care providers and used that data to target their detailing and speaker-recruiting efforts. Top prescribers of opioids were profiled at the city, region, zip code, and sometimes facility levels, with information about their specialty, prescribing patterns (including product and dose), product loyalty and refill history. Providers' prescribing volume was ranked and sorted into deciles.

155. As described herein, misrepresentations and deceptions regarding the risks, benefits, and superiority of opioid use to treat chronic pain were part and parcel of Defendants' marketing campaigns in Missouri.

156. Defendants' representatives marketed their drugs as safe, with low risk of addiction or lower risk than competing opioids, and touted that their company's product was the drug of choice for chronic pain conditions such as low back pain and osteoarthritis. Defendants' representatives also repeatedly claimed or implied that their drugs had minimal or low abuse potential; were safer than other pain medications; and, in the case of Cephalon's Actiq and Fentora, were appropriate for off-label uses.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**C.    Defendants Used "Unbranded" Marketing to Evade Regulations and Consumer Protection Laws.**

157.    In addition to their direct marketing efforts, Defendants in conspiracy with each other and/or acting in concert with each other, used unbranded, third-party marketing, which they deployed as part of their national marketing strategies for their branded drugs. Each Defendant executed these strategies through a network of third-party KOLs and Front Groups, with which it acted in concert by funding, assisting, encouraging, and directing their efforts, while at the same time exercising substantial control over the content of the messages these third parties generated and disseminated, and distributing certain of those materials themselves.  As with their other marketing strategies, Defendants' unbranded marketing created and relied upon an appearance of independence and credibility that was undeserved but central to its effectiveness.  Unlike their direct promotional activities, Defendants' unbranded marketing allowed them to evade the oversight of federal regulators and gave them greater freedom to expand their deceptive messages.

**1.    Regulations Governing Branded Promotion Require that it Be Truthful, Balanced, and Supported by Substantial Evidence.**

158.    Drug companies that make, market, and distribute opioids are subject to generally applicable rules requiring truthful marketing of prescription drugs.  A drug company's branded marketing, which identifies and promotes a specific drug, must:  (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.  The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of drugs for their patients.

159.    Further, Defendants under the FDA Regulations are prohibited from marketing drugs that are misbranded.  A drug is misbranded if it lacks adequate directions for use or if the label is false or misleading in any particular.  Adequate directions for use are directions under which the layman can use a drug safely and for the purposes for which it is intended.  Labeling includes more than the drug's physical label; it also includes all . . . other written, printed, or graphic matter . . . accompanying the drug, including promotional material.  The term accompanying is interpreted broadly to include promotional materials—posters, websites, brochures, books, and the like—disseminated by or on behalf of the manufacturer of the drug.  A drug is misbranded if it is marketed for use other than for which the drug is approved.  Thus, Defendants' promotional materials are part of their drugs' labels and required to be accurate, balanced, and not misleading.

160.    Labeling is misleading if it is not based on substantial evidence, if it materially misrepresents the benefits of the drug, or if it omits material information about or minimizes the frequency or severity of a product's risks.  Promotion that fails to present the most important risks of the drug as prominently as its benefits lacks fair balance and are deceptive.

### 2.    Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf.

161.    Drug companies market both directly and indirectly, using third party validators (such as scientists, physicians, or patient or professional organizations) that appear to be independent and therefore more credible . . . .

> A firm is responsible for the content generated by its employees or any agents acting on behalf of the firm who promote the firm's

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

product.  For example, if an employee or agent of a firm, such as a
medical science liaison or paid speaker (e.g., a key opinion leader)
acting on the firm's behalf, comments on a third-party site about
the firm's product, the firm is responsible for the content its
employee or agent provides.  A firm is also responsible for the
content on a blogger's site if the blogger is acting on behalf of the
firm.

162.    In addition to being carried out directly or through third parties, drug companies'

promotional activity can be branded or unbranded; unbranded marketing refers not to a specific

drug, but more generally to a disease state or treatment.  By using unbranded communications,

drug companies can sidestep the regulatory framework, governing branded communications.

163.    Defendants disseminated many of their false, misleading, imbalanced, and

unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing

materials.  These KOLs and Front Groups were important elements of Defendants' marketing

plans, which specifically contemplated their use, because they seemed independent and therefore

outside of FDA oversight.  Through unbranded materials, Defendants presented information and

instructions concerning opioids generally that were contrary to, or at best, inconsistent with

information and instructions listed on Defendants' branded marketing materials and drug labels

and with Defendants' own knowledge of the risks, benefits and advantages of opioids.

Defendants did so knowing that unbranded materials.

164.    Defendants' sales representatives distributed third-party marketing material that

was deceptive to Defendants' target audiences.  Defendants are responsible for these materials.

165.    Defendants took an active role in guiding, reviewing, and approving many of the

misleading statements issued by these third parties, ensuring that Defendants were consistently

aware of their content.  By funding, directing, editing, and distributing these materials,

Defendants exercised control over their deceptive messages and acted pursuant to an agreement

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

with these third parties and other manufacturer and distributing Defendants to fraudulently promote the use of opioids for the treatment of chronic pain.

166.    The third-party publications Defendants assisted in creating and distributing did not include the warnings and instructions nor were they consistent with the risks and benefits known to Defendants.  For example, these publications either did not disclose the risks of addiction, abuse, misuse, and overdose, affirmatively denied that patients faced a serious risk of addiction and that there were no clinical trials supporting opioid use for long term and/or chronic pain.

167.    By acting through third parties, Defendants were able to give the false appearance that the messages reflected the views of independent third parties.  Later, Defendants would cite to these sources as "independent" corroboration of their own statements.  As one physician adviser to Defendants noted, third-party documents not only had greater credibility, but broader distribution, as doctors did not "push back" at having materials from, for example, the non-profit American Pain Foundation ("APF") on display in their offices, as they might with first party, drug company pieces.  Nevertheless, the independence of these materials was a ruse— Defendants were in close contact with these third parties, paid for and were aware of the misleading information they were disseminating about the use of opioids to treat chronic pain, and regularly helped them to tailor and distribute their misleading, pro-opioid messaging.

168.    As part of a strategic marketing scheme, Defendants spread and validated their deceptive messages through the following vehicles:  (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d)  CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

        a.      <u>Defendants' Use of KOLs</u>

169.    Defendants cultivated a small circle of doctors who, upon information and belief, were selected and sponsored by Defendants solely because they favored the aggressive treatment of chronic pain with opioids.  Defendants' support helped these doctors become respected industry experts.  In return, these doctors repaid Defendants by touting the benefits of opioids to treat chronic pain.

170.    Pro-opioid doctors have been at the hub of Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain.  KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy.  They have served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain (even while acknowledging the lack of evidence in support of that position) and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.  Defendants were able to exert control of each of these modalities through their KOLs.

171.    In return, the KOLs' association with Defendants provided not only money, but prestige, recognition, research funding, and avenues to publish.  This positioned them to exert even more influence in the medical community.

172.    Although some KOLs initially may have advocated for more permissive opioid prescribing with honest intentions, Defendants cultivated and promoted only those KOLs who could be relied on to help broaden the chronic opioid therapy market.  Defendants selected,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

funded, and elevated those doctors whose public positions were unequivocal and supportive of using opioids to treat chronic pain. These doctors' professional reputations were then dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the drug companies.

173. Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Defendants did not support, acknowledge, or disseminate the publications of doctors critical of the use of chronic opioid therapy. Indeed, one prominent KOL sponsored by Defendants, Russell Portenoy, stated that he was told by a drug company that research critical of opioids (and the doctors who published that research) would never obtain funding. In fact, Defendants never funded a randomized controlled clinical trial on the safety and efficacy of the use of opioids to treat chronic pain or long term use. Some KOLs have even gone on to become direct employees and executives of Defendants, like Dr. David Haddox, Purdue's Vice President of Risk Management, or Dr. Bradley Galer, Endo's former Chief Medical Officer.

174. Defendants provided substantial opportunities for KOLs to participate in research studies on topics Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature. As described by Dr. Portenoy, drug companies would approach him with a study that was well underway and ask if he would serve as the study's author. Dr. Portenoy regularly agreed.

175. Defendants also paid KOLs to serve as consultants or on their advisory boards and give talks or present CMEs, typically over meals or at conferences. From 2000 on, Cephalon, for instance, has paid doctors more than $4.5 million for programs relating to its opioids.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

176.    These KOLs were carefully vetted to ensure that they were likely to remain on-message and supportive of a pharmaceutical industry agenda.  One measure was a doctor's prior work for trusted Front Groups.

177.    Defendants kept close tabs on the content of the misleading materials published by these KOLs.  In many instances, they also scripted what these KOLs said—as they did with all their recruited speakers.  The KOLs knew or deliberately ignored the misleading way in which they portrayed the use of opioids to treat chronic pain to patients and prescribers, but they continued to publish those misstatements to benefit themselves and Defendants, all the while causing harm to Missouri prescribers and patients.

i.    *Russell Portenoy*

178.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Defendants identified and promoted to further their marketing campaign.  Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

179.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain.  He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009.  He was also a member of the board of APF, an advocacy organization almost entirely funded by Defendants.

180.    Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations.  He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain.  On this widely watched program, broadcast in

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Missouri and across the country, Dr. Portenoy claimed:  "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."

181.    To his credit, Dr. Portenoy has recently admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."  These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids.  According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks.  Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."  Portenoy candidly stated:  "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation?  Well, . . . I guess I did."

ii.    *Lynn Webster*

182.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah.  Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy.  He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER.  Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue.  At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

183.    Dr. Webster had been under investigation for overprescribing by the DEA, which raided his clinic in 2010.  More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.  Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines.  As evidence of Defendants' conspiracy and/or acting in concert of action, versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.  In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*.  Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths."  This webinar was available to and was intended to reach Missouri doctors.

184.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain.  In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids.  As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), when faced with signs of aberrant behavior, increasing the dose "in most cases  . . . should be the clinician's first response."  Endo distributed this book to doctors.  Years later, Dr. Webster reversed himself, as described below in Section V.D.4, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

b.   "Research" That Lacked Supporting Evidence

185.   Rather than find a way to actually test the safety and efficacy of opioids for long-term use, Defendants led everyone to believe that they already had.  Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was thus more likely to shape the perceptions of prescribers, patients and payers.  This literature was, in fact, marketing material focused on persuading doctors and consumers that the benefits of long-term opioid use outweighed the risks.

186.   To accomplish this, Defendants—sometimes through third-party consultants and/or advocacy organizations—commissioned, edited, and arranged for the placement of favorable articles in academic journals.  Defendants' internal documents reveal plans to submit research papers and "studies" to long lists of journals, including back-up options and last resort, "fast-track" application journals that they could use if the pending paper was rejected everywhere else.

187.   Defendants coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs.  The plans for these materials did not originate in the departments within the Defendant organizations that were responsible for research, development or any other area that would have specialized knowledge about the drugs and their effects on patients, but in Defendants' marketing departments and with Defendants' marketing and public relations consultants.  Defendants often relied on "data on file" or presented posters, neither of which are subject to peer review.  They also published their articles

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

not through a competitive process, but in paid journal supplements, which allowed Defendants to publish, in nationally circulated journals, studies supportive of their drugs.

188.    Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature, even where references distorted the significance or meaning of the underlying study.  Most notably, Purdue promoted a 1980 reference in the well-respected *New England Journal of Medicine*:  J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, 302(2) *New Eng. J. Med.* 123 (1980) ("Porter-Jick Letter").  It is cited 856 times as one of the most piece of literature supporting the safe use of opioids to treat long term pain in Google Scholar, and 86 times since 2010.  It appears as a reference in two CME programs in 2012 sponsored by Purdue and Endo.  Defendants and those acting on their behalf fail to reveal that this "article" is actually a letter-to-the-editor, not a peer-reviewed study (or any kind of study at all).  The Porter-Jick Letter, reproduced in full below, describes a review of the charts of hospitalized patients who had received opioids.  Because it was a 1980 study, standards of care almost certainly would have limited opioids to acute or end-of-life situations, not chronic pain. It was also a "study" of hospitalized patients which were predominately treated with opioids for acute post-surgical pain, which is the labelled purpose for opioids.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

## ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154          Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

189.     The Porter-Jick Letter notes that, when these patients' records were reviewed, it found almost no references to signs of addiction, though there is no indication that caregivers were instructed to assess or document signs of addiction. None of these serious limitations is disclosed when Defendants or those acting on their behalf cite the Porter-Jick Letter, typically as the sole scientific support for the proposition that opioids are rarely addictive, even when taken long-term. In fact, Dr. Jick later complained that his letter had been distorted and misused.

190.     Defendants worked not only to create or elevate favorable studies in the literature, but to discredit or bury negative information. Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy. In order to do so, Defendants—often with the help of third-party consultants—targeted a broad range of media to get their message out, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

191.     Defendants' strategies—first, to plant and promote supportive literature and then, to cite the pro-opioid evidence in their promotional materials, while failing to disclose evidence

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

that contradicts those claims—are flatly inconsistent with their legal obligations.  The strategies were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits and superiority of opioids for chronic pain relief and distorted prescribing patterns as a result.

        c.     <u>Treatment Guidelines</u>

192.    Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy.  They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are otherwise not experts, nor trained, in the treatment of chronic pain.  Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications.  Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

        i.     *FSMB*

193.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.  The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.  The FSMB finances opioid- and pain-specific programs through grants from Defendants.

194.    As further evidence of Defendants' conspiracy and/or acting in concert, in 1998, the FSMB developed *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* ("FSMB Guidelines"), which FSMB admitted was produced "in collaboration with pharmaceutical companies."  The FSMB Guidelines taught not that opioids could be appropriate

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

in limited cases or after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks relating to respiratory depression and overdose, and they discussed addiction only in the sense that "inadequate understandings" of addiction can lead to "inadequate pain control."

195. A 2004 iteration of the FSMB Guidelines and the 2007 book adapted from the 2004 guidelines, *Responsible Opioid Prescribing*, also make these same claims. These guidelines were posted online and were available to and intended to reach Missouri physicians.

196. The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Cephalon, Endo, and Purdue. The FSMB financed the distribution of *Responsible Opioid Prescribing* by its member boards by contracting with drug companies, including Endo and Cephalon, for bulk sales and distribution to sales representatives (for distribution to prescribing doctors).

197. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed to state medical boards (and through the boards, to practicing doctors), and the FSMB benefitted by earning approximately $250,000 in revenue and commissions from their sale. The FSMB website describes the book as the "leading continuing medication education (CME) activity for prescribers of opioid medications."

198. Drug companies relied on FSMB guidelines to convey the message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head—doctors, who used to believe

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

that they would be disciplined if their patients became addicted to opioids, were taught that they would be punished instead if they failed to prescribe opioids to their patients with pain.

199.   FSMB, more recently, has moderated its stance.  Although the 2012 revision of *Responsible Opioid Prescribing* continues to teach that pseudoaddiction is real and that opioid addiction risk can be managed through risk screening, it no longer recommends chronic opioid therapy as a first choice after the failure of over-the-counter medication and has heightened its addiction and risk warnings.

ii.        *AAPM/APS Guidelines*

200.   AAPM and the APS are purportedly professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013 (with AAPM receiving over $2 million). This concurrent funding of AAPM and APS to promote opioid use is further evidence of Defendants' conspiracy and/or acting in concert.  They issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.  The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue.  Dr. Portenoy was the sole consultant.  The consensus statement, which also formed the foundation of the FSMB Guidelines, remained on AAPM's website until 2011.  The statement was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

201.   AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.  Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

202.    The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.  One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members.  These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Missouri during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

203.    Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

### iii.    *American Geriatrics Society*

204.    The American Geriatrics Society ("AGS"), a nonprofit organization serving health care professionals who work with the elderly, disseminated guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain in Older Persons*, hereinafter "2009 AGS Guidelines").  The 2009 AGS Guidelines included the following recommendations: "All patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)," and "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  These recommendations, which continue to appear on AGS's website, are not supported

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

by any study or other reliable scientific evidence.  Nevertheless, they have been cited more than 278 times in Google Scholar since their 2009 publication.

205.    AGS contracted with Defendants Endo, Purdue, and Janssen to disseminate the 2009 Guidelines, and to sponsor CMEs based on them.  These Defendants were aware of the content of the 2009 Guidelines when they agreed to provide funding for these projects.  The 2009 Guidelines were released at the May 2009 AGS Annual Scientific Meeting and first published online on July 2, 2009.  AGS submitted grant requests to Defendants including Endo and Purdue beginning July 15, 2009.  Internal AGS discussions in August 2009 reveal that it did not want to receive up-front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate the publication.  However, by drafting the guidelines knowing that pharmaceutical company funding would be needed, and allowing these companies to determine whether to provide support only after they have approved the message, AGS ceded significant control to these companies. As further evidence of Defendants' conspiracy and/or acting in concert.  Endo, Janssen, and Purdue all agreed to provide support to distribute the guidelines.

206.    According to one news report, AGS has received $344,000 in funding from opioid makers since 2009.  Five of 10 of the experts on the guidelines panel disclosed financial ties to Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Defendants, receiving grants from Defendants, and investing in Defendants' stock.  The Institute of Medicine recommends that, to ensure an unbiased result, fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

iv.     *Guidelines That Did Not Receive Defendants' Support*

207.    The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines—the authors of which did not accept drug company funding—reached very different conclusions.  The 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain*, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it."  ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain."  ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring,  in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects."

208.    Similarly, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence," while conceding there may be patients for whom opioid therapy is appropriate.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

209.     The *Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review:

> revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy.  Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies.  Critical research gaps . . . include:  lack of effectiveness studies on long-term benefits and harms of opioids . . .; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification . . .; lack of evidence on the utility of informed consent and opioid management plans . . .; and treatment of patients with chronic non-cancer pain at higher risk for drug abuse or misuse.

d.     Continuing Medical Education

210.     CMEs are ongoing professional education programs provided to doctors.  Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure.  These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications.  Doctors rely on CMEs not only to satisfy licensing requirements, but to get information on new developments in medicine or to deepen their knowledge in specific areas of practice.  Because CMEs typically are delivered by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

211.     The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation.  As one target, Defendants aimed to reach general practitioners, whose broad area of focus and lack of specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

212.    In all, Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint.  These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.

213.    The American Medical Association ("AMA") has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the educational subject matter."

214.    Dozens of CMEs that were available to and attended or reviewed by Missouri doctors during the relevant time period did not live up to the AMA's standards.

215.    The influence of Defendants' funding on the content of these CMEs is clear.  One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on opioids versus another group who reviewed a non-industry-funded CME article.  The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times.  Students who read the industry-funded article more frequently noted the impression that opioids were underused in treating chronic pain.  The "take-aways" of those reading the non-industry-funded CME mentioned the risks of death and addiction much more frequently than the other group.  Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty health care providers have in screening and accounting for source bias.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

216.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, Defendants could expect messages to be favorable to them, as these organizations were otherwise dependent on Defendants for other projects.  The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids.  Producers of CMEs and Defendants measured the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

e.    Unbranded Patient Education

217.    Pharmaceutical industry marketing experts see patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."  Evidence also demonstrates that physicians are willing to acquiesce to patient demands for a particular drug— even for opioids and for conditions for which they are not generally recommended.  An Actavis marketing plan, for example, noted that "[d]irect-to-consumer marketing affects prescribing decisions."  Recognizing this fact, Defendants put their relationships with Front Groups to work to engage in largely unbranded patient education about opioid treatment for chronic pain.  There have been studies that show for every dollar a drug company spends on direct to consumer advertising, they make $4.00.

218.    The drug companies expect that they will recoup their investment in direct-to-consumer advertisements because they will capture at least some of any additional prescriptions that result from patients "asking their doctor" about drugs that can treat their pain.  Doctors also may review direct-to-consumer materials sales representatives give them to distribute to patients.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

f.   Defendants' Use of Front Groups

219.   As noted above, Defendants Mallinckrodt, Insys, Cephalon, Endo, Janssen, DepoMed, Mylan, Insys and Purdue entered into arrangements with numerous organizations to promote opioids.  These organizations depend upon Defendants for significant funding and, in some cases, for their survival.  They were involved not only in generating materials and programs for doctors and patients that supported chronic opioid therapy, but also in assisting Defendants' marketing in other ways—for example, responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing.  They developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on use of opioids to treat chronic pain.  Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages.  (See "Fueling an Epidemic" a U.S. Senate Homeland Security Committee parting member report, 2018).

220.   Several representative examples of such Front Groups are highlighted below, but there are others, too, such as APS, AGS, FSMB, American Chronic Pain Association ("ACPA"), AAPM, American Society of Pain Educators ("ASPE"), NPF, and PPSG.

i.   *American Pain Foundation*

221.   The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.  Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

222.   APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

addiction.  APF also launched a campaign to promote opioids for returning veterans, which has

contributed to high rates of addiction and other adverse outcomes—including death—among

returning soldiers.  APF also engaged in a significant multimedia campaign—through radio,

television and the internet—to educate patients about their "right" to pain treatment, namely

opioids.  All of the programs and materials were available nationally and were intended to reach

Missourians.

223.    In addition to Perry Fine, Russell Portenoy, and Scott Fishman, who served on

APF's Board and reviewed its publications, another board member, Lisa Weiss, was an

employee of a public relations firm that worked for both Purdue and APF.

224.    In 2009 and 2010, more than 80% of APF's operating budget came from

pharmaceutical industry sources.  Including industry grants for specific projects, APF received

about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its

budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total

income of about $3.5 million.  By 2011, APF was entirely dependent on incoming grants from

defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.  As one of its

board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest

problems at APF.

225.    APF held itself out as an independent patient advocacy organization.  It often

engaged in grassroots lobbying against various legislative initiatives that might limit opioid

prescribing, and thus the profitability of its sponsors.  It was often called upon to provide "patient

representatives" for Defendants' promotional activities, including for Purdue's *Partners Against

Pain* and Janssen's *Let's Talk Pain*.  As laid out below, APF functioned largely as an advocate

for the interests of Defendants, not patients.  Indeed, as early as 2001, Purdue told APF that the

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

226.   In practice, APF operated in close collaboration with opioid makers.  On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue.  APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

227.   APF assisted in other marketing projects for drug companies.  One project funded by another drug company—*APF Reporter's Guide:  Covering Pain and Its Management* (2009)—recycled text that was originally created as part of the company's training document.

228.   The same drug company made general grants, but even then it directed how APF used them.  In response to a an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year—this would be a very good issue on which to use some of that.  How does that work?"

229.   The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and Defendants.  APF's clear lack of independence—in its finances, management, and mission—and its willingness to allow Defendants to control its activities and messages support an inference that each Defendant that worked with it was able to exercise editorial control over its publications.

230.   Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  The investigation caused considerable damage to APF's credibility as an

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

objective and neutral third party and Defendants stopped funding it.  Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances."  APF "cease[d] to exist, effective immediately."

ii.  *The American Academy of Pain Medicine*

231.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed in Section V.C.2.c.ii, and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

232.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers.  AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations.  AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings.  Defendants Endo, Purdue, Cephalon and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event.

233.    AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.  AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster.  Dr.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Webster was even elected president of AAPM while under a DEA investigation.  Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."

234.    AAPM's staff understood they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

### 3.    Defendants Acted In Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing.

235.    Like cigarette makers that engaged in an industry-wide effort to misrepresent the safety and risks of smoking.  As further evidence of Defendants conspiracy and/or acting in concert, Defendants worked with each other and with the Front Groups and KOLs they funded and directed to carry out a common scheme to deceptively market the risks, benefits, and superiority of opioids to treat chronic pain.

236.    Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages.  These KOLs have worked reciprocally with Defendants to promote misleading messaging regarding the appropriate use of opioids to treat chronic pain.  Although participants knew this information was false and misleading, these misstatements were nevertheless disseminated to Missouri prescribers and patients.

237.    One vehicle for their collective collaboration was Pain Care Forum ("PCF").  PCF began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues."  APF President Will Rowe described the Forum as "a

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

238.   PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (*e.g.*, American Academy of Pain Management, APS, and American Society of Pain Educators); patient advocacy groups (*e.g.*, APF and ACPA); and other like-minded organizations (*e.g.*, FSMB and Wisconsin Pain & Policy Studies Group), almost all of which received substantial funding from Defendants. Plaintiffs have reason to believe and do believe the same type of organizations were created in Missouri.

239.   PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients.  This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would deflate Defendants' marketing efforts.  The recommendations—drafted by Will Rowe of APF—claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers."  Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, and not undermine, their deceptive marketing of opioids for chronic pain.

### 4.   Defendants Targeted Vulnerable and Lucrative Populations.

a.   The Elderly

240.   Elderly patients taking opioids have been found to suffer elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

interactions, such as respiratory depression, which, as Defendants acknowledge in their labels (but not in their marketing), occurs more frequently in elderly patients.  A 2010 paper in the Archives of Internal Medicine reported that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs.  Defendants' targeted marketing to the elderly and the absence of cautionary language in their promotional materials flies in the face of scientific evidence and their own labels, and creates a heightened risk of serious injury to elderly patients.

241.    Defendants also promoted the notion—also without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to opioids.  AGS's 2009 Guidelines, for example, which Mallinckrodt publicized, described the risk of addiction as "exceedingly low in older patients with no current or past history of substance abuse."  Yet, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

242.    Defendants' efforts have paid off.  Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.  In Missouri, use of chronic opioid therapy by elderly patients is significant.  Many seniors start on opioids to treat chronic back pain or arthritis.

b.      Veterans

243.    Veterans, too, are suffering greatly from the effects of Defendants' targeted marketing.  A 2008 survey showed prescription drug abuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years.  In 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001.  Further, one-third of veterans prescribed opioids as of 2012 remained on take-home

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

opioids for more than 90 days.  Although many of these veterans are returning from service with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment.  Among former service members receiving VA services nationally in a single year (2005), 1,013 had died of accidental drug overdoses—double the rate of the civilian population.

244.    Plaintiff counties and city have a substantial veteran population.

245.    Opioids are particularly dangerous to veterans.  According to a study published last year in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death.  Yet, according to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines.  Again, as with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and omitted from their promotional materials the known, serious risks opioids posed to them.

246.    *Exit Wounds*, a 2009 publication sponsored by Purdue, distributed by APF with grants from Janssen and Endo, and written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury.  It notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."  The book also asserts that "[d]enying a person opioid pain medication because he or she has a history of substance

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

abuse or addiction is contrary to the model guidelines for prescribing opioids, published by the U.S. Federation of State Medical Boards."  As laid out above, the FSMB itself received support from Defendants during the time it created and published its guidelines.

247.   *Exit Wounds* minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with benzodiazapines, which were taken by a significant number of veterans.  It is not the unbiased narrative of a returning war veteran.  It is pure marketing, sponsored by Mallinckrodt.  Yet, Janssen, for example, supported the marketing effort, and its insufficient disclosures, despite acknowledging on the label for its opioid Duragesic that its use with benzodiazepines "may cause respiratory depression, hypotension, and profound sedation or potentially result in coma."  A similar warning is found on the labels of other Defendants' opioids.

248.   The deceptive nature of *Exit Wounds* is obvious in comparing it to guidance on opioids published by the VA and DOD in 2010 and 2011.  The VA's *Taking Opioids Responsibly* describes opioids as "dangerous."  It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol.  The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects and death—none of which is disclosed in *Exit Wounds*.

**D.    Defendants Used False Marketing and Advertising Tactics with Chronic Pain Patients and Failed to Report Suspicious Orders**

**1.    Insys and Mylan Targeted Non-Cancer Treatment Physicians and Funded False Publications and Presentations**

249.   Insys targeted and bribed practitioners in a number of ways.  Insys bribed Subsys prescribers through strategic hires, employing sales representatives and other employees at practitioners' behest and with the expectation that such hires would provide inroads with key

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

practitioners.  Further, the indictment alleges that Insys bribed practitioners through a sham speakers' bureau that was purportedly intended to increase brand awareness using peer-to-peer educational lunches and dinners.

250.    The indictment alleges that in June 2012, former executives began using in-person meetings, telephone calls and texts to inform Insys sales representatives that the key to sales was using the speakers' bureau to pay practitioners to prescribe Subsys.  As one of the company's vice presidents for sales texted one of his sales representatives about potential physicians for the speakers' bureau:  "[t]hey do not need to be good speakers, they need to write a lot of [Subsys prescriptions]."  The former Insys executives actively recruited physicians known to have questionable prescribing habits for these speakers' bureaus.  Insys Indictment Press Release, *supra*.

251.    The indictment alleges that speakers' bureaus were often just social gatherings at high-priced restaurants involving neither education nor presentations.  Frequently, they involved repeat attendees, including physicians not licensed to prescribe Subsys.  Many of the speakers' bureaus had no attendees; sales representatives were instructed to falsely list names of attendees and their signatures on Insys' sign-in sheets.

252.    Insys made thousands of payments to physicians nationwide, including physicians who spoke in Missouri, for participating on these speakers' bureaus and for other services.

253.    Moreover, the executives are charged with targeting practitioners who prescribed Subsys not only for cancer pain, but for all pain.

254.    As set forth in the indictment, at one national speakers' bureau on or about 2014, Insys' then-vice president of sales stated:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

"These [doctors] will tell you all the time, well, I've only got like eight patients with cancer.  Or, I only have, like, twelve patients that are on a rapid-onset opioids [sic].  Doc, I'm not talking about any of those patients.  I don't want any of those patients.  That's, that's small potatoes.  That's nothing.  That's not what I'm here doing.  I'm here selling [unintelligible] for the breakthrough pain.  If I can successfully sell you the [unintelligible] for the breakthrough pain, do you have a thousand people in your practice, a thousand patients, twelve of them are currently on a rapid-onset opioids [sic].  That leaves me with at least five hundred patients that can go on this drug."

255.    The indictment also alleges that, when agents of insurers or pharmacy benefit managers asked if a patient was being treated for BTP in cancer patients, Insys' reimbursement unit employees were instructed to answer using a written script, sometimes called "the spiel": "The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients.  The physician is treating the patient for their pain (or breakthrough pain, whichever is applicable.)."

256.    Defendant Mylan manufactured their generic version of the Fentanyl patch under the brand name "Mylan-Fentanyl Matrix Patch."

257.    Mylan falsely marketed their patch product to doctors for an effective treatment for chronic neck and back pain and for other off-label pain conditions.

258.    Mylan utilized KOL's and was a participant in the financial support of various front groups, including, but not limited to the American Pain Society.

259.    Mylan timed their payments to this group to coincide with their launch of intermediate dosage strengths for its Fentanyl Transdermal System, which was their attempt to access the chronic pain market.  Their payments were part of an overall education process for prescribing doctors "about the availability of the intermediate strengths" (Homeland Security Report, ranking member, 2018, part two, page 6).

**2.    Insys and Mylan Failed to Report Suspicious Sales as Required.**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

260.    Missouri law and federal law imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

261.    Insys and Mylan are "registrants" under Missouri law which requires manufacturers of Schedule II controlled substances to register with the State of Missouri.

262.    Insys and Mylan failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders.  Insys' failure to timely report these and other suspicious sales violated Missouri laws.

### 3.    Mallinckrodt

263.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs in Missouri. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

264.    Among the drugs it distributes are the following:

| Exalgo (hydromorphone hydrochloride extended release) | Opioid agonist indicated for opioid-tolerant patients for management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options (*e.g.,* non-opioid analgesics) are inadequate.  The FDA approved the 8, 12, and 16 mg tablets of Exalgo in March 2010 and 32 mg tablet in August 2012. | Schedule IL |
| --- | --- | --- |
| Roxicodone (oxycodone hydrochloride) | Brand-name instant-release form of oxycodone hydrochloride.  Indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate.  Acquired from Xanodyne Pharmaceuticals in 2012. Strengths range up to 30 mg per pill.  Nicknames include Roxies, blues, and stars. | Schedule II |
| Xartemis    XR | The FDA approved Xartemis XR in March 2014 for the | Schedule II |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| (oxycodone hydrochloride and acetaminophen) | management of acute pain severe enough to require opioid treatment and in patients for whom alternative treatment options are ineffective, not tolerated or would otherwise be inadequate. It was the first extended-release oral combination of oxycodone and acetaminophen. | |
|---|---|---|
| Methadose (methadone hydrochloride) | Branded generic product. Opioid agonist indicted for treatment of opioid addiction. | Schedule II |
| Morphine sulfate extended release | Generic product | Schedule II |
| Fentanyl extended release | Generic product | Schedule II |
| Fentanyl citrate | Generic product | Schedule II |
| Oxycodone and acetaminophen | Generic product | Schedule II |
| Hydrocodone bitartrate and acetaminophen | Generic product | Schedule II |
| Hydromorphone hydrochloride | Generic product | Schedule II |
| Hydromorphone hydrochloride extended release | Generic product | Schedule II |
| Naltrexone hydrochloride | Generic product | Schedule II |
| Oxymorphone hydrochloride | Generic product | Schedule II |
| Methadone hydrochloride | Generic product | Schedule II |
| Oxycodone hydrochloride | Generic product | Schedule II |

265.    Mallinckrodt purchased Roxicodone from Xandodyne Pharmaceuticals in 2012.

266.    Mallinckrodt debuted Xartemis (MNK-795) at the September 4-7, 2013

PAINWeek in Las Vegas.

267.    Mallinckrodt's opioids were widely prescribed in Missouri and the Plaintiff's

counties and city. The vast majority of these drugs were manufactured in the City of St.Louis.

### 4.    Mallinckrodt Funded False Publications and Presentations

268.    Like the other Manufacturing Defendants, Mallinckrodt provided substantial

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

funding to purportedly neutral organizations which disseminated false messaging about opioids.

269.    For example, until at least February 2009, Mallinckrodt provided an educational grant to Pain-Topics.org, a now-defunct website that touted itself as "a noncommercial resource for healthcare professionals, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices."

Among other content, the website included a handout titled "Oxycodone Safety Handout for Patients," which advised practitioners that:   "Patients' fears of opioid addiction should be dispelled."   The handout included several false and misleading statements concerning the risk of addiction associated with prescription opioids:

> Will you become dependent on or addicted to oxycodone? After a while, oxycodone causes physical dependence.  That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings.  These may take several days to develop.  This is not the same as addiction, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm.  Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare.

270.    Additionally, the FAQ section of Pain-Topics.org contained the following false and misleading information downplaying the dangers of prescription opioid use:

> **Pseudoaddiction** – has been used to describe aberrant patient behaviors that may occur when pain is undertreated (AAPM 2001). Although this diagnosis is not supported by rigorous investigation, it has been widely observed that patients with unrelieved pain may become very focused on obtaining opioid mediations, and may be erroneously perceived as "drug seeking." Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated.   Along with this, two related phenomena have been described in the literature.  (Alford et al. 2006):

>> **Therapeutic dependence** – sometimes patients exhibit what is considered drug-seeking because they fear the reemergence of pain and/or withdrawal symptoms from lack of adequate medication; their ongoing quest for more analgesics is in the hopes of insuring a tolerable level of comfort.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

> **Pseudo-opioid-resistance** – other patients, with adequate pain control, may continue to report pain or exaggerate its presence, as if their opioid analgesics are not working, to prevent reductions in their currently effective doses of medication.
>
> Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief."

271.    Another document available on the website, "Commonsense Oxycodone Prescribing & Safety," falsely suggests that generic oxycodone is less prone to abuse and diversion that branded oxycodone:  "Anecdotally, it has been observed that generic versions of popularly abused opioids usually are less appealing; persons buying drugs for illicit purposes prefer brand names because they are more recognizable and the generics have a lower value 'on the street,' which also makes them less alluring for drug dealers."

272.    In November 2016, Mallinckrodt paid Dr. Scott Gottlieb ("Gottlieb"), the new commissioner of the FDA, $22,500 for a speech in London, shortly after the U.S. presidential election.  Gottlieb has also received money from the Healthcare Distribution Alliance, an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.

273.    Mallinckrodt also made thousands of payments to physicians nationwide, including to Missouri physicians.

### 5.    The DEA Investigates Suspicious Orders of Mallinckrodt

274.    In 2008, the DEA and federal prosecutors launched an investigation into Mallinckrodt, charging that the company ignored red flags and supplied – and failed to report – suspicious orders for its generic oxycodone between 2008 and 2012.  The investigation uncovered that from 2008 to 2012, Mallinckrodt sent, for example, 500 million tablets of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

oxycodone into a single state, Florida – "66 percent of all oxycodone sold in the state." According to the internal government documents obtained by the Washington Post, Mallinckrodt's failure to report could have resulted in "nearly 44,000 federal violations and exposed it to $2.3 billion in fines."

275.   In May 2014, Mallinckrodt posted a video titled "Red Flags:  Pharmacists Anti-Abuse Video."  The video is a thinly veiled attempt to divert responsibility for the opioid epidemic away from manufacturers and wholesalers, and toward individual pharmacists.  The video is further evidence of Defendants' conspiracy and/or action in concert sponsored by the Anti-Diversion Industry Working Group, which is composed of Cardinal Health, Actavis, McKesson, Mallinckrodt, AmerisourceBergen, and Qualitest – all of whom are conveniently missing from the list of those responsible.

276.   Despite learning from the DEA that generic opioids seized in a Tennessee drug operation were traceable to one of its Florida distributors, Sunrise Wholesale ("Sunrise") of Broward County, Mallinckrodt in the following six weeks sent 2.1 million tablets of oxycodone to Sunrise.  In turn, Sunrise sent at least 92,400 oxycodone tablets to a single doctors over an 11-month period, who, in one day, prescribed 1,000 to a single patient.  *Id.*

277.   According to documents obtained by the Washington Post, investigators also found "scores of alleged violations" at Mallinckrodt.  Those violations included the failure to keep accurate records, to document transfers of drugs and to secure narcotics.

278.   Plaintiffs upon information and belief, believes Mallinckrodt committed these same violations in Missouri leading to the flood of opioids and the increase of the use of opioids in the Plaintiff counties and city.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

279.     During the DEA's investigation, Mallinckrodt sponsored the Healthcare Distribution Alliance (known as the Healthcare Distribution Management Association until 2016), an industry-funded organization that represents pharmaceutical distributors.  The HAD initiated the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (enacted April 19, 2016), which requires the DEA to give notice of violations and an opportunity to comply, to pharmacies and distributors, before withdrawing licenses.  This Act substantially lessened the DEA's ability to regulate manufacturers and wholesalers.

280.     In April 2017, Mallinckrodt plc reached an agreement with the DEA and the U.S. Attorneys for the Eastern District of Michigan and Northern District of New York to pay $35 million to resolve a probe of its distribution of its opioid medications.  Mallinckrodt finalized the settlement on July 11, 2017, agreeing to pay $35 million while admitting no wrongdoing.

281.     Plaintiffs upon information and belief, understand that Mallinckrodt undertook the very same conduct and acts associated with their plea of guilt relating to Florida in Missouri and in the Plaintiffs' counties and the city of Joplin.  Their acts, or failure to act, have directly led to the overabundance of opioids in Plaintiffs' communities causing damage and continuing to cause damage.

### 6.     Mallinckrodt Failed to Report Suspicious Sales as Required

282.     The Missouri law and federal law imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially form a normal pattern, and orders of unusual frequency."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

283.     Mallinckrodt is a "registrant" under Missouri law and federal CSA.  21 C.F.R. §

1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §

823.  Section 823, in turn, requires manufacturers of Schedule II controlled substances to register

with the DEA.

284.     Mallinckrodt failed to design and operate a system to disclose suspicious orders of

controlled substances and/or failed to notify the appropriate DEA field division of suspicious

orders.

**D.    Each Defendant Engaged in Deceptive Marketing, Both Branded and Unbranded, that Targeted and Reached Missouri Prescribers.**

285.     Defendants—and the Front Groups and KOLs who depended on and worked

alongside them—were able to effect a sea change in medical opinion in favor of accepting

opioids as a medically necessary long-term treatment for chronic pain.  As set forth below, each

Defendant contributed to that result through a combination of both direct marketing efforts and

third-party marketing efforts over which that Defendant exercised editorial control.  These

deceptive and misleading statements were directed to and reached Missouri prescribers and

patients, with the intent of distorting their views on the risks, benefits, and superiority of opioids

for treatment of chronic pain.

286.     Defendants engaged in their deceptive marketing campaign, both nationwide and

in Missouri, using a number of strategies.  Defendants trained their sales forces and recruited

physician speakers to deliver these deceptive messages and omissions, and they in turn conveyed

them to prescribers.  Defendants also broadly disseminated promotional messages and materials,

both by delivering them personally to doctors during detailing visits and by mailing deceptive

advertisements directly to prescribers.  Because they are disseminated by Defendant drug

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

manufacturers and relate to Defendants' drugs, these materials are considered "labeling," which means Defendants are liable for their content.

    **1.**     **Actavis**

287.     As described below, Actavis promoted its branded opioid, Kadian, through a highly deceptive marketing campaign that it carried out principally through its sales force and recruited physician speakers.  As internal documents indicate, this campaign rested on a series of misrepresentations and omissions regarding the risks, benefits, and superiority of opioids, and indeed incorporated each of the types of deceptive messages.  Based on the highly coordinated and uniform nature of Actavis's marketing, and as confirmed by both verbatim message data and prescriber interviews, Actavis conveyed these deceptive messages to Missouri prescribers. Actavis did so with the intent that Missouri prescribers and/or consumers would rely on the messages in choosing to use opioids to treat chronic pain.

        a.     Actavis's Deceptive Direct Marketing

288.     To help devise its marketing strategy for Kadian, Actavis commissioned a report from one of its consultants in January 2005 about barriers to market entry.  The report concluded that two major challenges facing opioid manufacturers in 2005 were (i) overcoming "concerns regarding the safety and tolerability" of opioids, and (ii) the fact that "physicians have been trained to evaluate the supporting data before changing their respective practice behavior."  To do that, the report advocated a "[p]ublication strategy based on placing in the literature key data that influence members of the target audience" with an "emphasis . . . on ensuring that the message is believable and relevant to the needs of the target audience."  This would entail the creation of "effective copy points. . . backed by published references" and "developing and placing publications that demonstrate [the] efficacy [of opioids] and [their] safety/positive side

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

effect profile."  According to the report, this would allow physicians to "reach[] a mental

agreement" and change their "practice behavior" without having first evaluated supporting

data—of which Actavis (and other Defendants) had none.

289.    The consulting firm predicted that this manufactured body of literature "w[ould],

in turn, provide greater support for the promotional message and add credibility to the brand's

advocates" based on "either actual or *perceived* 'scientific exchange'" in relevant medical

literature. (emphasis added).  To this end, it planned for three manuscripts to be written during

the first quarter of 2005.  Of these, "[t]he neuropathic pain manuscript will provide evidence

demonstrating KADIAN is as effective in patients with presumptive neuropathic pain as it is in

those with other pain types"; "[t]he elderly subanalysis . . . will provide clinicians with evidence

that KADIAN is efficacious and well tolerated in appropriately selected elderly patients" and

will "be targeted to readers in the geriatrics specialty"; and "[t]he QDF/BID manuscript will . . . .

call attention to the fact that KADIAN is the only sustained-release opioid to be labeled for [once

or twice daily] use."  In short, Actavis knew exactly what each study would show—and how that

study would fit into its marketing plan—before it was published.  Articles matching Actavis's

descriptions later appeared in the *Journal of Pain* and the *Journal of the American Geriatrics

Society.*

290.    To ensure that messages based on this science reached individual physicians,

Actavis deployed sales representatives, or detailers, to visit prescribers in Missouri and across

the country.  At the peak of Actavis's promotional efforts in 2011, the company spent $6.7

million on detailing.

291.    To track its detailers' progress, Actavis's sales and marketing department actively

monitored the prescribing behavior of physicians.  It tracked the Kadian prescribing activity of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

individual physicians, and assessed the success of its marketing efforts by tabulating how many Kadian prescriptions a prescriber wrote after he or she had been detailed.

292.    Actavis also planned to promote Kadian by presenting at conferences of organizations where it believed it could reach a high concentration of pain specialists.  Its choice of conferences also was influenced by the host's past support of opioids.  For example, Actavis documents show that Actavis presented papers concerning Kadian at an annual meeting of AGS because AGS's guidelines "support the use of opioids."

293.    Actavis targeted prescribers using both its sales force and recruited physician speakers, as described below.

i.    *Actavis's Deceptive Sales Training*

294.    Actavis's sales representatives targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country.  These sales representatives were critical in delivering Actavis's marketing strategies and talking points to individual prescribers.

295.    Actavis's strategy and pattern of deceptive marketing is evident in its internal training materials.  A sales education module titled "Kadian Learning System" trained Actavis's sales representatives on the marketing messages—including deceptive claims about improved function, the risk of addiction, the false scientific concept of "pseudoaddiction," and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers in Missouri.

296.    The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function.  The sales training instructed Actavis sales representatives that "most chronic benign pain patients do have

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

markedly improved ability to function when maintained on chronic opioid therapy," when, in reality, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work.  The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids.  First, Actavis taught its sales representatives, who would pass this message on to doctors, that pain patients would not develop tolerance to opioids, which would require them to receive increasing doses:  "Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [Chronic pain]."  Second, Actavis instructed its sales personnel that opioid "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose."  Actavis failed to explain to its sales representatives and, through them, to doctors the greater risks associated with opioids at high doses.

297.    Further, the 2010 sales training module highlighted the risks of alternate pain medications without providing a comparable discussion of the risks of opioids, painting the erroneous and misleading impression that opioids are safer.  Specifically, the document claimed that "NSAIDs prolong the bleeding time by inhibiting blood platelets, which can contribute to bleeding complications" and "can have toxic effects on the kidney."  Accordingly, Actavis coached its sales representatives that "[t]he potential toxicity of NSAIDs limits their dose and, to some extent, the duration of therapy" since "[t]hey should only be taken short term."  By contrast, the corresponding section related to opioids neglects to include a *single* side effect or risk associated with the use of opioids, including from long-term use.

298.    This sales training module also severely downplayed the main risk associated with Kadian and other opioids—addiction.  It represented that "there is no evidence that simply

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

taking opioids for a period of time will cause substance abuse or addiction" and, instead, "[i]t appears likely that most substance-abusing patients in pain management practices had an abuse problem before entering the practice." This falsely suggests that few patients will become addicted, that only those with a prior history of abuse are at risk of opioid addiction, and that doctors can screen for those patients and safely prescribe to others. To the contrary, opioid addiction will affect a significant population of patients; while patients with a history of abuse may be more prone to addiction, all patients are at risk, and doctors may not be able to identify, or safely prescribe to, patients at greater risk.

299.    The sales training also noted that there were various "signs associated with substance abuse," including past history or family history of substance or alcohol abuse, frequent requests to change medication because of side effects or lack of efficacy, and a "social history of dysfunctional or high-risk behaviors including multiple arrests, multiple marriages, abusive relationships, etc." This is misleading, as noted above, because it implies that only patients with these kinds of behaviors and history become addicted to opioids.

300.    Further, the sales training neglected to disclose that no risk-screening tools related to opioids have ever been scientifically validated. The AHRQ recently issued an Evidence Report that could identify "[n]o study" that had evaluated the effectiveness of various risk mitigation strategies—including the types of patient screening implied in Actavis's sales training—on outcomes related to overdose, addiction, abuse or misuse.

301.    The sales training module also directed representatives to counsel doctors to be on the lookout for the signs of "[p]seudoaddiction," which were defined as "[b]ehaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain." The concept of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

"pseudoaddiction" is unsubstantiated and meant to mislead doctors and patients about the risks and signs of addiction.

302.    Finally, the 2010 national training materials trivialized the harms associated with opioid withdrawal by explaining that "[p]hysical dependence simply requires a tapered withdrawal should the opioid medication no longer be needed."  This, however, overlooks the fact, that the side effects associated with opiate withdrawal are severe and a serious concern for *any person* who wishes to discontinue long-term opioid therapy.

303.    The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers even before then.  A July 2010 "Dear Doctor" letter issued by Actavis indicated that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]."  Certain risks that were misrepresented included the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid agonists have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

304.    Actavis's documents also indicate that the company continued to deceptively market its drugs after 2010.  Specifically, a September 2012 Kadian Marketing Update, and the "HCP Detail" aid continued therein, noted that Kadian's "steady state plasma levels" ensured that Kadian "produced higher trough concentrations and a smaller degree of peak-to-trough fluctuations" than other opioids.

305.    Actavis also commissioned surveys of prescribers to ensure Kadian sales representatives were promoting the "steady-state" message.  That same survey—paid for and reviewed by Actavis—found repeated instances of prescribers being told by sales representatives

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

that Kadian had low potential of abuse or addiction.  This survey also found that prescribers were influenced by Actavis's messaging.  A number of Kadian prescribers stated that they prescribed Kadian because it was "without the addictive potential" and wouldn't "be posing high risk for addiction."  As a result, Actavis's marketing documents celebrated a "perception" among doctors that Kadian had "low abuse potential".

306.    Finally, the internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Mallinckrodt, Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits.  These guidelines deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories.

ii.    *Actavis's Deceptive Speakers Training*

307.    Actavis also increasingly relied on speakers—physicians whom Actavis recruited to market opioids to their peers—to convey similar marketing messages.  Actavis set a goal to train 100 new Kadian speakers in 2008 alone, with a plan to set up "power lunch teleconferences" connecting speakers to up to 500 participating sites nationwide.  Actavis sales representatives, who were required to make a certain number of sales visits each day and week, saw the definition of sales call expanded to accommodate these changes; such calls now included physicians' "breakfast & lunch meetings with Kadian advocate/speaker."

308.    A training program for Actavis speakers included training on many of the same messages found in the Kadian Learning System, as described below.  The deceptive messages in Actavis's speakers' training are concerning for two reasons:  (a) the doctors who participated in the training were themselves prescribing doctors, and the training was meant to increase their

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

prescriptions of Kadian; and (b) these doctors were trained, paid, and directed to deliver these messages to other doctors who would write prescriptions of Kadian.

309.    Consistent with the training for sales representatives, Actavis's speakers' training falsely minimized the risk of addiction posed by long-term opioid use.  Actavis claimed, without scientific foundation, that "[o]pioids can be used with minimal risk in chronic pain patients without a history of abuse or addiction."  The training also deceptively touted the effectiveness of "Risk Tools," such as the Opioid Risk Tool, in determining the "risk for developing aberrant behaviors" in patients being considered for chronic opioid therapy.  In recommending the use of these screening tools, the speakers' training neglected to disclose that none of them has been scientifically validated.

310.    The speakers' training also made reference to "pseudoaddiction" as a "[c]ondition characterized by behaviors, such as drug hoarding, that outwardly mimic addiction but are in fact driven by a desire for pain relief and usually signal undertreated pain."  It then purported to assist doctors in identifying those behaviors that *actually* indicated a risk of addiction from those that did not.  Behaviors it identified as "[m]ore suggestive of addiction" included "[p]rescription forgery," "[i]njecting oral formulations," and "[m]ultiple dose escalations or other nonadherence with therapy despite warnings."  Identified as "[l]ess suggestive of addiction" were "[a]ggressive complaining about the need for more drugs," "[r]equesting specific drugs," "[d]rug hoarding during periods of reduced symptoms," and "[u]napproved use of the drug to treat another symptom."  By portraying the risks in this manner, the speakers' training presentation deceptively gave doctors a false sense of security regarding the types of patients who can become addicted to opioids and the types of behaviors these patients exhibit.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

311.    The speakers' training downplayed the risks of opioids, while focusing on the risks of competing analgesics like NSAIDs.  For example, it asserted that "Acetaminophen toxicity is a major health concern."  The slide further warned that "Acetaminophen poisoning is the most common cause of acute liver failure in an evaluation of 662 US Subjects with acute liver failure between 1998-2003," and was titled "Opioids can be a safer option than other analgesics."  However, in presenting the risks associated with opioids, the speakers' training focused on nausea, constipation, and sleepiness, and ignored the serious risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness; increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazapines.  As a result, the training exaggerated the risks of NSAIDs, both absolutely and relative to opioids, to make opioids appear to be a more attractive first-line treatment for chronic pain.

312.    The speakers' training also misrepresented the risks associated with increased doses of opioids.  For example, speakers were instructed to "[s]tart low and titrate until patient reports adequate analgesia" and to "[s]et dose levels on [the] basis of patient need, not on predetermined maximal dose."  However, the speakers' training neglected to warn speakers (and speakers' bureau attendees) that patients on high doses of opioids are more likely to suffer adverse events.

313.    The misleading messages and training materials Actavis provided to its sales force and speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and alternatives.  This deception was national in scope and included Missouri.  For example, they were carried into Missouri by Actavis's sales representatives during detailing visits as well as

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals.  They have also been delivered to Missouri prescribers by Actavis's paid speakers, who were required by Actavis policy and by FDA regulations to stay true to Actavis's nationwide messaging.

314.    Once trained, Actavis's sales representatives and speakers were directed to, and did, visit potential prescribers in Missouri, as elsewhere, to deliver their deceptive messages. These contacts are demonstrated by Actavis's substantial effort in tracking the habits of individual Missouri physicians in prescribing Kadian, and by the direct evidence of Actavis detailing Missouri prescribers.

315.    The experiences of specific prescribers confirm both that Actavis's national marketing campaign included the misrepresentations, and that the company disseminated these same misrepresentations to Missouri prescribers and consumers.  In particular, these prescriber accounts reflect that Actavis detailers omitted or minimized the risk of opioid addiction; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

### 2.    Cephalon

316.    At the heart of Cephalon's deceptive promotional efforts was a concerted and sustained effort to expand the market for its branded opioids, Actiq and Fentora, far beyond their FDA-approved use in opioid-tolerant cancer patients.  Trading on their rapid-onset formulation, Cephalon touted its opioids as the answer to "breakthrough pain"—a term its own KOL allies planted in the medical literature—whether cancer pain or not.  Cephalon promoted this message through its sales force, paid physician speakers, advertisements, and CMEs, even after the FDA issued the company warnings and rejected an expanded drug indication.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

317.    Even as it promoted Actiq and Fentora off-label, Cephalon also purveyed many of the deceptive messages.  It did so both directly—through detailing visits and speaker programs—and through the publications and CMEs of its third-party partners.  These messages included misleading claims about functional improvement, addiction risk, pseudoaddiction, and the safety of alternatives to opioids.

318.    Based on the highly coordinated and uniform nature of Cephalon's marketing, and as confirmed by both verbatim message data and prescriber interviews, Cephalon conveyed these deceptive messages to Missouri prescribers.  The materials that Cephalon generated in collaboration with third-parties also were distributed or made available in Missouri.  Cephalon distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

        a.    Cephalon's Deceptive Direct Marketing

319.    Like the other Defendants, Cephalon directly engaged in misleading and deceptive marketing of its opioids through its sales force and branded advertisements.  These messages were centrally formulated and intended to reach prescribers nationwide, including those practicing in the Missouri area.  Cephalon also spent the money necessary to aggressively promote its opioid drugs, setting aside $20 million to market Fentora in 2009 alone.

                i.    *Cephalon's Fraudulent Off-Label Marketing*
                      *of Actiq and Fentora*

320.    Chief among Cephalon's direct marketing efforts was its campaign to deceptively promote its opioids for off-label uses.  Cephalon reaps significant revenue from selling its opioids for treatment of chronic non-cancer pain.  However, neither of its two opioid drugs—Actiq or Fentora—is approved for this purpose.  Instead, both have indications that are very

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

clearly and narrowly defined to limit their use to a particular form of cancer pain.  Despite this restriction and in order to claim its piece of the broader chronic non-cancer pain market, Cephalon deceptively and unlawfully marketed Actiq and then Fentora for patients and uses for which they were not safe, effective, or allowed, causing prescriptions to be written and paid and, grievously, patients to be injured and die.   Cephalon's efforts to expand the market for its drugs beyond cancer pain extended to Missouri prescribers, few of whom were oncologists and at least one of whom was surprised to have received Cephalon's sales pitches because he ran a "headache clinic."

(a)     Cephalon launched its fraudulent marketing scheme for Actiq

321.     Cephalon's Actiq is a powerful opioid narcotic that is delivered to the bloodstream by a lollipop lozenge that dissolves slowly in the mouth.  As described by one patient, Actiq "tastes like the most delicious candy you ever ate."

322.     Actiq is appropriately used only to treat "breakthrough" cancer pain that cannot be controlled by other medications.  Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.  Actiq is a rapid-onset drug that takes effect within 10-15 minutes but lasts only a short time.  It is also an extremely strong drug, considered to be at least 80 times more powerful than morphine.  Fentanyl, a key ingredient in Actiq, has been linked to fatal respiratory complications in patients.  Actiq is not safe in any dose for patients who are not opioid tolerant, that is, patients who have taken specific doses of opioids for a week or longer and whose systems have acclimated to the drugs.

323.     In 1998, the FDA approved Actiq "***ONLY*** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

opioid therapy for their underlying persistent cancer pain." (Emphasis in FDA document). Because of Actiq's dangers, wider, off-label uses—as the FDA label makes clear—are not permitted:

> This product **must not** be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason ACTIQ is contraindicated in the management of acute or postoperative pain.

324.    Actiq and Fentora are thus intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.  Unlike other drugs, as to which off-label uses are permitted but cannot be promoted by the drug maker, Actiq and Fentora are so potent that off-label use for opioid naïve patients is barred by the FDA, as their labels make clear.

325.    Notwithstanding the drug's extreme potency and related dangers and the FDA's explicit limitations, Cephalon actively promoted Actiq for chronic non-cancer pain—an unapproved, off-label use.  Cephalon marketed Actiq as appropriate for the treatment of various conditions including back pain, headaches, pain associated with sports-related injuries, and other conditions not associated with cancer for which it was not approved, appropriate, or safe.

326.    Actiq's initial sales counted in the tens of millions of dollars, corresponding to its limited patient population.  But by 2005, Actiq sales reached $412 million, making it Cephalon's second-highest selling drug.  As a result of Cephalon's deceptive, unlawful marketing, sales exceeded $500 million by 2006.

(b)    October 1, 2006—Cephalon fraudulently marketed Actiq's successor drug, Fentora

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

327.    Actiq was set to lose its patent protection in September 2006.  To replace the

revenue stream that would be lost once generic competitors came to market, Cephalon purchased

a new opioid drug, Fentora, from Cima Labs and, in August 2005, submitted a New Drug

Application ("NDA") to the FDA for approval.  Like Actiq, Fentora is an extremely powerful

and rapid-onset opioid.  It is administered by placing a tablet in the mouth until it disintegrates

and is absorbed by the mucous membrane that lines the inside of the mouth.

328.    On September 25, 2006, the FDA approved Fentora, like Actiq, only for the

treatment of breakthrough cancer pain in cancer patients who were already tolerant to around-

the-clock opioid therapy for their underlying persistent cancer pain.  Fentora's unusually strong

and detailed black box warning label—the most serious medication warning required by the

FDA—makes clear that, among other things:

> Fatal respiratory depression has occurred in patients treated with
> FENTORA, including following use in opioid non-tolerant patients
> and improper dosing.  The substitution of FENTORA for any other
> fentanyl product may result in fatal overdose.
>
> Due to the risk of respiratory depression, FENTORA is
> contraindicated in the management of acute or postoperative pain
> including headache/migraine and in opioid non-tolerant patients.

329.    When Cephalon launched Fentora on October 1, 2006, it picked up the playbook

it developed for Actiq and simply substituted in Fentora.  Cephalon immediately shifted 100

general pain sales representatives from selling Actiq to selling Fentora to the very same

physicians for uses that would necessarily and predictably be off-label.  Cephalon's marketing of

Actiq therefore "primed the market" for Fentora.  Cephalon had trained numerous KOLs to lead

promotional programs for Fentora, typically including off-label uses for the drug.  Cephalon

billed Fentora as a major advance that offered a significant upgrade in the treatment of

breakthrough pain generally—not breakthrough cancer pain in particular—from Actiq.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Cephalon also developed a plan in 2007 to target elderly chronic pain patients, via a multi-city tour with stops at AARP events, YMCAs, and senior living facilities.

330.   On February 12, 2007, only four months after the launch, Cephalon CEO Frank Baldino told investors:

> [W]e've been extremely pleased to retain a substantial portion, roughly 75% of the rapid onset opioid market.  We executed our transition strategy and the results in our pain franchise have been better than we expected.  With the successful launch of FENTORA and the progress in label expansion program, we are well positioned to grow our pain franchise for many years to come.

331.   On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's.  He described the company's successful and "aggressive" launch of Fentora that was persuading physicians to prescribe Fentora for ever broader uses.  He identified two "major opportunities"—treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain. . . .
>
> . . . .
>
> We believe that a huge opportunity still exists as physicians and patients recognize FENTORA as their first choice rapid onset opioid medication. . . . [opioids are] widely used in the treatment of . . . non-cancer patients . . . .
>
> . . . .
>
> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain.  In contrast only 12% are taking them to treat cancer pain, 12%.
>
> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA.   And for all these reasons, we are tremendously

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

excited about the significant impact FENTORA can have on patient health and wellbeing and the exciting growth potential that it has for Cephalon.

In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.

   (c)  September 2007—Reports of death and serious side effects led the FDA to issue a public health warning for Fentora

332. On September 10, 2007, Cephalon sent letters to doctors warning of deaths and other "serious adverse events" connected with the use of Fentora and indicating that "[t]hese deaths occurred as a result of improper patient selection (*e.g.*, use in opioid non-tolerant patients), improper dosing, and/or improper product substitution." The warning did not mention Cephalon's deliberate role in the "improper patient selection."

333. Two weeks later, the FDA issued its own Public Health Advisory. The FDA emphasized, once again, that Fentora should be prescribed only for approved conditions and that dose guidelines should be carefully followed. The FDA Advisory made clear that several Fentora-related deaths had occurred in patients who were prescribed the drug for off-label uses. The FDA Advisory warned that Fentora should not be used for any off-label conditions, including migraines, post-operative pain, or pain due to injury, and that it should be given only to patients who have developed opioid tolerance. The Advisory reiterated that because Fentora contains a much greater amount of fentanyl than other opiate painkillers, it is not a suitable substitute for other painkillers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

334.     Cephalon's off-label marketing continued notwithstanding the regulatory scrutiny. Cephalon's 2008 internal audit of its Sales & Marketing Compliance Programs concluded that marketing and tactical documents, as written, may be construed to promote off-label uses.  The same report acknowledged that Cephalon lacked a process to confirm that speakers' program participants were following Cephalon's written, formal policies prohibiting off-label promotion, and that "non-compliant [Cephalon Speaker Programs] may be taking place."  Moreover, the report acknowledged that Cephalon's "call universe" may include "inappropriate prescribers"— prescribers who had nothing to do with cancer pain.

(d)     May 6, 2008—The FDA rejected Cephalon's
request for expanded approval of Fentora

335.     Cephalon filed a supplemental new drug application, ("sNDA"), asking the FDA to approve Fentora for the treatment of non-cancer breakthrough pain.  Cephalon admitted that Fentora already had been heavily prescribed for non-cancer pain, but argued that such widespread use demonstrated why Fentora should be approved for these wider uses.  Cephalon's application also conceded that "[t]o date, no medication has been systematically evaluated in clinical studies or approved by the FDA for the management of [breakthrough pain] in patients with chronic persistent non-cancer-related pain."  *Id.*

336.     In response to Cephalon's application, the FDA presented data showing that 95% of all Fentora use was for treatment of non-cancer pain. By a vote of 17-3, the relevant Advisory Committee—a panel of outside experts—voted against recommending approval of Cephalon's sNDA for Fentora, citing the potential harm from broader use.  On September 15, 2008, the FDA denied Cephalon's application and requested, in light of Fentora's already off-label use, that Cephalon implement and demonstrate the effectiveness of proposed enhancements to Fentora's

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Risk Management Program.  In December 2008, the FDA followed that up with a formal request directing Cephalon to submit a Risk Evaluation and Mitigation Strategy for Fentora.

> (e)     March 26, 2009—the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") warned Cephalon about its misleading advertising of Fentora

337.    Undeterred by the rejection of its sNDA, Cephalon continued to use its general pain sales force to promote Fentora off-label to pain specialists as an upgrade over Actiq for the treatment of non-cancer breakthrough pain.  Deceptively and especially dangerously, Cephalon also continued to promote Fentora for use by all cancer patients suffering breakthrough cancer pain, and not simply those who were opioid tolerant.

338.    On March 26, 2009, DDMAC issued a Warning Letter to Cephalon, telling Cephalon that its promotional materials for Fentora amounted to deceptive, off-label promotion of the drug.  Specifically, the Warning Letter asserted that a sponsored link on Google and other search engines for Fentora, which said "[l]earn about treating breakthrough pain in patients with cancer," was improper because it "misleadingly broaden[ed] the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora therapy . . . when this is not the case."

339.    DDMAC emphasized that Fentora's label was limited to cancer patients with breakthrough pain **_who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain._** (Emphasis in original).  DDMAC explained that the advertisement was "especially concerning given that Fentora **must not** be used in opioid non-tolerant patients because life-threatening hypoventilation and death could occur at any dose in patients not on a chronic regimen of opioids." (Emphasis in original).  DDMAC also

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

warned Cephalon that, based on a review of Cephalon-sponsored links for Fentora on internet search engines, the company's advertisements were "misleading because they make representations and/or suggestions about the efficacy of Fentora, but fail to communicate **any** risk information associated with the use" of the drug. (Emphasis in original).

(f)    Cephalon continues to knowingly, deceptively, and illegally promote Fentora for off-label uses

340.    Cephalon's own market research studies confirm that its Fentora promotions were not focused on the physicians who treat breakthrough cancer pain.  Cephalon commissioned several market research studies to determine whether oncologists provided an "adequate" market potential for Fentora.  These studies' central goal was to determine whether oncologists treat breakthrough cancer pain themselves, or whether they refer such patients to general pain specialists.  The first study, completed in 2007, reported that 90% of oncologists diagnose and treat breakthrough cancer pain themselves, and do not refer their breakthrough cancer pain patients to pain specialists.  The second study, completed in 2009, confirmed the results of the 2007 study, this time reporting that 88% of oncologists diagnose and treat breakthrough cancer pain themselves and rarely, if ever, refer those patients to general pain specialists.  (One reason that general pain specialists typically do not treat oncological pain is that the presence of pain can, in itself, be an indicator of a change in the patient's underlying condition that should be monitored by the treating oncologist.)

341.    Cephalon was well aware that physicians were prescribing Fentora for off-label uses.

342.    In 2011, Cephalon wrote and copyrighted an article titled "2011 Special Report: An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

(FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)" that was published in *Pain Medicine News*.  The article promoted Cephalon's drugs for off-label uses by stating that the "judicious use of opioids can facilitate effective and safe management of chronic pain" and noted that Fentora "has been shown to be effective in treatment of [break through pain] associated with multiple causes of pain," not just cancer.

ii.     *Cephalon's Misrepresentation of the Risks Associated with the Use of Opioids for the Long-Term Treatment of Chronic Pain*

343.    Cephalon's conduct in marketing Actiq and Fentora for chronic non-cancer pain, despite their clear (and deadly) risks and unproved benefits, was an extension, and reaped the benefits, of Cephalon's generally deceptive promotion of opioids for chronic pain.

344.    As described above in Section V.D.1, there is no scientific evidence corroborating a link between chronic opioid therapy and increased functionality, and any suggestion of such a link is, in fact, false.

345.    As with the other Defendants, Cephalon deployed the made-up concept of pseudoaddiction to encourage prescribers to address addictive behavior in the worst way possible—with more opioids.

346.    Working with FSMB, Cephalon also trained its speakers to turn doctors' fear of discipline on its head—doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with pain.  Through this messaging, Cephalon aimed to normalize the prescribing of opioids for chronic pain and failed to acknowledge the serious risks of long-term opioid use and its inappropriateness as a front-line treatment for pain.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

347.    Finally, Cephalon also developed a guidebook called *Opioid Medications and REMS:  A Patient's Guide*, which deceptively minimized the risks of addiction from the long-term use of opioids.  Specifically, the guidebook claimed that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids," which, as described in Section V.D.2, is dangerously false.  Cephalon distributed the guidebook broadly, and it was available to and intended to reach prescribers in Missouri.

348.    The misleading messages and materials Cephalon provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and alternatives.  This deception was national in scope and included Missouri.  As described above in Section V.B, Cephalon's nationwide messages would have reached Missouri prescribers in a number of ways.  For example, they were delivered in Missouri by Cephalon's sales representatives in detailing visits and made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals.  They have also been delivered to Missouri prescribers by Cephalon's paid speakers, who were required by Cephalon policy to stay true to the company's nationwide messaging.

b.    Cephalon's Deceptive Third-Party Statements

349.    Like the other Defendants, Cephalon also relied on third parties to disseminate its messages through deceptive publications and presentations.  By funding, developing and reviewing the content of, and distributing and facilitating the distribution of these messages, Cephalon exercised editorial control over them.  Cephalon, in some instances, used its sales force to directly distribute certain publications by these Front Groups and KOLs, and making

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Cephalon responsible for their contents.  Cephalon also deployed its KOLs as speakers for talks and CMEs to selected groups of prescribers.

350.    Cephalon's relationships with several such Front Groups and KOLs—and the misleading and deceptive publications and presentations those relationships generated—are described below.

i.    *FSMB – Responsible Opioid Prescribing*

351.    In 2007, for example, Cephalon sponsored and distributed through its sales representatives FSMB's *Responsible Opioid Prescribing*, which was drafted by "Medical Writer X," whose work for Janssen.  Medical Writer X was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science.  Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

352.    *Responsible Opioid Prescribing* was a signature piece of Medical Writer X's work and contained a number of deceptive statements.  This publication claimed that because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function."  However, as described in Section V.D.1 above, the truth is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

353.    *Responsible Opioid Prescribing* also misrepresented the likelihood of addiction by mischaracterizing drug-seeking behavior as "pseudoaddiction."  It explained that "requesting drugs by name," engaging in "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding were all signs of "pseudoaddiction" and are likely the

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

effects of undertreated pain, rather than true addiction.  There is no scientific evidence to support the concept of pseudoaddiction, and any suggestion that addictive behavior masquerades as "pseudoaddiction" is false.

354.    Cephalon spent $150,000 to purchase copies of *Responsible Opioid Prescribing* in bulk.  It then used its sales force to distribute these copies to 10,000 prescribers and 5,000 pharmacists nationwide.  These were available to and intended to reach prescribers and pharmacists in Missouri.

ii.    *APF – Treatment Options:  A Guide for People Living with Pain*

355.    Cephalon also exercised considerable control over the Front Group APF, which published and disseminated many of the most egregious falsehoods regarding chronic opioid therapy.  Their relationship, and several of the APF publications, are described in detail below.

356.    Documents indicate that Cephalon provided APF with substantial assistance in publishing deceptive information regarding the risks associated with the use of opioids for chronic pain.  An April 3, 2008 Fentora Assessment Strategy Tactics Team Meeting presentation outlines Cephalon's strategy to prepare for a meeting at which the FDA Advisory Committee would consider expanding the indication of Fentora to include chronic, non-cancer pain.  Cephalon prepared by "reaching out to third-party organizations, KOLs, and patients to provide context and, where appropriate, encourage related activity."  First among the Front Groups listed was APF.

357.    Cephalon was among the drug companies that worked with APF to persuade the Institute of Medicine of the National Academies (IOM) on issues related to chronic opioid therapy.  APF President Will Rowe circulated a document to Cephalon and other drug company

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

personnel that contained key message points and suggested that they "[c]onsider using this document in your communications with the members of the IOM Committee."  According to Rowe, recipients should "consider this a working document which you can add to or subtract from."  Rowe also advised that, if recipients "have an ally on that Committee," they should "consider sharing this document with that person."

358.    Cephalon personnel responded enthusiastically, with Cephalon's Associate Director for Alliance Development stating her belief that "the document does a good job of bringing together many important ideas."  Cephalon reviewed and directed changes to this document, with the Cephalon Associate Director thanking Rowe "for incorporating the points we had raised."  The close collaboration between Cephalon and APF on this project demonstrates their agreement to work collaboratively to promote the use of opioids as an appropriate treatment for chronic pain.

359.    Cephalon's influence over APF's activities was so pervasive that APF's President, Will Rowe, even reached out to Defendants—including Cephalon—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

360.    Cephalon also sponsored APF's *Treatment Options:  A Guide for People Living with Pain*, starting in 2007.  It is rife with misrepresentations regarding the risks, benefits, and superiority of opioids.

361.    For example, *Treatment Options* deceptively asserts that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve."  There is no scientific evidence corroborating that statement, and such statements are, in fact, false because

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in life activities like work.

362.    *Treatment Options* also claims that addiction is rare and is evident from patients' conduct in self-escalating their doses, seeking opioids from multiple doctors, or stealing the drugs.  *Treatment Options* further minimizes the risk of addiction by claiming that it can be avoided through the use of screening tools, like "opioid agreements," which can "ensure [that patients] take the opioid as prescribed."  Nowhere does *Treatment Options* explain to patients and prescribers that neither "opioid agreements" nor any other screening tools have been scientifically validated to decrease the risks of addiction, and the publication's assurances to the contrary are false and deceptive.

363.    *Treatment Options* also promotes the use of opioids to treat chronic pain by painting a misleading picture of the risks of alternate treatments, most particularly NSAIDs. *Treatment Options* notes that NSAIDs can be dangerous at high doses, and attributes 10,000 to 20,000 deaths a year annually to NSAID overdose.  According to *Treatment Options*, NSAIDs are different from opioids because opioids have "no ceiling dose," which is beneficial since some patients "need" larger doses of painkillers than they are currently prescribed.  These claims misleadingly suggest that opioids are safe even at high doses and omit important information regarding the risks of high-dose opioids.

364.    Additionally, *Treatment Options* warns that the risks associated with NSAID use increase if NSAIDs are "taken for more than a period of months," but deceptively omits any similar warning about the risks associated with the long-term use of opioids.  This presentation paints a misleading picture of the risks and benefits of opioids compared with alternate treatments.

365.    APF distributed 17,200 copies of *Treatment Options* in 2007 alone.  It is currently available online and was intended to reach Missouri prescribers and pharmacists. It was attended by at least one Missouri physician, Prescriber G.

iii.    *Key Opinion Leaders and Misleading Science*

366.    Employing these tactics, Cephalon caused the term "breakthrough pain"—a term it seeded in the medical literature—to be used in articles published by practitioners and clinicians it supported.  With funding from Cephalon, for example, Dr. Portenoy wrote an article that purported to expand the definition of breakthrough cancer pain to non-cancer indications, vastly expanding the marketing potential of Cephalon's Fentora.  The article was published in the nationally circulated *Journal of Pain* in 2006 and helped drive a surge in Fentora prescriptions.

367.    The concept of "breakthrough pain" ultimately formed the sole basis for the central theme of promotional messages Cephalon cited to support the approval and marketing of Actiq and Fentora, rapid-acting opioids which begin to work very quickly but last only briefly.  Neither of these drugs had a natural place in the treatment of chronic pain before Cephalon's marketing campaign changed medical practice.  A recent literature survey of articles describing non-cancer breakthrough pain calls into question the validity of the concept, suggesting it was not a distinct pain condition but a hypothesis to justify greater dosing of opioids.  In other words, Cephalon conjured the science of breakthrough pain in order to sell its drugs.

368.    As one scholar has pointed out, references to breakthrough pain in articles published on the MEDLINE bibliographic database spiked in 1998 and again in 2006.  These spikes coincide with FDA's approval of Actiq and Fentora.

369.    Each of these doctors received some combination of research support, consulting fees, and honoraria from Cephalon, and Dr. Portenoy was a paid consultant for the company.  All

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

told, Cephalon has paid doctors more than $4.5 million for programs relating to its opioids since 2000.

iv. <em>Misleading Continuing Medical Education</em>

370.    Cephalon developed sophisticated plans for the deployment of its KOLs, broken down by sub-type and specialty, to reach targeted groups of prescribers through CMEs.

371.    Cephalon used the CME programs it sponsored to deceptively portray the risks related to the use of opioids to treat chronic non-cancer pain and promote the off-label use of Actiq and Fentora.

372.    In 2007 and 2008, Cephalon sponsored three CMEs that each positioned Actiq and Fentora, and only Actiq and Fentora, as "rapid onset opioids" that would provide effective analgesia within the time period during which "breakthrough pain" was at its peak intensity. Although the CMEs used only the generic names of the drugs, the description of the active ingredient and means of administration means that a physician attending the CME knew it referred only to Actiq or Fentora.

373.    The CMEs each taught attendees that there was no sound basis for the distinction between cancer and non-cancer "breakthrough pain," and one instructed patients that Actiq and Fentora were commonly used in non-cancer patients, thus effectively endorsing this use. *Optimizing Opioid Treatment for Breakthrough Pain*, offered online by Medscape, LLC from September 28, 2007, through December 15, 2008, was prepared by KOL Dr. Lynn R. Webster and M. Beth Dove.  It recommends prescribing a "short-acting opioid" (e.g., morphine, hydromorphone, oxycodone) "when pain can be anticipated," or a rapid-onset opioid when it cannot.  The only examples of rapid-onset opioids then on the market were oral transmucosal fentanyl citrate (*i.e.*, Actiq) or fentanyl effervescent buccal tablet (*i.e.*, Fentora):  "Both are

Page 121

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

indicated for treatment of [breakthrough pain] in opioid-tolerant cancer patients *and are frequently prescribed to treat [breakthrough pain] in noncancer patients as well*." (Emphasis added).

374.    *Optimizing Opioid Treatment for Breakthrough Pain* not only deceptively promoted Cephalon's drugs for off-label use, but also misleadingly portrayed the risks, benefits, and superiority of opioids for the treatment of chronic pain.  For example, the CME misrepresented that Actiq and Fentora would help patients regain functionality by advising that they improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.  The CME also minimized the risks associated with increased opioid doses by explaining that NSAIDs were less effective than opioids for the treatment of breakthrough pain because of their dose limitations, without disclosing the heightened risk of adverse events on high-dose opioids.

375.    Around the same time, Dr. Webster was receiving nearly $2 million in funding from Cephalon.

376.    Cephalon similarly used an educational grant to sponsor the CME *Breakthrough Pain:  Improving Recognition and Management*, which was offered online between March 31, 2008, and March 31, 2009, by Medscape, LLC.  The direct result of Cephalon's funding was a purportedly educational document that echoed Cephalon's marketing messages:  the CME deceptively omitted Actiq's and Fentora's tolerance limitations, cited examples of patients who experienced pain from accidents, not from cancer, and, like Cephalon's *Optimizing Opioid Treatment* CME, taught that Actiq and Fentora were the only products on the market that would take effect before the breakthrough pain episode subsided.  This CME was available online and was intended to reach Missouri prescribers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

377.     Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski and Michael J. Brennan, M.D.  Cephalon paid to have this CME published in a supplement of Pain Medicine News in 2009.  It instructed prescribers that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility," and recommended dispensing "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," *i.e.*, Actiq, and "fentanyl buccal tablet," *i.e.*, Fentora, including in patients with chronic non-cancer pain.  Dr. Miaskowski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on Cephalon's speakers bureau.  Dr. Fine also received funding from Cephalon for consulting services.

378.     *Opioid-Based Management of Persistent and Breakthrough Pain* was available to and was intended to reach Missouri prescribers.  It was attended by at least two Missouri physicians, Prescriber O and Prescriber P.

379.     Cephalon's control over the content of these CMEs is apparent based on its advance knowledge of their content.  A December 2005 Cephalon launch plan set forth key "supporting messages" to position Fentora for its product launch.  Among them was the proposition that "15-minute onset of action addresses the unpredictable urgency of BTP."  Years later, the same marketing messages reappeared in the Cephalon-sponsored CMEs described above.  Echoing the Cephalon launch plan, *Optimizing Opioid Treatment for Breakthrough Pain* stated that "[t]he unpredictability of BTP will strongly influence the choice of treatment" and that Fentora "delivers an onset of analgesia that is similar to [Actiq] at ≤ 15 minutes."  Similarly,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

*Opioid-Based Management of Persistent and Breakthrough Pain* defined "breakthrough pain" as "unpredictable," over a table describing both cancer and non-cancer "breakthrough pain."

380.     Cephalon tracked the effectiveness of its deceptive marketing through third parties, demonstrating that Cephalon not only planned for but depended upon their activities as a key element of its marketing strategy.  These programs were available to prescribers in Missouri and, based on the uniform and nationwide character of Cephalon's marketing, featured the same deceptive messages described above.

**3.     Endo**

381.     Endo promoted its opioids through the full array of marketing channels.  The company deployed its sales representatives, paid physician speakers, journal supplements, and advertising in support of its branded opioids, principally Opana and Opana ER.  Misleading claims about the purportedly lower abuse potential of Opana ER featured prominently in this campaign, but Endo also made many of the other deceptive statements and omissions described above in Section V.D.  These included deceptive messages about functional improvement, addiction risk, pseudoaddiction, addiction screening tools, and the safety of alternatives to opioids.

382.     At the same time, Endo also relied on a cast of third-party partners to promote the safety, efficacy, and superiority of opioids generally, through a combination of CMEs, websites, patient education pamphlets, and other publications.  These materials echoed the misrepresentations described above, and also made deceptive statements about withdrawal symptoms and the safety of opioids at higher doses.

383.     Based on the highly coordinated and uniform nature of Endo's marketing, and as confirmed by verbatim message data and interviews with a sales representative and prescribers,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Endo conveyed these deceptive messages to Missouri prescribers.  The materials that Endo generated in collaboration with third-parties also were distributed or made available in Missouri. Endo distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.    <u>Endo's Deceptive Direct Marketing</u>

384.    Like the other Defendants, Endo used deceptive direct marketing to increase the sales of its dangerous opioids.  As set forth below, Endo conveyed these deceptive messages in training of its sales force and recruited speakers, who in turn conveyed them to physicians; in a misleading journal supplement; and in unbranded advertising.

i.    *Endo's Sales Force and Deceptive Sales Training*

385.    Endo's promotion of Opana ER relied heavily on in-person marketing, including to Missouri prescribers.  Endo had an aggressive detailing program, with its sales representatives making nearly 72,000 visits to prescribers nationwide to detail Opana ER in the first quarter of 2010 alone.  Between 2007 and 2013, Endo spent between $3 million and $10 million each quarter to promote opioids through its sales force.

386.    Endo's sales representatives, like those of the other Defendants, targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country.  These sales representatives were critical in transmitting Endo's marketing strategies and talking points to individual prescribers.

387.    Endo specifically directed its sales force to target physicians who would prescribe its drugs to treat chronic pain.  For example, an Opana Brand Tactical Plan dated August, 2007 aimed to increase "Opana ER business from [the Primary Care Physician] community" more

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

than 45% by the end of that year.  Indeed, Endo sought to develop strategies that would be most persuasive to primary care doctors—strategies that sought to influence the prescribing behavior of primary care physicians through the use of subject matter experts.  A February 2011 Final Report on Opana ER Growth Trends, for example, predicted that Endo's planned "[u]se of Pain Specialists as local thought leaders should affect increased primary care adoption."

388.    Endo trained its sales force to make a number of misrepresentations to physicians nationwide, including to physicians in Missouri.  Endo's sales representatives were trained to represent to these prescribers that Opana ER would help patients regain function they had lost to chronic pain; that Endo opioids had a lower potential for abuse because they were "designed to be crush resistant," even though the "clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER;" and that drug seeking behavior was a sign of undertreated pain rather than addiction.

389.    Endo knew that its marketing reached physicians —repeatedly—because it tracked their exposure.  Internal Endo documents dated August 23, 2006 demonstrate that the following percentages of physicians would view an Endo journal insert (or paid supplement) at least 3 times in an 8 month period:  86% of neurologists; 86% of rheumatologists; 85% of oncologists; 85% of anesthesiologists; 70% of targeted primary care physicians; and 76% of OB/Gyns.

390.    Endo was not only able to reach physicians through its marketing, but also successfully imparted its marketing messages.  The company found its promotional materials tripled prescribers' ability to recall the sales message and doubled their willingness to prescribe Opana ER in the future.  This was true of marketing that contained its deceptions.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

391.    For example, according to internal Endo documents, up to 10% of physicians it detailed were able to recall without assistance the message that Opana ER had "Minimal/less abuse/misuse" potential than other drugs.  The Endo message that prescribers retained was a plain misrepresentation: that use of Opana ER was unlikely to lead to abuse and addiction. Although Opana ER always has been classified under Schedule II as a drug with a "high potential for abuse" and consistent with the pattern of misrepresentations, the largest single perceived advantage of Opana ER, according to a survey of 187 physicians who reported familiarity with the drug, was "perceived low abuse potential," cited by 15% of doctors as an advantage.  Low abuse potential was among the deceptive messages that Missouri prescribers received, and retained, from Endo sales representatives.

392.    Endo's own internal documents, however, acknowledged the misleading nature of these statements, conceding that "Opana ER has an abuse liability similar to other opioid analgesics as stated in the [FDA-mandated] box warning."  A September 2012 Opana ER Business Plan similarly stated that Endo needed a significant investment in clinical data – to support comparative effectiveness, scientific exchange, benefits and unmet need, while citing lack of "head-to-head data" as a barrier to greater share acquisition.

393.    Nevertheless, Endo knew that its marketing was extremely effective in turning physicians into prescribers.  Nationally, the physicians Endo targeted for in-person marketing represented approximately 84% of all prescriptions for Opana ER in the first quarter of 2010. Endo also observed that the prescribers its sales representatives visited wrote nearly three times as many prescriptions per month for Opana ER as those physicians who were not targeted for Endo's marketing—7.4 prescriptions per month versus 2.5.  The most heavily targeted prescribers wrote nearly 30 prescriptions per month.  Internal Endo documents from May 2008

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

indicate that Endo expected that each of its sales representatives would generate 19.6 prescriptions per week by the end of 2008.  As summarized by a February 2011 report on Opana ER growth trends, Endo's "[a]ggressive detailing [is] having an impact."

394.     More broadly, Endo's sales trainings and marketing plans demonstrate that its sales force was trained to provide prescribers with misleading information regarding the risks of opioids when used to treat chronic pain.  Foremost among these messages were misleading claims that the risks of addiction, diversion, and abuse associated with opioids—and Endo's products in particular—were low, and lower than other opioids.

(a)     Endo's Sales Force Deceptively Minimized
the Risks of Addiction Associated with
Chronic Opioid Therapy.

395.     By way of illustration, Endo's Opana ER INTAC Technology Extended-Release Sell Sheet Implementation Guide, which instructs Endo sales personnel how to effectively "support key messages" related to the marketing of Opana ER, states that it is an "approved message" for sales representatives to stress that Opana ER was "designed to be crush resistant," even though this internal document conceded that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER."

396.     Other Endo documents acknowledged the limitations on Opana ER's INTAC technology, conceding that while Opana ER may be resistant to pulverization, it can still be "ground" and "cut into small pieces" by those looking to abuse the drug.

397.     Endo's claims about the crush-resistant design of Opana ER also made their way to the company's press releases.  A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as "crush-resistant."  This article was posted on the *Pain Medicine News* website, which was accessible to Missouri patients and prescribers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

398.    Endo could only have promoted the crush resistance of Opana ER in order to persuade doctors that there was less risk of abuse, misuse, and diversion of the drug.  Endo claimed that it was less addictive than other drugs was the precise message that Missouri prescribers took from Endo's marketing.

399.    On May 10, 2013, however, the FDA warned Endo that there was no evidence that Opana ER's design "would provide a reduction in oral, intranasal, or intravenous abuse" and that the post-marketing data Endo had submitted to the FDA "are insufficient to support any conclusion about the overall or route-specific rates of abuse."  Even though it was rebuked by the FDA, Endo continued to market Opana ER as having been *designed* to be crush resistant, knowing that this would (falsely) imply that Opana actually *was* crush resistant and that this crush-resistant quality would make Opana ER less likely to be abused.

400.    Endo's sales training and the promotional materials distributed by its sales representatives also minimized the risk of addiction.  For example, Endo circulated an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which implied to persons providing care to chronic pain patients that addiction was not a substantial concern by stating that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."  This program was downloadable from Endo's website and accessible to Missouri area prescribers.

401.    Endo's sales training also misrepresented the risks of addiction associated with Endo's products by implying that Endo's prolonged absorption would make it less likely to lead to abuse.  For example, a presentation titled "Deliver the Difference for the Opana Brand in POA II" sets out that one of the "[k]ey [m]essages" for the Endo sales force was that Opana ER provides "[s]table, steady-state plasma levels for true 12-hour dosing that lasts."  Endo's sales

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

representatives used this messaging to imply to Missouri prescribers that Opana ER provided

"steady state" pain relief, making Opana less likely to incite euphoria in patients and less likely

to lead to addiction.

402.    Endo further instructed its sales force to promote the misleading concept of

"pseudoaddiction,"—*i.e.*, that drug-seeking behavior was not cause for alarm, but merely a

manifestation of undertreated pain.  In a sales training document titled "Understanding the

Primary Care MD and their use of Opioids," Endo noted that the "biggest concerns" among

primary care physicians were "prescription drug abuse (84.2%), addiction (74.9%), adverse

effects (68%), tolerance (60.7%), and medication interaction (32%)."  In response to these

concerns, Endo instructed its sales representatives to ask whether their customers are

"confus[ing] 'pseudo-addiction' with 'drug-seekers'" and how confident they are that their

health care providers "know these differences (Tolerance, Dependence, Addiction, Pseudo-

Addiction . . .)."

> (b)     Endo's Sales Force Deceptively Implied that
>          Chronic Opioid Therapy Would Improve
>          Patients' Ability to Function.

403.    In addition to their deceptive messages regarding addiction, Endo's promotional

materials and sales trainings also misleadingly claimed that patients using opioids for the long-

term treatment of chronic pain would experience improvements in their daily function.  In

reality, long-term opioid use has not been shown to and does not improve patients' function, and,

in fact, often is accompanied by serious side effects that degrade function.  Endo's own internal

documents acknowledged that claims about improved quality of life were unsubstantiated "off

label claims."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

404.    Nevertheless, Endo distributed product advertisements that suggested that using Opana ER to treat chronic pain would allow patients to perform demanding tasks like work as a chef.  One such advertisement states prominently on the front:  "Janice is a 46-year-old chef with chronic low back pain.  She needs a treatment option with true 12-hour dosing."  The advertisement does not mention the "moderate to severe pain" qualification in Opana ER's indication, except in the fine print.  These advertisements were mailed to prescribers and distributed by Endo's sales force in detailing visits, which would have included Endo representatives' visits to Missouri prescribers.

405.    In a 2007 Sales Tool that was intended to be shown by Endo sales personnel to physicians during their detailing visits, Endo highlighted a hypothetical patient named "Bill," a 40-year-old construction worker who was reported to suffer from chronic low back pain.  According to the Sales Tool, Opana ER will make it more likely that Bill can return to work and support his family.

406.    Similarly, training materials for sales representatives from March 2009 ask whether it is true or false that "[t]he side effects of opioids prevent a person from functioning and can cause more suffering than the pain itself."  The materials indicate that this is "[f]alse" because "[t]he overall effect of treatment with opioids is very favorable in most cases."

407.    A sales training video dated March 8, 2012 that Endo produced and used to train its sales force makes the same types of claims.  A patient named Jeffery explains in the video that he suffers from chronic pain and that "chronic pain [ . . .] reduces your functional level."  Jeffery claims that after taking Opana ER, he "can go out and do things" like attend his son's basketball game and "[t]here's no substitute for that."  This video was shown to Endo's sales

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

force, which adopted its misleading messaging in its nationwide sales approach, including the approach it used in Missouri.

408.    Claims of improved functionality were central to Endo's marketing efforts for years.  A 2012 Endo Business Plan lists ways to position Opana ER, and among them is the claim that Opana ER will help patients "[m]aintain[] normal functionality, sleep, [and] work/life/performance productivity" and have a positive "[e]ffect on social relationships." Indeed, that business plan describes the "Opana ER Vision" as "[t]o make the Opana franchise (Opana ER, Opana, Opana Injection) the choice that maximizes improvement in functionality and freedom from the burden of moderate-to-severe pain."

(c)    Endo's Sales Force Deceptively Presented the<br>Risks and Benefits of Opioids To Make Them<br>Appear Safer Than Other Analgesics

409.    Endo further misled patients and prescribers by downplaying the risks of opioids in comparison to other pain relievers.  For example, it distributed in Missouri and elsewhere a presentation titled *Case Challenges in Pain Management*:  *Opioid Therapy for Chronic Pain*. This study held out as a representative example one patient who had taken NSAIDs for more than eight years and, as a result, developed "a massive upper gastrointestinal bleed."  The presentation recommended treating this patient with opioids instead.  By focusing on the adverse side effects of NSAIDs, while omitting discussion of serious side effects associated with opioids, this presentation misleadingly portrayed the comparative risks and benefits of these drugs.

410.    Endo distributed *Case Challenges in Pain Management*:  *Opioid Therapy for Chronic Pain* to 116,000 prescribers in 2007, including primary care physicians.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

ii.      *Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy*

411.    In addition to its sales representatives' visits to doctors, Endo also used deceptive science and speaker programs to spread its deceptive messages.

412.    Endo leaned heavily on its speakers' bureau programs.  In 2008 alone, Endo spent nearly $4 million to promote up to 1,000 speakers programs around the country.  In 2012, at least 13 speakers programs devoted to Opana ER took place in Illinois, up from 8 in 2011.  Endo contracted with a medical communications firm to operate its speakers bureau program, planning to hold a total of 500 "fee-for-service . . . peer-to-peer promotional programs" for Opana ER in just the second half of 2011, including dinners, lunches and breakfasts.  These programs were attended by sales representatives, which reveal their true purpose as marketing, rather than educational, events.

413.    Endo's internal reporting stated that the "return on investment" turned positive 8-12 weeks after such programs.  Endo measured that return on investment in numbers of prescriptions written by physicians who attended the events.  One internal Endo document concluded: "[w]e looked at the data for [the] 2011 program and the results were absolutely clear: physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than they had before they participated.  You can't argue with results like that."

414.    These speakers bureau presentations included the very same misrepresentations Endo disseminated through its sales representatives.  A 2012 speaker slide deck for Opana ER— on which Endo's recruited speakers were trained and to which they were required to adhere to in their presentations—misrepresented that the drug had low abuse potential, in addition to

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

suggesting that as many as one-quarter of the adult population could be candidates for opioid therapy.

415.    In addition, a 2013 training module directed speakers to instruct prescribers that "OPANA ER with INTAC is the only oxymorphone designed to be crush resistant" and advised that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush resistant is to prescribe OPANA ER with INTAC."  This was a key point in distinguishing Opana ER from competitor drugs.  Although Endo mentioned that generic versions of oxymorphone were available, it instructed speakers to stress that "[t]he generics are not designed to be crush resistant."  This was particularly deceptive given that Opana ER was not actually crush-resistant.

416.    In 2009, Endo wrote a talk titled *The Role of Opana ER in the Management of Chronic Pain*.  The talk included a slide titled "Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain," which cited the AAPM/APS Guidelines—and, their accompanying misstatements regarding the likelihood of addiction (by claiming that addiction risks were manageable regardless of patients' past abuse histories) while omitting their disclaimer regarding the lack of supporting evidence in favor of that position.  This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.

417.    The misleading messages and materials Endo provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives.  This deception was national in scope and included Missouri.  Endo's nationwide messages would have reached Missouri prescribers in a number of ways.  For example, they were carried into Missouri by Endo's sales representatives during detailing visits as well as made available to Missouri patients and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

prescribers through websites and ads.  They also have been delivered to Missouri prescribers by Endo's paid speakers, who were required by Endo policy and by FDA regulations to stay true to Endo's nationwide messaging.

iii.       <em>Endo's Misleading Journal Supplement</em>

418.    In 2007, Endo enlisted Prescribers to write a supplement available for CME credit in the *Journal of Family Practice* that Endo paid to have published.  It was called *Pain Management Dilemmas in Primary Care:  Use of Opioids*, and it deceptively minimized the risk of addiction by emphasizing the effectiveness of screening tools.  Specifically, it recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain.  It also falsely claimed that, through the use of tools like toxicology screens, pill counts, and a "maximally structured approach," even patients at high risk of addiction could safely receive chronic opioid therapy.  Endo distributed 96,000 copies of this CME nationwide, and it was available to and was intended to reach Missouri prescribers.

iv.       <em>Endo's Deceptive Unbranded Advertising</em>

419.    Endo also used unbranded advertisements to advance its goals.  By electing to focus on unbranded marketing, Endo was able to make claims about the benefits of its opioids that the FDA would never allow in its branded materials.  The chart below compares an Endo unbranded statement with one of Endo's FDA-regulated, branded statements:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Living with Someone with Chronic Pain  (2009) (Unbranded) | Opana ER Advertisement (2011/2012/2013) (Branded) |
|---|---|
| Patient education material created by Endo | Endo advertisement |
| "Most health care providers who treat people with pain agree that **most people do not develop an addiction problem**." | "[C]ontains oxymorphone, an opioid agonist and Schedule II controlled substance with an abuse liability similar to other opioid agonists, legal or illicit."  "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

b.      Endo's Deceptive Third-Party Statements

420.    Endo's efforts were not limited to directly making misrepresentations through its marketing materials, its speakers, and its sales force.  Endo believed that support for patient advocacy and professional organizations would reinforce Endo's position as "the pain management company."

421.    Prior to, but in contemplation of, the 2006 launch of Opana ER, Endo developed a "Public Stakeholder Strategy."  Endo identified "tier one" advocates to assist in promoting the approval and acceptance of its new extended release opioid.  Endo also intended to enlist the support of organizations that engage or have the potential to advocate for public policy that would be "favorable" to Schedule II opioids from a sales perspective.  Endo sought to develop its relationships with these organizations through its funding.  In 2008, Endo spent $1 million per

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

year to attend conventions of these pro-opioid medical societies, including meetings of AAPM, APS, and the American Society of Pain Management Nursing ("ASPMN").

422.    APF's ability to influence professional societies and other third parties is demonstrated by its approach in responding to a citizens' petition filed with the FDA by the Physicians for Responsible Opioid Prescribing (the "PROP Petition").  The PROP petition, filed by a group of prescribers who had become concerned with the rampant prescribing of opioids to treat chronic pain, asked the FDA to require dose and duration limitations on opioid use and to change the wording of the approved indication of various long-acting opioids to focus on the severity of the pain they are intended to treat.

423.    The PROP Petition set off a flurry of activity at Endo.  It was a given that Endo would respond to the petition; the only question among Endo personnel was "[s]hould we [ . . . ] consider filing a direct response to this [citizens' petition] or do you think we are better served by working through our professional society affiliations?"  One Endo employee responded: "My sense is the societies are better placed to make a medical case than Endo."  Endo's Director of Medical Science agreed that "a reply from an external source would be most impactful."  These communications reflected Endo's absolute confidence that the professional societies would support its position.

i.    <em>APF</em>

424.    One of the societies with which Endo worked most closely was APF.  Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control ("NIPC").  Endo was one of the APF's biggest financial supporters, and Endo provided more than half of the $10 million APF received from opioid manufacturers during its lifespan.  Endo

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

spent $1.1 million on the NIPC program in 2008 alone, funding earmarked, in part, for the creation of CME materials that were intended to be used over and over again.

425.    Endo's influence over APF's activities was so pervasive that APF President Will Rowe even reached out to Defendants—including Endo—rather than his own staff to identify potential authors to answer an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.  Personnel from Defendants Purdue, Endo, Janssen, and Cephalon worked with Rowe to formulate APF's response.  The response suggested by Defendants was the one that APF ultimately published.

426.    Documents also indicate that Endo personnel were given advance notice of materials APF planned to publish on its website and provided an opportunity to comment on the content of those materials before they were published.  For example, in early July of 2009, APF's Director of Strategic Development wrote to Endo personnel to give them advance notice of content that APF planned to be "putting . . . up on the website but it's not up yet."  This Endo employee also reassured the sender that she "<u>will not forward it to anyone at all</u>" and promised that she would "'double delete it' from [her] inbox."  In response, APF's Director of Strategic Development replied internally with only four words:  "And where's the money?"

427.    Nowhere was Endo's relationship with APF closer than with its sponsorship of the NIPC.  Before being taken over by APF, the NIPC was sponsored by Professional Postgraduate Services, but that company was determined to be a "commercial interest" by the ACCME and could no longer serve as a sponsor.  In response, Endo reached out to APF.  An August 2009 document titled "A Proposal for the American Pain Foundation to Assume Sponsorship of the National Initiative on Pain Control," pointed out that "[f]or the past 9 years, the NIPC has been supported by unrestricted annual grants from Endo Pharmaceuticals, Inc."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

According to this document, APF's sponsorship of the NIPC "[o]ffers the APF a likely opportunity to generate new revenue, as Endo has earmarked substantial funding:  $1.2 million in net revenue for 2010 to continue the NIPC."  Further, sponsorship of the APF would "[p]rovide[] numerous synergies to disseminate patient education materials," including "[h]andouts to attendees at all live events to encourage physicians to drive their patients to a trusted source for pain education—the APF website."

428.    A September 14, 2009 presentation to APF's board contained a materially similar discussion of NIPC sponsorship, emphasizing the financial benefit to APF from assuming the role of administering NIPC.  The proposal "offer[ed] a solution to continue the development and implementation of the NIPC initiative as non-certified . . . yet independent education to physicians and healthcare professionals in the primary care setting, while providing the APF with a dependable, ongoing source of grant revenue."  A number of benefits related to NIPC sponsorship were listed, but chief among them was "a likely opportunity [for APF] to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC."

429.    Internal Endo scheduling documents indicate that "NIPC module curriculum development, web posting, and live regional interactive workshops" were Endo promotional tasks in 2010.  Endo emails indicate that Endo personnel reviewed the content created by NIPC and provided feedback.

430.    Behind the scenes, Endo exercised substantial control over NIPC's work.  Endo exerted its control over NIPC by funding NIPC and APF projects; developing, specifying, and reviewing content; and taking a substantial role in distribution of NIPC and APF materials, which in effect determined which messages were actually delivered to prescribers and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

consumers.  As described below, Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

431.    From 2007 until at least 2011, Endo also meticulously tracked the distribution of NIPC materials, demonstrating Endo's commercial interest in and access to NIPC's reach.  Endo knew exactly how many participants viewed NIPC webinars and workshops and visited its website, *Painknowledge.com*.  Endo not only knew how many people viewed NIPC's content, but what their backgrounds were (*e.g.*, primary care physicians or neurologists).  Endo's access to and detailed understanding of the composition of the audience at these events demonstrates how deeply Endo was involved in NIPC's activities.  Moreover, Endo tracked the activities of NIPC—ostensibly a third party—just as it tracked its own commercial activity.

432.    Endo worked diligently to ensure that the NIPC materials it helped to develop would have the broadest possible distribution.  Endo's 2008 to 2012 Opana Brand Tactical Plan indicates that it sought to reach 1,000 prescribers in 2008 through live NIPC events, and also to "[l]everage live programs via enduring materials and web posting."  Endo also planned to disseminate NIPC's work by distributing two accredited newsletters to 60,000 doctors nationwide for continuing education credit and sponsoring a series of 18 NIPC regional case-based interactive workshops.  Endo had earmarked more than one million dollars for NIPC activities in 2008 alone.

433.    In short, NIPC was a key piece of Endo's marketing strategy.  Indeed, internal APF emails question whether it was worthwhile for APF to continue operating NIPC given that the NIPC's work was producing far more financial benefit for Endo than for APF.  Specifically, after Endo approved a $244,337.40 grant request to APF to fund a series of NIPC eNewsletters, APF personnel viewed it as "[g]reat news," but cautioned that "the more I think about this whole

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

thing, [Endo's] making a lot of money on this with still pretty slender margins on [APF's] end."

APF's commitment to NIPC's "educational" mission did not figure at all in APF's consideration

of the value of its work, nor was Endo's motive or benefit in doubt.

(a)     Misleading Medical Education

434.     NIPC distributed a series of eNewsletter CMEs focused on "key topic[s]

surrounding the use of opioid therapy" and sponsored by Endo.  These newsletters were edited

by KOL Dr. Perry Fine and also listed several industry-backed KOLs, including Dr. Webster, as

individual authors.  Endo estimated that roughly 60,000 prescribers viewed each one, which were

available to and would have included Missouri prescribers.  Before-and-after surveys,

summarized in the chart below, showed that prescriber comfort with prescribing opioids ranged

from 27% to 62% before exposure to the CME, and from 76% to 92% afterwards:

| Topic | Comfort level *prior to reading the article* | Comfort level *after reading the article* |
|---|---|---|
| Patient Selection and Initiation of Opioid Therapy as a Component of Pain Treatment | 47% | 87% |
| Informed Consent and Management Plans to Optimize Opioid Therapy for Chronic Pain | 48% | 81% |
| Risk Stratification and Evaluation of High-Risk Behaviors for Chronic Opioid Therapy | 28% | 76% |
| Integration of Nonpharmacologic and Multidisciplinary Therapies Into the Opioid Treatment Plan | 42% | 85% |
| Addressing Patients' Concerns Associated With Chronic Pain Treatment and Opioid Use | 62% | 92% |
| Opioid Therapy in Patients With a History of Substance Use Disorders | 35% | 85% |
| Urine Drug Testing: An Underused Tool | 54% | 86% |
| Appropriate Documentation of Opioid Therapy: The Emergence of the 4As and Trust and Verify as the Paradigm | 44% | 86% |
| Opioid Rotation | 27% | 92% |
| Discontinuing Opioid Therapy: Developing  and Implementing an "Exit Strategy" | 37% | 90% |

435.     Endo documents made clear that the persuasive power of NIPC speakers was

directly proportional to their perceived objectivity.  Accordingly, Endo personnel directed that,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

when giving Endo-sponsored talks, NIPC faculty would not appear to be "Endo Speakers." Nevertheless, the two parties understood that Endo and NIPC shared a common "mission to educate physicians" and working "through the APF . . . [wa]s a great way to work out . . . problems that could have been there without the APF's participation and support."

436.    The materials made available on and through NIPC included misrepresentations. For example, Endo worked with NIPC to sponsor a series of CMEs titled *Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*.  These CMEs misrepresented the prevalence of addiction by stating that opioids have "possibly less potential for abuse" in elderly patients than in younger patients, even though there is no evidence to support such an assertion. Moreover, whereas withdrawal symptoms are always a factor in discontinuing long-term opioid therapy, *Persistent Pain in the Older Adult* also misleadingly indicated that such symptoms can be avoided entirely by tapering the patient's does by 10-20% per day for ten days.  *Persistent Pain in the Older Patient*, for its part, made misleading claims that opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."  NIPC webcast these CMEs from its own website, where they were available to and were intended to reach Missouri prescribers.

(b)    Painknowledge.com

437.    Working with NIPC enabled Endo to make a number of misleading statements through the NIPC's website, *Painknowledge.com*.  Endo tracked visitors to *PainKnowledge.com* and used *Painknowledge.com* to broadcast notifications about additional NIPC programming that Endo helped to create.

438.    APF made a grant request to Endo to create an online opioid "tool-kit" for NIPC and to promote NIPC's website, *Painknowledge.com*.  In so doing, APF made clear that it

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

planned to disseminate Defendants' misleading messaging.  The grant request expressly indicated APF's intent to make misleading claims about functionality, noting:  "Some of these people [in chronic pain] may be potential candidates for opioid analgesics, which can improve pain, function, and quality of life."  Endo provided $747,517 to fund the project.

439.    True to APF's word, *Painknowledge.com* misrepresented that opioid therapy for chronic pain would lead to improvements in patients' ability to function.  Specifically, in 2009 the website instructed patients and prescribers that, with opioids, a patient's "level of function should improve" and that patients "may find [they] are now able to participate in activities of daily living, such as work and hobbies, that [they] were not able to enjoy when [their] pain was worse."

440.    *Painknowledge.com* also deceptively minimized the risk of addiction by claiming that "[p]eople who take opioids as prescribed usually do not become addicted." *Painknowledge.com* did not stop there.  It deceptively portrayed opioids as safe at high doses and also misleadingly omitted serious risks, including the risks of addiction and death, from its description of the risks associated with the use of opioids to treat chronic pain.

441.    Endo was the sole funder of *Painknowledge.com*, and it continued to provide that funding despite being aware of the website's misleading contents.

(c)    *Exit Wounds*

442.    Finally, Endo also sponsored APF's publication and distribution of *Exit Wounds*, a publication aimed at veterans that also contained a number of misleading statements about the risks, benefits, and superiority of opioids to treat chronic pain.  *Exit Wounds* was drafted by "Medical Writer X," who did extensive work for Janssen. Medical Writer X was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

as science.  Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

443.    *Exit Wounds* is a textbook example of Medical Writer X's authorship on drug companies' behalf.  The book misrepresented the functional benefits of opioids by stating that opioid medications "*increase* your level of functioning" (emphasis in original).

444.    *Exit Wounds* also misrepresented that the risk of addiction associated with the use of opioids to treat chronic pain was low.  It claimed that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."

445.    Finally, *Exit Wounds* misrepresented the safety profile of using opioids to treat chronic pain by omitting key risks associated with their use.  Specifically, it omitted warnings of the risk of interactions between opioids and benzodiazepines—a warning sufficiently important to be included on Endo's FDA-required labels.  *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids—a particular risk for veterans.

446.    As outlined above, Endo exercised dominance over APF and the projects it undertook in an effort to promote the use of opioids to treat chronic pain.  In addition, as outlined above, Medical Writer X's work was being reviewed and approved by drug company representatives, motivating him to draft pro-opioid propaganda masquerading as science.  Combined, these factors gave Endo considerable influence over the work of Medical Writer X and over APF.  Further, by paying to distribute *Exit Wounds*, Endo endorsed and approved its contents.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

ii.      *Other Front Groups:  FSMB, AAPM, and AGS*

447.    In addition to its involvement with APF, Endo worked closely with other third-party Front Groups and KOLs to disseminate deceptive messages regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain.  As with certain APF publications, Endo in some instances used its sales force to directly distribute certain publications by these Front Groups and KOLs, making those publications "labeling" within the meaning of 21 C.F.R. § 1.3(a).

448.    In 2007, Endo sponsored FSMB's *Responsible Opioid Prescribing*, which, as described in Section V.D, in various ways deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.  *Responsible Opioid Prescribing* was drafted by "Medical Writer X."

449.    Endo spent $246,620 to help FSMB distribute *Responsible Opioid Prescribing*. Endo approved this book for distribution by its sales force.  Based on the uniform and nationwide character of Endo's marketing campaign, and the fact that Endo purchased these copies specifically to distribute them, these copies were distributed to physicians nationwide, including physicians in Missouri.

450.    In December 2009, Endo also contracted with AGS to create a CME to promote the 2009 guidelines titled the *Pharmacological Management of Persistent Pain in Older Persons* with a $44,850 donation.  These guidelines misleadingly claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse," since the study supporting this assertion did not analyze addiction rates by age.  They also stated, falsely, that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)" when in reality, opioid therapy was

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

an appropriate treatment only for a subset of those patients, as Endo's FDA-mandated labels recognized.

451.    AGS's grant request to Endo made explicit reference to the CME Endo was funding.  Endo thus knew full well what content it was paying to distribute, and was in a position to evaluate that content to ensure it was accurate, substantiated, and balanced before deciding whether to invest in it.  After having sponsored it, Endo's internal documents indicate that Endo's pharmaceutical sales representatives discussed the AGS guidelines with doctors during individual sales visits.

452.    Endo also worked with AAPM, which it viewed internally as "Industry Friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.

453.    A talk written by Endo in 2009, approved by Endo's Medical Affairs Review Committee, and given by a Missouri-area KOL, titled *The Role of Opana ER in the Management of Chronic Pain,* includes a slide titled *Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain.*  That slide cites the AAPM/APS Guidelines, which contain a number of misstatements while omitting their disclaimer regarding the lack of supporting evidence.  This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.  Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

iii.      *Key Opinion Leaders and Misleading Science*

454.    Endo also sought to promote opioids for the treatment of chronic pain through the use of key opinion leaders and biased, misleading science.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

455.    Endo's 2010 publication plan for Opana ER identified a corporate goal of making Opana ER the second-leading branded product for the treatment of moderate-to-severe chronic pain (after OxyContin).  Endo sought to achieve that goal by providing "clinical evidence for the use of Opana ER in chronic low back pain and osteoarthritis," and succeeded in having articles on this topic published.

456.    In the years that followed, Endo sponsored articles, authored by an Endo consultant and Endo employees, which argued that the metabolic pathways utilized by Opana ER made it less likely than other opioids to result in drug interactions in elderly low back and osteoarthritis pain patients.  In 2010, Endo directed its publication manager to reach out to a list of consultants conducting an ongoing Endo-funded study, to assess their willingness to respond to an article that Endo believed emphasized the risk of death from opioids, "without [] fair balance."

457.    Endo's reliance on flawed, biased research is also evident in its 2012 marketing materials and strategic plans.   A 2012 Opana ER slide deck for Endo's speakers bureaus—on which these recruited physician speakers were trained and to which they were required to adhere—misrepresented that the drug had low abuse potential and suggested that as many as one-quarter of the adult population could be candidates for opioid therapy.  Although the FDA requires such speaker slide decks to reflect a "fair balance" of information on benefits and risks, Endo's slides reflected one-sided and deeply biased information.  The presentation's 28 literature citations were largely to "data on file" with the company, posters, and research funded by or otherwise connected to Endo.  Endo's speakers carried the information in these slides to audiences that were unaware of the skewed science on which the information rested.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

458.    A 2012 Opana ER Strategic Platform Review suffered from similar defects.  Only a small number of the endnote references in that document, which it cites to indicate "no gap" in scientific evidence for particular claims, were to national-level journals.  Many were published in lesser or dated journals, and written or directly financially supported by opioid manufacturers. Where the strategy document did cite independent, peer-reviewed research, it did so out of context.  For example, it cited a 2008 review article on opioid efficacy for several claims, including that "treatment of chronic pain reduces pain and improves functionality," but it ignores that article's overall focus on "the lack of consistent effectiveness of opioids in reducing pain and improving functional status."

459.    Notwithstanding Endo's reliance upon dubious or cherry-picked science, in an Opana ER brand strategy plan it internally acknowledged the continuing need for a significant investment in clinical data  to support comparative effectiveness.  Endo also cited a lack of "head-to-head data" as a barrier to greater share acquisition and the "lack of differentiation data" as a challenge to addressing the  "#1 Key Issue" of product differentiation.  Nor did this acknowledged lack of support stop Endo from directing its sales representatives to tell prescribers that its drugs were less likely to be abused or less addictive than other opioids.

460.    Endo also worked with various KOLs to disseminate various misleading statements about chronic opioid therapy.  For example, Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding your Pain: Taking Oral Opioid Analgesics*.  This pamphlet deceptively minimized the risks of addiction by stating that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems," implying that patients who are taking opioids for pain are not at risk of addiction.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

461.    *Understanding your Pain:  Taking Oral Opioid Analgesics* also misleadingly omitted any description of the increased risks posed by higher doses of opioid medication. Instead, in a Q&A format, the pamphlet asked "[i]f I take the opioid now, will it work later when I really need it?" and responded that "[t]he dose can be increased . . . [y]ou won't 'run out' of pain relief."

462.    Dr. Portenoy received research support, consulting fees, and honoraria from Endo for editing *Understanding Your Pain* and other projects.

463.    Endo similarly distributed a book written by Dr. Lynn Webster titled *Avoiding Opioid Abuse While Managing Pain*, which stated that in the face of signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."

464.    A slide from an Opana ER business plan contemplated distribution of the book as part of Endo's efforts to "[i]ncrease the breadth and depth of the OPANA ER prescriber base via targeted promotion and educational programs."  The slide indicates that the book would be particularly effective "for [the] PCP audience" and instructed "[s]ales representatives [to] deliver[ the book] to participating health care professionals."  The slide, shown below, demonstrates Endo's express incorporation of this book by a KOL into its marketing strategy:



465.    Endo documents indicate that, around 2007, the company purchased at least

50,000 copies of the book for distribution.  Internal Endo documents demonstrate that the book

had been approved for distribution by Endo's sales force, and Endo had fewer than 8,000 copies

on hand in March of 2013.  Based on the nationwide and uniform character of Endo's marketing,

and the book's approval for distribution, this book was available to and was intended to reach

Missouri prescribers.

### 4.    Janssen

466.    Janssen promoted its branded opioids, including Duragesic, Nucynta, and

Nucynta ER, through its sales representatives and a particularly active speakers program.

Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms

were a foundation of this marketing campaign.  Janssen also conveyed other misrepresentations

as described in Section V.D, including that its opioids could safely be prescribed at higher doses

and were safer than alternatives such as NSAIDs.

467.    Janssen supplemented these efforts with its own unbranded website, as well as

third-party publications and a Front Group website, to promote opioids for the treatment of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

chronic pain.  These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments.  They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

468.    Based on the highly coordinated and uniform nature of Janssen's marketing, and as confirmed by verbatim message data and interviews with prescribers, Janssen conveyed these deceptive messages to Missouri prescribers.  The materials that Janssen generated in collaboration with third-parties also were distributed or made available in Missouri.  Janssen distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.    <u>Janssen's Deceptive Direct Marketing</u>

469.    Janssen joined the other Defendants in propagating deceptive branded marketing that falsely minimized the risks and overstated the benefits associated with the long-term use of opioids to treat chronic pain.  Like the other Defendants, Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country.  These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers.  In 2011, at the peak of its effort to promote Nucynta ER, Janssen spent more than $90 million on detailing.

470.    Janssen's designs to increase sales through deceptive marketing are apparent on the face of its marketing plans.  For example, although Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain, its Nucynta Business Plans indicated that one of the "drivers" to sell more

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Nucynta among primary care physicians was the "[l]ow perceived addiction and/or abuse potential" associated with the drug.  However, there is no evidence that Nucynta is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low. Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

       i.    *Janssen's Deceptive Sales Training*

471.    Janssen's sales force was compensated based on the number of Nucynta prescriptions written in each sales representative's territory.  Janssen encouraged these sales representatives to maximize sales of Nucynta and meet their sales targets by relying on the false and misleading statements.

472.    For example, Janssen's sales force was trained to trivialize addiction risk.  A June 2009 Nucynta training module warns that physicians are reluctant to prescribe controlled substances like Nuycnta because of their fear of addicting patients, but this reluctance is unfounded because "the risks . . . are [actually] much smaller than commonly believed."  Janssen also encouraged its sales force to misrepresent the prevalence of withdrawal symptoms associated with Nucynta.  A Janssen sales training PowerPoint titled "Selling Nucynta ER and Nucynta" indicates that the "low incidence of opioid withdrawal symptoms" is a "core message" for its sales force.  The message was touted at Janssen's Pain District Hub Meetings, in which Janssen periodically gathered its sales force personnel to discuss sales strategy.

473.    This "core message" regarding a lack of withdrawal symptoms runs throughout Janssen's sales training materials.  For example, Janssen's "Licensed to Sell" Facilitator's Guide instructs those conducting Janssen sales trainings to evaluate trainees, in part, on whether they

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

remembered that "[w]ithdrawal symptoms after abrupt cessation of treatment with NUCYNTA ER were mild or moderate in nature, occurring in 11.8% and 2% of patients, respectively" and whether they were able to "accurately convey" this "core message."  Janssen further claimed in 2008 that "low incidence of opioid withdrawal symptoms" was an advantage of the tapentadol molecule.

474.    Similarly, a Nucynta Clinical Studies Facilitator's Guide instructs individuals training Janssen's sales representatives to ask trainees to describe a "key point"—that "83% of patients reported no withdrawal symptoms after abruptly stopping treatment without initiating alternative therapy"—"as though he/she is discussing it with a physician."

ii.      *Janssen's Deceptive Speakers Bureau Programs*

475.    Janssen did not stop at disseminating its misleading messages regarding chronic opioid therapy through its sales force.  It also hired speakers to promote its drugs and trained them to make the very same misrepresentations made by its sales representatives.

476.    Janssen's speakers worked from slide decks—which they were required to present—reflecting the deceptive information about the risks, benefits, and superiority of opioids outlined above.  For example, a March 2011 speaker's presentation titled *A New Perspective For Moderate to Severe Acute Pain Relief:  A Focus on the Balance of Efficacy and Tolerability* set out the following adverse events associated with use of Nucynta:  nausea, vomiting, constipation, diarrhea, dizziness, headache, anxiety, restlessness, insomnia, myalgia, and bone pain.  It completely omitted the risks of misuse, abuse, addiction, hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and other known, serious risks associated with chronic opioid therapy.  The presentation also minimized the risks of withdrawal

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

by stating that "more than 82% of subjects treated with tapentadol IR reported no opioid withdrawal symptoms."

477.    An August 2011 speakers presentation titled *New Perspectives in the Management of Moderate to Severe Chronic Pain* contained the same misleading discussion of the risks associated with chronic opioid therapy.  It similarly minimized the risks of withdrawal by reporting that 86% of patients who stopped taking Nucynta ER "abruptly without initiating alternative opioid therapy" reported no withdrawal symptoms whatsoever.  The same deceptive claims regarding risks of adverse events and withdrawal appeared in a July 2012 speaker's presentation titled *Powerful Pain Management:  Proven Across Multiple Acute and Chronic Pain Models*.

478.    These speakers presentations were part of Janssen's nationwide marketing efforts.  Upon information and belief, a number of these events were available to and were intended to reach Missouri prescribers.

iii.        *Janssen's Deceptive Unbranded Advertising*

479.    Janssen was aware that its branded advertisements and speakers programs would face regulatory scrutiny that would not apply to its unbranded materials, so Janssen also engaged in direct, unbranded marketing.

480.    One such unbranded project was Janssen's creation and maintenance of *Prescriberesponsibly.com* (last updated July 2, 2015), a website aimed at prescribers and patients that claims that concerns about opioid addiction are "overstated."  A disclaimer at the bottom of the website states that the "site is published by Janssen Pharmaceuticals, Inc., which is solely responsible for its content."  This website was available to and intended to reach Missouri prescribers and patients.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

b.    Janssen's Deceptive Third-Party Statements

481.    Janssen's efforts were not limited to directly making misrepresentations through its sales force, speakers bureau, and website.  To avoid regulatory constraints and give its efforts an appearance of independence and objectivity, Janssen obscured its involvement in certain of its marketing activities by "collaborat[ing] with key patient advocacy organizations" to release misleading information about opioids.

i.    *AAPM and AGS – Finding Relief:  Pain Management for Older Adults*

482.    Janssen worked with AAPM and AGS to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009).  In doing so, Janssen contracted with a medical publishing firm, Conrad & Associates, LLC.  The content was drafted by a writer ("Medical Writer X") hired by Conrad & Associates and funded by Janssen.  These materials were reviewed, in detail, by Janssen's medical-legal review team, which conducted detailed reviews and gave him editorial feedback on his drafts, which was adopted in the published version.

483.    Medical Writer X understood, without being explicitly told, that since his work was funded and reviewed by Janssen, the materials he was writing should aim to promote the sale of more drugs by overcoming the reluctance to prescribe or use opioids to treat chronic pain.  He knew that the publication was undertaken in connection with the launch of a new drug and was part of its promotional effort.  Medical Writer X knew of the drug company sponsoring the publication, and he would go to the company's website to learn about the drug being promoted.  He also knew that his clients—including Janssen—would be most satisfied with his work if he emphasized that:  (a) even when used long-term, opioids are safe and the risk of addiction is low; (b) opioids are effective for chronic pain; and (c) opioids are under-prescribed

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

because doctors are hesitant, confused, or face other barriers.  *Finding Relief* is rife with the deceptive content described above in Sections V.D.2, V.D.6, and V.D.7.  *Finding Relief* misrepresents that opioids increase function by featuring a man playing golf on the cover and listing examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.  The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The functional claims contained in *Finding Relief* are textbook examples of Defendants' use of third parties to disseminate messages the FDA would not allow them to say themselves. Compare, e.g.:

| **Branded Advertisement That Triggers an FDA Warning Letter (2008)** |
|---|
| Improvement in Daily Activities Includes: <br><br> •   Walking on a flat surface <br><br> •   Standing or sitting <br><br> •   Climbing stairs <br><br> •   Getting in and out of bed or bath <br><br> •   Ability to perform domestic duties. |

with:

| **Seemingly Independent Publication: "Finding Relief: Pain Management for Older Adults" (Final Authority, Janssen 2009)**: |
|---|

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

> Your recovery will be measured by how well you reach functional goals such as
>
> - Sleeping without waking from pain
>
> - Walking more, or with less pain
>
> - Climbing stairs with less pain
>
> - Returning to work
>
> - Enjoying recreational activities
>
> - Having sex
>
> - Sleeping in your own bed

484.    *Finding Relief* also trivialized the risks of addiction describing a "myth" that opioids are addictive, and asserting as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."

485.    *Finding Relief* further misrepresented that opioids were safe at high doses by listing dose limitations as "disadvantages" of other pain medicines but omitting any discussion of risks from increased doses of opioids.  The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time."

486.    Finally, *Finding Relief* deceptively overstated the risks associated with alternative forms of treatment.  It juxtaposes the advantages and disadvantages of NSAIDs on one page, with the "myths/facts" of opioids on the facing page.  The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] . . . risk of heart attack and stroke."  Conversely, the only adverse effects of opioids listed by *Finding Relief*

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

are "upset stomach or sleepiness," which the brochure claims will go away, and constipation. The guide never mentions addiction, overdose, abuse, or other serious side effects of opioids.

487.     Janssen was not merely a passive sponsor of *Finding Relief*.  Instead, Janssen exercised control over its content and provided substantial assistance to AGS and AAPM to distribute it.  A "Copy Review Approval Form" dated October 22, 2008 indicates that key personnel from Janssen's Advertising & Promotion, Legal, Health Care Compliance, Medical Affairs, Medical Communications, and Regulatory Departments reviewed and approved *Finding Relief*.  All six Janssen personnel approving the publication checked the box on the approval form indicating that *Finding Relief* was "Approved With Changes."  After the publication was modified at the behest of Janssen personnel, Janssen paid to have its sales force distribute 50,000 copies of *Finding Relief* in Missouri and throughout the nation.  Thus, *Finding Relief* is considered labeling for Janssen's opioids.

488.     *Finding Relief's* author, Medical Writer X, later said it was clear, from his perch at the intersection of science and marketing, that the money paid by drug companies to the KOLs and professional and patient organizations with which he worked distorted the information provided to doctors and patients regarding opioids.  The money behind these and many other "educational" efforts also, he believes, led to a widespread lack of skepticism on the part of leading physicians about the hazards of opioids.  It also led these physicians to accept without adequate scrutiny published studies that, while being cited to support the safety of opioids, were, in fact, of such poor methodological quality that they would not normally be accepted as adequate scientific evidence.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

ii.     *AGS – Misleading Medical Education*

489.    Janssen also worked with the AGS on another project—AGS's CME promoting

the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.

These guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older

patients with no current or past history of substance abuse" when the study supporting this

assertion did not analyze addiction rates by age.  They also stated, falsely, that "[a]ll patients

with moderate to severe pain . . . should be considered for opioid therapy (low quality of

evidence, strong recommendation)."  Based on Janssen's control over AGS's *Finding Relief*,

Janssen also would have exercised control over this project as well.

iii.    *APF*

490.    Janssen also worked with APF to carry out its deceptive marketing campaign.

Documents obtained from one of Janssen's public relations firms, Ketchum, indicate that Janssen

and the firm enlisted APF as part of an effort to "draft media materials and execute [a] launch

plan" for Janssen's drugs at an upcoming meeting of the AAPM.  Janssen also drew on APF

publications to corroborate claims in its own marketing materials and its sales training.  Janssen

personnel participated in a March 2011 call with APF's "Corporate Roundtable," in which they

worked with APF and drug company personnel to develop strategies to promote chronic opioid

therapy.  In particular, APF personnel spoke with Janssen employees, who "shar[ed] expertise

from within their company for [a] public awareness campaign."

491.    Their joint work on the "Corporate Roundtable" demonstrates the close

collaboration between Janssen and APF in promoting opioids for the treatment of chronic pain.

APF President Will Rowe also reached out to Defendants—including Janssen—rather than his

own staff to identify potential authors to draft an answer to an article critical of opioids that

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

appeared in the *Archives of Internal Medicine* in 2011.  Additional examples of APF's

collaboration with Janssen are laid out below:

(a)     Let's Talk Pain

492.    Most prominent among these efforts was the *Let's Talk Pain* website.  Janssen

sponsored *Let's Talk Pain* in 2009, acting in conjunction with APF, American Academy of Pain

Management, and American Society of Pain Management Nursing, whose participation in the

website Janssen financed and orchestrated.

493.    Janssen exercised substantial control over the content of the *Let's Talk Pain*

website.  Janssen's internal communications always referred to *Let's Talk Pain* as promoting

tapentadol, the molecule it sold as Nucynta and Nucynta ER.  Janssen regarded *Let's Talk Pain*

and another website—*Prescriberesponsibly.com*— as integral parts of Nucynta's launch:



Janssen documents also reveal that Janssen personnel viewed APF and AAPM as "coalition

members" in the fight to increase market share.

494.    To this end, Janssen and APF entered into a partnership to "keep pain and the

importance of responsible pain management top of mind" among prescribers and patients.  They

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

agreed to work to reach "target audiences" that included patients, pain management physicians, primary care physicians, and KOLs.  One of the roles Janssen assumed in the process was to "[r]eview, provide counsel on, and approve materials."  Janssen did in fact review and approve material for the *Let's Talk Pain* website, as evidenced by the following edits by a Janssen executive to the transcript of a video that was to appear on the site:



The final version of the video on *Let's Talk Pain* omitted the stricken language above.

495.    This review and approval authority extended to the *Let's Talk Pain* website. Emails between Janssen personnel and a consultant indicate that, even though the *Let's Talk Pain* website was hosted by APF, Janssen had approval rights over its content.  Moreover, emails describing Janssen's review and approval rights related to *Let's Talk Pain* indicate that this right extended to "major changes and video additions."

496.    As a 2009 Janssen memo conceded, "[t]he *Let's Talk Pain Coalition* is sponsored by PriCara, a Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc." and "[t]he Coalition and Pricara **maintain editorial control of all *Let's Talk Pain* materials and publications**" (emphasis added).

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

497.    A 2011 Consulting Agreement between Janssen and one of APF's employees, relating to the dissemination of national survey data, demonstrates the near-total control Janssen was empowered to exercise over APF in connection with the *Let's Talk Pain* website, including in requiring APF to circulate and post Janssen's promotional content.  The agreement required APF to "participate in status calls between Janssen, APF, AAPM, ASPMN, and Ketchum as requested by Janssen" and required APF to "respond to requests to schedule status calls **within 48 hours** of the request" (emphasis in original).  APF also was required to "[r]eview and provide feedback to media materials, including a press release, pitch email, a key messages document, and social media messages, **within one week** of receipt"  (emphasis in original).

498.    The agreement further required APF to provide a summary of the survey results in APF's PAIN MONITOR e-newsletter, post a link to the survey results on APF's Facebook page, send out tweets related to the survey, serve as a spokesperson available for media interviews, "[s]hare information with any media contacts with whom APF has existing relationships to promote the announcement of the national survey findings," identify at least two patient spokespersons to talk about the survey data, and include the survey results in "any future APF materials, as appropriate."  Tellingly, "any ideas made or conceived by [APF] in connection with or during the performance" of the Agreement "shall be the property of, and belong to, [Janssen]."

499.    Janssen also exercised its control over *Let's Talk Pain*.  Janssen was able to update the *Let's Talk Pain* website to describe its corporate restructuring and Janssen personnel asserted their control over "video additions" by reviewing and editing the interview touting the functional benefits of opioids.  Given its editorial control over the content of *Let's Talk Pain*, Janssen was at all times fully aware of—and fully involved in shaping—the website's content.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

500.    *Let's Talk Pain* contained a number of the misrepresentations.  For example, *Let's Talk Pain* misrepresented that the use of opioids for the treatment of chronic pain would lead patients to regain functionality.  *Let's Talk Pain* featured an interview claiming that opioids were what allowed a patient to "continue to function."  This video is still available today on YouTube.com and is accessible to Missouri prescribers and patients.

(b)    Exit Wounds

501.    Janssen also engaged in other promotional projects with and through APF.  One such project was the publication and distribution of *Exit Wounds*, which deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.  *Exit Wounds* was drafted by "Medical Writer X."  It is fully representative of his work on behalf of drug companies.

502.    Janssen gave APF substantial assistance in distributing *Exit Wounds* in Missouri and throughout the nation by providing grant money and other resources.

503.    APF mailed copies of *Exit Wounds* to the "Wounded Heroes Foundation" in Missouri.  The Wounded Heroes Foundation is an organization designed to support the injured men and women who have served the United States in Iraq, Afghanistan and around the world.  Unfortunately, by distributing *Exit Wounds* to its members, it distributed Defendants' deceptive statements about the appropriateness of opioid therapy to treat chronic pain.

**5.    Purdue**

504.    Purdue promoted its branded opioids—principally, Oxycontin, Butrans, and Hysingla—and opioids generally in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement.  Purdue did so through its sales force, branded advertisements, promotional materials, and speakers, as well as a host of materials produced by its third-party partners, most prominently APF.  Purdue's sales

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

representatives and advertising also misleadingly implied that OxyContin provides a full 12 hours of pain relief, and its allied Front Groups and KOLs conveyed the additional deceptive messages about opioids' safety at higher doses, the safety of alternative therapies, and the effectiveness of addiction screening tools.

505.   Based on the highly coordinated and uniform nature of Purdue's marketing, and as confirmed by verbatim message data and interviews with prescribers, Purdue conveyed these deceptive messages to Missouri prescribers.  The materials that Purdue generated in collaboration with third parties also were distributed or made available in Missouri.  Purdue distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.   Purdue's Deceptive Direct Marketing

506.   Like the other Defendants, Purdue directly disseminated deceptive branded and unbranded marketing focused on minimizing the risks associated with the long-term use of opioids to treat chronic pain.  Purdue directed these messages to prescribers and consumers through its sales force and branded advertisements.

507.   Purdue engaged in in-person marketing to doctors in Missouri and operated speakers bureau programs that included and targeted Missouri prescribers.  Purdue had 250 sales representatives in 2007, of whom 150 were devoted to promoting sales of OxyContin full time. Like the other Defendants' detailers, Purdue sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed, identically, across the country.  These sales representatives were critical in delivering Purdue's marketing strategies and talking points to individual prescribers.  Indeed, Endo's internal documents indicate that

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines, which deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories, with doctors during individual sales visits.

508.    Purdue's spending on detailing reached its nadir in 2006 and 2007, as the company faced civil and criminal charges for misbranding OxyContin.  Since settling those charges in 2007, however, Purdue has sharply increased its quarterly spending on promotion through its sales force, from under $5 million in 2007 to more than $30 million by the end of 2014.

509.    Purdue also marketed its drugs through branded advertisements, which relied on, among other deceptive tactics, misleading statements about the efficacy and onset of OxyContin. As described above in Section V.D.8, Purdue has marketed its drug as effective for 12 hours. Purdue knew, however, that these claims were misleading because, for many patients, the pain relief lasted for as little as eight hours, which led to end-of-dose failure and withdrawal symptoms and prompted doctors to prescribe or patients to take higher or more frequent doses of opioids, all of which increased the risk of abuse and addiction.

510.    For example, a "Conversion and Titration Guide" submitted to the FDA and distributed to physicians by Purdue, prominently referred to "Q12h OxyContin Tablets," meaning that each tablet is intended to "offer your patient every-twelve-hour dosing." Other marketing materials directed at physicians and disseminated across the country in 2006 touted that OxyContin's "12-hour AcroContin Delivery System" is "designed to deliver oxycodone over 12 hours," which offered patients "life with Q12H relief."  Those same marketing materials included a timeline graphic with little white paper pill cups only at "8AM" and, further down the line, at "8PM."  They also proclaimed that OxyContin provides "Consistent Plasma Levels Over

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

12 Hours" and set forth charts demonstrating absorption measured on a logarithmic scale, which fraudulently made it appear levels of oxycodone in the bloodstream slowly taper over a 12 hour time period.

511.    Purdue advertisements that ran in 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin with "Q12h" handwritten.  Another advertisement Purdue ran in 2005 in the *Journal of Pain* touted OxyContin's "Q12h dosing convenience" and displayed two paper dosing cups, one labeled "8 am" and one labeled "8 pm," implying that OxyContin is effective for the 12 hour period between 8 a.m. and 8 p.m.  Similar ads appeared in the March 2005 *Clinical Journal of Pain*.

512.    Further, to this day, Purdue includes prominent 12-hour dosing instructions in its branded advertising, such as in a 2012 Conversion and Titration Guide, which states:  "Because each patient's treatment is personal / Individualize the dose / Q12h OxyContin Tablets."

513.    These statements; however, are misleading because they fail to make clear that a 12 hour dose does not equate to 12 hours of pain relief.   Nevertheless, Purdue's direct marketing materials have misleadingly claimed OxyContin offers 12 hour "dosing convenience."

514.    As described below, these deceptive statements regarding the efficacy of OxyContin were also carried into Missouri by Purdue's detailers.

515.    Purdue's direct marketing materials also misrepresented that opioids would help patients regain functionality and make it easier for them to conduct everyday tasks like walking, working, and exercising.

516.    For example, in 2012, Purdue disseminated a mailer to doctors titled "Pain vignettes."  These "vignettes" consisted of case studies describing patients with pain conditions that persisted over a span of several months.  One such patient, "Paul," is described to be a "54-

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

year-old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work.  None of these ads, however, disclosed the truth—that there is no evidence that opioids improve patients' lives and ability to function (and there was substantial evidence to the contrary).

517.    Some of the greatest weapons in Purdue's arsenal, however, were unbranded materials it directly funded and authored.  These were in addition to the unbranded materials, described below, that Purdue channeled through third parties.

518.    In 2011, Purdue published a prescriber and law enforcement education pamphlet titled *Providing Relief, Preventing Abuse*, which deceptively portrayed the signs—and therefore the prevalence—of addiction.  However, Purdue knew, that OxyContin was used non-medically by injection less than less than 17% of the time.  Yet, *Providing Relief, Preventing Abuse* prominently listed side effects of injection like skin popping and track marks as "Indications of Possible Drug Abuse"—downplaying much more prevalent signs of addiction associated with OxyContin use, such as asking for early refills, and making it seem that addiction only occurs when opioids are taken illicitly.

519.    *Providing Relief, Preventing Abuse* also deceptively camouflaged the risk of addiction by falsely supporting the idea that drug-seeking behavior could, in fact, be a sign of "pseudo addiction" rather than addiction itself.  Specifically, it noted that the concept of pseudo addiction had "emerged in the literature" to describe "[drug-seeking behaviors] in patients who have pain that has not been effectively treated."  Nowhere in *Providing Relief, Preventing Abuse* did Purdue disclose the lack of scientific evidence justifying the concept of pseudo addiction, nor that it was coined by a Purdue vice president.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

520.    *Providing Relief, Preventing Abuse* was available nationally and was intended to

reach Missouri prescribers.  As described below, the deceptive statements in *Providing Relief,*

*Preventing Abuse* regarding addiction were the very same messages Purdue directed at Missouri

prescribers through its sales force.

521.    Purdue also disseminated misrepresentations through two of its unbranded

websites, *In the Face of Pain* and *Partners against Pain*.

522.    Consistent with Purdue's efforts to portray opioid treatment as "essential" for the

proper treatment of chronic pain and label skepticism related to chronic opioid therapy as an

"inadequate understanding" that leads to "inadequate pain control," *In the Face of Pain* criticized

policies that limited access to opioids as being "at odds with best medical practices" and

encouraged patients to be "persistent" in finding doctors who will treat their pain.  This was

meant to imply that patients should keep looking until they find a doctor willing to prescribe

opioids.

523.    *In the Face of Pain* was available nationally and was intended to reach Missouri

prescribers.

524.    Purdue also used its unbranded website *Partners Against Pain* to promote the

same deceptive messages regarding risk of addiction that are described in Section V.D.2 and

delivered by its sales representatives.  On this website, Purdue posted *Clinical Issues in Opioid*

*Prescribing*, a pamphlet that was copyrighted in 2005.  Purdue distributed a hard-copy version of

this pamphlet at least as of November 2006.  *Clinical Issues in Opioid Prescribing* claimed that

"illicit drug use and deception" were not indicia of addiction, but rather indications that a

patient's pain was undertreated.  The publication indicated that "[p]seudoaddiction can be

distinguished from true addiction in that the behaviors resolve when the pain is effectively

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

treated."  In other words, Purdue suggested that when faced with drug-seeking behavior from their patients, doctors should prescribe more opioids—turning evidence of addiction into an excuse to sell and prescribe even more drugs.

525.    Purdue's misleading messages and materials were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives.  This deception was national in scope and included Missouri.  As described in Section V.B.2 above, Purdue's nationwide messages would have reached Missouri prescribers in a number of ways.  For example, they were carried into Missouri by Purdue's sales representatives during detailing visits as well as made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals.  They would have also been delivered to Missouri prescribers by Purdue's paid speakers, who were required by Purdue policy and by FDA regulations to stay true to Purdue's nationwide messaging.

b.    Purdue's Deceptive Third-Party Statements

526.    Purdue's efforts were not limited to making misrepresentations through its own sales force and its own branded and unbranded marketing materials.  As described above, Purdue knew that regulatory constraints restricted what it was able to say about its drugs through direct marketing.  For this reason, like the other Defendants, Purdue enlisted the help of third parties to release misleading information about opioids.  The most prominent of these was APF.

i.    *APF*

(a)    Purdue's Control of APF

527.    Purdue exercised considerable control over APF, which published and disseminated in many of the most blatant falsehoods regarding chronic opioid therapy.  Their relationship, and several of the APF publications, is described in detail below.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

528.    Purdue exercised its dominance over APF over many projects and years.  Purdue was APF's second-biggest donor, with donations totaling $1.7 million.  Purdue informed APF that the grant money reflected Purdue's effort to "strategically align its investments in nonprofit organizations that share [its] business interests," making clear that Purdue's funding depended upon APF continuing to support Purdue's business interests.  Indeed, Purdue personnel participated in a March 2011 call with APF's "Corporate Roundtable," where they suggested that APF "[s]end ambassadors to talk about pain within companies and hospitals."  Thus, Purdue suggested what role APF could play that would complement its own marketing efforts.  On that call, Purdue personnel also committed to provide APF with a list of "industry state advocates" who could help promote chronic opioid therapy, individuals and groups that, upon information and belief, APF reached out to.  Purdue personnel remained in constant contact with their counterparts at APF.

529.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives.  Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011.  That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project.  Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project.  The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.  Even for projects not produced during the terms of this Agreement, the Agreement demonstrates APF's lack of independence and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work.

530.    Purdue used this agreement to conduct work with APF on the *Partners against Pain* website. *Partners against Pain* is a Purdue-branded site, and Purdue holds the copyright. However, its ability to deploy APF on this project illustrates the degree of control Purdue exercised over APF.  In 2011, it hired an APF employee to consult on the *Partners Against Pain* rollout, to orchestrate the media campaign associated with the launch of certain content on the website, and to make public appearances promoting the website along with a celebrity spokesperson.  Purdue contemplated paying this consultant $7,500 in fees and expenses for 26 hours of work.  Purdue would require this consultant to "to discuss and rehearse the delivery of [Purdue's] campaign messages" and Purdue committed that "[m]essage points will be provided to [the] Consultant in advance and discussed on [a planned] call."  At all times, decisions regarding the final content on the *Partners against Pain* website were "at the sole discretion of Purdue."

531.    APF also volunteered to supply one of its staff (a medical doctor or a nurse practitioner) to assist Purdue as a consultant and spokesperson in connection with the launch of one of Purdue's opioid-related projects, *Understanding & Coping with Lower Back Pain*, which appeared on *Partners against Pain*.  One of the consultants was APF's paid employee, Mickie Brown.  The consultant's services would be provided in return for a $10,000 in consulting fees for APF and $1,500 in honoraria for the spokesperson.  All documents used by the consultant in her media appearances would be reviewed and approved by individuals working for Purdue. Purdue initiated this project, and it was not until later that APF worried about "how Purdue sees this program fitting in with our [existing] grant request."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

532.    Given the financial and reputational incentives associated with assisting Purdue in this project and the direct contractual relationship and editorial oversight, APF personnel were acting under Purdue's control at all relevant times with respect to *Partners against Pain*.

533.    Purdue often asked APF to provide "patient representatives" for *Partners against Pain*, and APF fulfilled these requests.  Moreover, APF staff and board members and Front Groups ACPA and AAPM, among others (such as Dr. Webster), appear on *Inthefaceofpain.com* as "Voices of Hope"—"champions passionate about making a difference in the lives of people who live with pain" and providing "inspiration and encouragement" to pain patients.  APF also contracted with Purdue for a project on back pain where, among other things, it provided a patient representative who agreed to attend a Purdue-run "media training session."

534.    According to an Assurance of Voluntary Compliance ("AVC") entered into between the New York Attorney General and Purdue Pharma on August 19, 2015, *Inthefaceofpain.com* received 251,648 page views between March 2014 and March 2015.  Except in one document linked to the website, *Inthefaceofpain.com* makes no mention of opioid abuse or addiction.  Purdue's copyright appears at the bottom of each page of the website, indicating its ownership and control of its content.  There is no other indication that 11 of the individuals who provided testimonials on *Inthefaceofpain.com* received payments, according to the AVC, of $231,000 for their participation in speakers programs, advisory meetings and travel costs between 2008 and 2013.  Therefore, the New York Attorney General found Purdue's failure to disclose its financial connections with these individuals had the potential to mislead consumers by failing to disclose the potential bias of these individuals.

535.    In 2011, APF and another third-party advocacy group, the Center for Practical Bioethics, were contemplating working together on a project.  Having reviewed a draft document

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

provided by the Center for Practical Bioethics, the APF employee cautioned that "this effort will be in cooperation with the efforts of the PCF" and acknowledged that "I know you have reservations about the PCF and pharma involvement, but I do believe working with them and keeping the lines of communications open is important." The Center for Practical Bioethics CEO responded by indicating some confusion about whom to speak with, asking "[i]s Burt Rosen the official leader" and reflecting what other sources have confirmed.

536.    In 2007, the PCF Education Subgroup, consisting of drug companies Purdue and Alpharma, and Front Groups APF and ACPA (self-described as "industry-funded" groups), developed a plan to address a perceived "lack of coordination" among the industry and pro-opioid professional and patient organizations. PCF members agreed to develop simplified "key" messages" to use for public education purposes. Their messages were reflected in programs like NIPC's *Let's Talk Pain* (put together by Endo and APF), and Purdue's *In the Face of Pain*.

537.    When the FDA required drug companies to fund CMEs related to opioid risks in connection with its 2009 REMS, Purdue, along with these Front Groups, worked through the PCF to ensure that, although it was mandatory for drug companies to fund  these CMEs, it would not be mandatory for prescribers to attend them. A survey was circulated among Defendants Endo, Janssen, and Purdue, which predicted that the rates of doctors who would prescribe opioids for chronic pain would fall by 13% if more than four hours of mandatory patient education were required in connection with the REMS. With a push from PCF, acting under Purdue's direction, they were not.

538.    APF showed its indebtedness to Purdue and its willingness to serve its corporate agenda by testifying on the company's behalf at a July 2007 hearing before the Senate Judiciary Committee "evaluating the propriety and adequacy of the OxyContin criminal settlement."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Despite its ostensible role as a patient advocacy organization, APF was willing to overlook substantial evidence—resulting in the jailing of Purdue executives—that Purdue blatantly, and despite its clear knowledge to the contrary, told physicians and patients that OxyContin was "rarely" addictive and less addictive than other opioids.  Like Purdue and despite the leadership of numerous medical doctors and researchers on its board, APF ignored the truth about opioids and parroted Purdue's deceptive messaging.  Purdue testified on Purdue's behalf that addiction was a "rare problem" for chronic pain patients and asserted:  "[T]he scientific evidence suggests that addiction to opioids prescribed by legitimate chronic non-cancer pain patients without prior histories of substance abuse using the medication as directed is rare.  Furthermore, no causal effect has been demonstrated between the marketing of OxyContin and the abuse and diversion of the drug."  There was, and is, no scientific support for those statements.

539.    Recently the US Senate's committee on Homeland Security and Governmental Affairs issued a detailed report of the use by the above named defendants of third party groups. The report revealed the above named Defendants between 2012 and 2017 contributed nearly 9 million dollars to leading patient advocacy groups operating in the opioid area, with Doctors receiving more than 1.6 million from these same manufacturers. (See "Exposing the Financial Ties between Opioid Manufacturers and Third Party Advocacy Groups-Minority Staff Report Homeland Security and Governmental Affairs Committee, Feb, 2017).

540.    APF President Will Rowe reached out to Defendants—including Purdue—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

541.    Purdue's control over APF shaped and was demonstrated by specific APF, pro-opioid publications.  These publications had no basis in science and were driven (and can only be explained) by the commercial interest of pharmaceutical companies—Purdue chief among them.

(b)    *A Policymaker's Guide*

542.    Purdue provided significant funding to and was involved with APF in creating and disseminating *A Policymaker's Guide to Understanding Pain & Its Management*, which was originally published in 2011 and is available online to this day.  *A Policymaker's Guide to Understanding Pain & Its Management* misrepresented that that there were studies showing that the use of opioids for the long-term treatment of chronic pain could improve patients' ability to function.

543.    Specifically, *A Policymaker's Guide to Understanding Pain & Its Management* claimed that "multiple clinical studies" demonstrated that "opioids . . . are effective in improving [d]aily function, [p]sychological health [and] [o]verall health-related quality of life for people with chronic pain" and implied that these studies established that the use of opioids long-term led to functional improvement.  The study cited in support of this claim specifically noted that there were no studies demonstrating the safety of opioids long-term and noted that "[f]or functional outcomes, the other [studied] analgesics were significantly more effective than were opioids."

544.    The *Policymaker's Guide* also misrepresented the risk of addiction.  It claimed that pain generally had been "undertreated" due to "[m]isconceptions about opioid addiction" and that "less than 1% of children treated with opioids become addicted."

545.    Moreover, the *Policymaker's Guide* attempted to distract doctors from their patients' drug-seeking behavior by labeling it as pseudo addiction, which, according to the guide, "describes patient behaviors that may occur when pain is undertreated."  Like *Partners Against*

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

*Pain*, *A Policymaker's Guide* noted that "[p]seudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."  The similarity between these messages regarding pseudo-addiction highlights the common, concerted effort behind Purdue's deceptive statements.

546.    The *Policymaker's Guide* further misrepresented the safety of increasing doses of opioids and deceptively minimized the risk of withdrawal.  For example, the *Policymaker's Guide* claimed that "[s]ymptoms of physical dependence" on opioids in long-term patients "can often be ameliorated by gradually decreasing the dose of medication during discontinuation" while omitting the significant hardship that often accompanies cessation of use.  Similarly, the *Policymaker's Guide* taught that even indefinite dose escalations are "sometimes necessary" to reach adequate levels of pain relief, but it completely omitted the safety risks associated with increased doses.

547.    Purdue provided substantial assistance toward the creation and dissemination of the *Policymaker's Guide*, which APF ultimately disseminated on behalf of Defendants, including Purdue.  Purdue provided $26,000 in grant money to fund the development and dissemination of its content.  Purdue kept abreast of the content of the guide as it was being developed, and, based on the periodic reports APF provided to Purdue regarding its progress on the *Policymaker's Guide*, had editorial input into its contents.

548.    The *Policymaker's Guide* was posted online, and was available to and intended to reach Missouri prescribers and consumers.  As described below, the deceptive statements in *Policymaker's Guide* regarding addiction and functionality were the very same messages Purdue directed at Missouri through its own sales force.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

(c)    *Treatment Options:  A Guide for People*
*Living with Pain*

549.    Purdue's partnership with APF did not end with the *Policymaker's Guide*.  Purdue also substantially assisted APF by sponsoring *Treatment Options:  A Guide for People Living with Pain*, starting in 2007.  Based on Purdue's control of other APF projects, Purdue also would have exercised control over *Treatment Options*.

550.    *Treatment Options* is rife with misrepresentations regarding the safety and efficacy of opioids.  For example, *Treatment Options* misrepresented that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve."

551.    *Treatment Options* claimed that addiction is rare and, when it does occur, involves unauthorized dose escalations, patients who receive opioids from multiple doctors, or theft, which paints a narrow and misleading portrait of opioid addiction.

552.    *Treatment Options* also promoted the use of opioids to treat long-term chronic pain by denigrating alternate treatments, most particularly NSAIDs.  *Treatment Options* noted that NSAIDs can be dangerous at high doses and inflated the number of deaths associated with NSAID use, and distinguished opioids as having less risk.  According to *Treatment Options*, NSAIDs were different from opioids because opioids had "no ceiling dose," which was beneficial since some patients "need" larger doses of painkillers than they are currently prescribed.  *Treatment Options* warned that the risks associated with NSAID use increased if NSAIDs were "taken for more than a period of months," but deceptively omitted any similar warning about the risks associated with the long-term use of opioids.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

553.    *Treatment Options* was posted online and remains online today.  It was available to and intended to reach Missouri prescribers and patients.  As described below, the deceptive statements in *Treatment Options* regarding addiction and functionality echo the messages Purdue directed at Missouri through its own sales force.

(d)    *Exit Wounds*

554.    Purdue also engaged in other promotional projects with and through APF.  One such project was the publication and distribution of *Exit Wounds*, which deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.

555.    Purdue provided APF with substantial assistance in distributing *Exit Wounds* in Missouri and throughout the nation by providing grant money and other resources.

556.    APF mailed copies of *Exit Wounds* to the "Wounded Heroes Foundation" in Missouri.

ii.    *Purdue's Work with Other Third Party Front Groups and KOLs*

557.    Purdue also provided other third-party Front Groups with substantial assistance in issuing misleading statements regarding the risks, benefits, and superiority of opioids for the long-term treatment of chronic pain.

(a)    FSMB – Responsible Opioid Prescribing

558.    In 2007, Purdue sponsored FSMB's *Responsible Opioid Prescribing*, which, as described above in Section V.D, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.  *Responsible Opioid Prescribing* also was drafted by "Medical Writer X."

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

559.    Purdue spent $150,000 to help FSMB distribute *Responsible Opioid Prescribing*. The book was distributed nationally, and was available to and intended to reach prescribers in Missouri.

(b)    *AGS – Pharmacological Management of Persistent Pain in Older Persons*

560.    Along with Janssen, Purdue worked with the AGS on a CME to promote the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.  As discussed above in Section V.C.2.c.iii, these guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse" when the study supporting this assertion did not analyze addiction rates by age.  They also stated, falsely, that "[a]ll patients with moderate to severe pain should be considered for opioid therapy (low quality of evidence, strong recommendation)."

561.    Controversy surrounding earlier versions of AGS guidelines had taught AGS that accepting money directly from drug companies to fund the guidelines' development could lead to allegations of bias and "the appearance of conflict."  Accordingly, AGS endeavored to eliminate "the root cause of that flack" by turning down commercial support to produce the 2009 Guidelines.  Having determined that its veneer of independence would be tarnished if it accepted drug company money to create the content, AGS decided to develop the guidelines itself and turn to the drug companies instead for funding to *distribute* the pro-drug company content once it had been created.  As explained by AGS personnel, it was AGS's "strategy that we will take commercial support to disseminate [the 2009 Guidelines] if such support is forthcoming."  AGS knew that it would be difficult to find such support unless the report was viewed favorably by opioid makers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

562.    AGS sought and obtained grants from Endo and Purdue to distribute

*Pharmacological Management of Persistent Pain in Older Persons*.  As a result, the publication

was distributed nationally, and was available to and was intended to reach Missouri prescribers.

Indeed, internal documents of another Defendant, Endo, indicate that pharmaceutical sales

representatives employed by Purdue discussed treatment guidelines that minimized the risk of

addiction to opioids with doctors during individual sales visits.

(c)    *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*

563.    Purdue sponsored a 2012 CME program taught by Steven Stanos, a KOL-based

KOL, called *Chronic Pain Management and Opioid Use:  Easing Fears, Managing Risks, and*

*Improving Outcomes*.  The presentation deceptively instructed doctors that, through the use of

screening tools, more frequent refills, and other techniques, high-risk patients showing signs of

addictive behavior could be treated with opioids.  This CME was presented at various locations

in the United States.

(d)    *Managing Patient's Opioid Use:  Balancing the Need and Risk*

564.    Purdue also sponsored a 2011 CME taught by KOL Lynn Webster via webinar

titled *Managing Patient's Opioid Use:  Balancing the Need and Risk*.  This presentation likewise

deceptively instructed prescribers that screening tools, patient agreements, and urine tests

prevented "overuse of prescriptions" and "overdose deaths."  At the time, Dr. Webster was

receiving significant funding from Purdue.  Versions of Dr. Webster's Opioid Risk Tool appear

on, or are linked to, websites run by Purdue (and other Defendants).   The webinar was available

to and was intended to reach Missouri prescribers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

(e)     *Path of the Patient, Managing Chronic Pain*
*in Younger Adults at Risk for Abuse*

565.     Purdue also sponsored a CME program entitled *Path of the Patient, Managing*

*Chronic Pain in Younger Adults at Risk for Abuse*.  *Path of the Patient* is devoted entirely to

treating chronic pain with opioids.  Although the program purports to instruct a treating

physician how to manage chronic pain in younger adults at risk for abuse, it does no such thing.

This "educational" program, addressing treatment of a population known to be particularly

susceptible to opioid addiction, presents none of the alternative treatment options available, but

only discusses treatment of chronic pain with opioids.

566.     In a role-play in *Path of the Patient*, a patient who suffers from back pain tells his

doctor that he is taking twice as many hydrocodone pills as directed.  The doctor reports that the

pharmacy called him because of the patient's early refills. The patient has a history of drug and

alcohol abuse.  Despite these facts, the narrator notes that, because of a condition known as

"pseudoaddiction," the doctor should not assume his patient is addicted even if he persistently

asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved

escalating doses."  The doctor in the role play treats this patient by prescribing a high-dose, long-

acting opioid.  This CME was available online and was intended to reach Missouri prescribers.

(f)     *Overview of Management Options*

567.     Purdue also sponsored a CME titled *Overview of Management Options* and issued

by the American Medical Association in 2003, 2007, and 2013 (the latter of which is still

available for CME credit).  The CME was edited by KOL Russel Portenoy, among others.  It

deceptively instructed physicians that NSAIDs and other drugs, but not opioids, are unsafe at

high doses.  In fact, the data indicates that patients on high doses of opioids are more likely to

experience adverse outcomes than patients on lower doses of the drugs.  Dr. Portenoy received

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

research support, consulting fees, and honoraria from Purdue (among others), and was a paid Purdue consultant.  This CME was presented online in the United States and was available to Missouri prescribers.

iii.      *Purdue's Misleading Science*

568.    Purdue also misrepresented the risks associated with long-term opioid use by promoting scientific studies in a deceptive way.  In 1998, Purdue funded two articles by Dr. Lawrence Robbins in Missouri, which showed that between 8% and 13% of the patients he studied became addicted to opioids—a troubling statistic for Purdue, whose market, and marketing, depended upon the claim that opioids were rarely addictive.  Purdue had these articles placed in headache-specific journals, where they would be less likely to be encountered by pain specialists or general practitioners.  The first of these articles has been cited a mere 16 times; the second does not even appear on Google scholar.  Five years later, Purdue also funded a study of OxyContin in diabetic neuropathy patients, which was published in 2003.  Notwithstanding that Purdue-funded studies, testing Purdue's own drugs, had previously indicated that addiction rates were between 8% and 13%, Purdue's 2003 article reached back to the 1980 Porter-Jick Letter to support its claim that OxyContin was not commonly addictive.  This article was placed in a prominent pain journal and has been cited 487 times.  While this article was drafted over a decade ago, it continues to be relied upon to further the misrepresentations that opioids are not addictive.

**E.     Why Defendants' Marketing Messages Are Misleading and Unfair.**

569.    Defendants' marketing of opioids for long-term use to treat chronic pain, both directly and with and through third parties, included information that was false, misleading, contrary to credible scientific evidence and their own labels, and lacked balance and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

substantiation.  Their marketing materials omitted material information about the risks of opioids, and overstated their benefits.  Moreover, Defendants inaccurately suggested that chronic opioid therapy was supported by evidence, and failed to disclose the lack of evidence in support of treating chronic pain with opioids.

570.     As described in greater detail, there are seven primary misleading and unfounded representations.  Defendants and the third parties with which they teamed:

- misrepresented that opioids improve function;

- concealed the link between long-term use of opioids and addiction;

- misrepresented that addiction risk can be managed;

- masked the signs of addiction by calling them "pseudoaddiction";

- falsely claimed withdrawal is easily managed;

- misrepresented or omitted the greater dangers from higher doses of opioids; and

- deceptively minimized the adverse effects of opioids and overstated the risks of NSAIDs.

571.     In addition to these misstatements, Purdue purveyed an eighth deception—that OxyContin provides a full 12 hours of pain relief.

572.     Exacerbating each of these misrepresentations and deceptions was the collective effort of Defendants and third parties to hide from the medical community the fact that there were no adequate and well-controlled studies of opioid use longer than 12 weeks."

**1.     Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function.**

573.     Each of the following materials was created with the expectation that, by instructing patients and prescribers that opioids would improve patients' function and quality of life, patients would demand opioids and doctors would prescribe them.  These claims also

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

encouraged doctors to continue opioid therapy in the belief that failure to improve pain, function, or quality of life could be overcome by increasing doses or prescribing supplemental short-acting opioids to take on an as-needed basis for breakthrough pain.

574.    However, not only is there no evidence of improvement in long-term functioning, a 2006 study-of-studies found that "[f]or functional outcomes . . . other analgesics were significantly more effective than were opioids."  Studies of the use of opioids in chronic conditions for which they are commonly prescribed, such as low back pain, corroborate this conclusion and have failed to demonstrate an improvement in patients' function.  Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity.  Indeed, one Defendant's own internal marketing plans characterized functional improvement claims as "aspirational."  Another acknowledged in 2012 that "[s]ignificant investment in clinical data [was] needed" to establish opioids' effect on mitigating quality of life issues, like social isolation.

575.    The long-term use of opioids carries a host of serious side effects, including addiction, mental clouding and confusion, sleepiness, hyperalgesia, immune-system and hormonal dysfunction, that degrade, rather than improve, patients' ability to function.  Defendants often omitted these adverse effects from their publications, as well as omitting certain risks of drug interactions.

576.    Yet each of the following statements by Defendants, which are further discussed, by Defendant, suggests that the long-term use of opioids improve patients' function and quality of life, and that scientific evidence supports this claim.

577.    Insys manufactures, markets, sells and distributes the following pharmaceutical drug in Missouri and Nationwide:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Subsys (fentanyl) | Fentanyl sublingual spray; semi-synthetic opioid agonist, approved in 2012 | Schedule II |
|---|---|---|

578.    Subsys is indicated "for the management of breakthrough pain in cancer patients 18 year of age and older who are already receiving and are tolerant to opioid therapy for their underlying persistent cancer pain.  The indication also specifies that "SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."  In addition, the indication provides that "[p]atients must remain on around-the-clock opioids when taking SUBSYS."  Subsys is contraindicated for, among other ailments, the "[m]anagement of acute or postoperative pain including headache/migraine and dental pain."  It is available in 100 mcg, 200 mcg, 400 mcg, 600 mcg and 800 mcg dosage strengths.

579.    Insys' revenue is derived almost entirely from Subsys.  According to its Form 10-K for 2015, Insys reported revenues of $331 million.  Of that total, $329.5 million was derived from sales of Subsys.  The majority of Insys' sales of Subsys are through wholesalers including:  Defendants AmerisourceBergen, McKesson and Cardinal Health.  In 2015, those wholesalers respectively comprised 20%, 17% and 14% of Insys' total gross sales of Subsys.

580.    According to Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and chief medical officer of Phoenix House Foundation, fentanyl products are "the most potent and dangerous opioids on the market."

581.    The dangers associated with Subsys are reflected by its extremely limited and specific indication, as it is approved solely for BTP in cancer patients already receiving opioids for persistent cancer-related pain.

582.    Despite Subsys' limited indication and the potent danger associated with fentanyl, Insys falsely and misleadingly marketed Subsys to doctors as an effective treatment for back

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

pain, neck pain and other off-label pain conditions.  Moreover, as of June 2012, Insys defined BTP in cancer patients to include mild pain:  a "flare of **mild-to**-severe pain in patients with otherwise stable persistent pain," based on a misleading citation to a paper written by Portenoy. Portenoy's paper, "Breakthrough pain:  definition, prevalence and characteristics," which was featured in the 1990 issue of *Pain*, actually defined breakthrough pain as "a transitory increase in pain to greater than moderate intensity (that is, to an intensity of 'severe' or 'excruciating') . . . on a baseline pain of moderate intensity or less."  Insys trained and instructed its sales representatives to use the false definition of breakthrough pain and specifically to use a core visual aid, including the improper definition, whenever they detailed Subsys to a healthcare provider or provider's office.

583.    According to a 2014 article in *The New York Times*, only 1% of prescriptions for Subsys were written by oncologists.  Approximately half the prescriptions were written by pain specialists, with others written by other specialists including dentists and podiatrists.

584.    On December 8, 2016, several former Insys executives were arrested and indicted for conspiring to bribe practitioners in numerous states, many of whom operated pain clinics, in order to get them to prescribe Subsys.  In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for patients, most of whom were not diagnosed with cancer. (Hereinafter "Insys Indictment.")

585.    The indictment alleged that the former executives conspired to mislead and defraud health insurance providers, who were reluctant to approve payment for Subsys when it was prescribed for patients without cancer.  In response, the former executives established a "reimbursement unit" at Insys, which was dedicated to assisting physicians by obtaining prior authorization for prescribing Subsys directly from insurers and pharmacy benefit managers.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Insys' reimbursement unit employees were told to inform agents of insurers and pharmacy benefit managers that they were calling "from" or that they were "with" the doctor's office, or that they were calling "on behalf of" the doctor.

586.    The executive defendants in the indictment are Insys' former CEO and president, former vice president of sales, former national director of sales, former vice president of managed markets and several former regional sales directors.

587.    The indictment details a coordinated, centralized scheme by Insys to illegally drive profits.  The company defrauded insurers from a call center at corporate headquarters where Insys employees, acting at the direction of Insys' former  CEO and vice president of managed markets, disguised their identify and the location of their employer and lied about patient diagnoses, the type of pain being treated and the patient's course of treatment with other medication.

588.    The following Defendants also developed and falsely marketed their products' improved function, to wit:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that "***most*** chronic benign pain patients do have ***markedly improved ability to function*** when maintained on chronic opioid therapy." (Emphasis added.) |
|---------|----|----|
| | b. | Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational function. |
| | c. | Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and cause patients to enjoy their lives." The FDA warned Actavis such claims were misleading, writing: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." |
| | d. | Actavis sales representatives told Missouri prescribers that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Cephalon | e. | Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course."  Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
|---|---|---|
| | f. | Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids when used properly "give [pain patients] a quality of life we deserve."  The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids.  APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the publication is currently available online. |
| | g. | Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, through December 15, 2008.  The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids. |
| | h. | Cephalon sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| **Endo** | i.  Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."  Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.<br><br>j.  A CME sponsored by Endo, titled *Persistent Pain in the Older Patient*, taugh that chronic opioid therapy has been "shown to reduce pain and improve depressive symtoms and cognitive functioning."<br><br>k.  Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work as a chef.  This flyer also emphasized Opana ER's indication without including equally prominent disclosure of the "moderate to severe pain" qualification.<br><br>l.  Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007).  This book taught that relief of pain itself improved patients' function.  *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course."<br><br>m.  Endo provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original).  *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.  Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.<br><br>n.  Endo sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| **Janssen** | o.  Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed.  This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.  The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original).  The myth/fact structure implies authoritative backing for the claim that does not exist.  The targeting of older adults also ignored heightened opioid risks in this population. <br><br> p.  Janssen sponsored, developed, and approved content of a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* Janssen financed and orchestrated.  This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," inaccurately implying her experience would be representative.  This video is still available today on youtube.com. <br><br> q.  Janssen provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original).  *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.   Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. <br><br> r.  Janssen sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Purdue | s. | Purdue ran a series of advertisements for OxyContin in 2012 in medical journals titled "Pain vignettes," which were case studies featuring patients, each with pain conditions persisting over several months, recommending OxyContin for each.  One such patient, "Paul," is described to be a "54-year-old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work more effectively. |
|---|---|---|
| | t. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients."  The sole reference for the functional improvement claim noted the absence of long-term studies and actually stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids."   The *Policymaker's Guide* is still available online. |
| | u. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids, when used properly, "give [pain patients] a quality of life we deserve."  APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the guide currently is available online. |
| | v. | Purdue sponsored APF's *Exit Wounds* (2009), which taught veterans that opioid medications "increase your level of functioning."  *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.  Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | w. | Purdue sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function.  *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course."  Purdue also spent over $100,000 to support distribution of the book. |
| | x. | Purdue sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life. |

### 2. Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-Term Opioid Use.

589.    The fraudulent representation that opioids are rarely addictive is central to

Defendants' scheme.  To reach chronic pain patients, Defendants, and the Front Groups and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

KOLs that they directed, assisted, and collaborated with, had to overcome doctors' legitimate fears that opioids would addict their patients.  The risk of addiction is an extremely weighty risk—condemning patients to, among other things, dependence, compulsive use, haziness, a lifetime of battling relapse, and a dramatically heightened risk of serious injury or death.  But for Defendants' campaign to convince doctors otherwise, finding benefits from opioid use for common chronic pain conditions sufficient to justify that risk would have, and previously had, posed a nearly insurmountable challenge.

590.     Through their well-funded, comprehensive marketing efforts, Defendants and their KOLs and Front Groups were able to change prescriber perceptions, despite the well-settled historical understanding and clear evidence that opioids taken long-term are often addictive. Defendants and their third-party partners:  (a) called it Pseudoaddiction maintained that the risk of addiction for patients who take opioids long-term was low; and (b) omitted the risk of addiction and abuse from the list of adverse outcomes associated with chronic opioid use, even though the frequency and magnitude of the risk—and Defendants' own labels—compelled disclosure.

591.     Further, in addition to falsely claiming opioids had low addiction risk or omitting disclosure of the risk of addiction altogether, Defendants employed language that conveyed to prescribers that the drugs had lower potential for abuse and addiction.  Further, in addition to making outright misrepresentations about the risk of addiction, or failing to disclose that serious risk at all, Defendants used code words that conveyed to prescribers that their opioid was less prone to abuse and addiction.  For instance, sales representatives for Mallinckrodt, Actavis, Endo, Janssen, and Purdue promoted their drugs as having "steady-state" properties with the intent and expectation that prescribers would understand this to mean that their drugs caused less

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

of a rush or a feeling of euphoria, which can trigger abuse and addiction.  Further, Endo actively promoted its reformulated Opana ER on the basis that it was "designed to be crush-resistant," suggesting both (a) that Endo had succeeded in making the drug harder to adulterate, and (b) that it was less addictive, in consequence.  In fact, however, Endo knew that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER" and that Opana ER could still be ground and cut into small pieces by those looking to abuse the drug.  In the same vein, Janssen denied that Nucynta ER was an opioid and claimed that it was not addictive, and Purdue claimed that its opioids were not favored by addicts and did not produce a buzz, all of which falsely suggested that its opioids were less likely to be abused or addictive.

592.    Each of the following was created with the expectation that, by instructing patients and prescribers that addiction rates are low and that addiction is unlikely when opioids are prescribed for pain, doctors would prescribe opioids to more patients.  For example, one publication sponsored exclusively by Purdue—APF's 2011 *A Policymaker's Guide to Understanding Pain & Its Management*—claimed that opioids are not prescribed often enough because of "misconceptions about opioid addiction."

593.    Acting directly or with and through third parties, each of the Defendants claimed that the potential for addiction from its drugs was relatively small, or non-existent, even though there was no scientific evidence to support those claims, and the available research contradicted them.  A recent literature survey in 2016 found that while ranges of "problematic use" of opioids ranged from <1% to 81%, abuse averages between 21% and 29% and addiction between 8% and 12%.  These estimates are well in line with Purdue's own studies, showing that between 8% and 13% of OxyContin patients became addicted, but on which Purdue chose not to rely, citing

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

instead the Porter-Jick letter, which primarily looked at hospitalized patients with acute post-surgical pain.

594.   The FDA has found as well that 20% of opioid patients use two or more pharmacies, 26% obtain opioids from two or more prescribers, and 16.5% seek early refills—all potential "red flags" for abuse or addiction.  The FDA in fact has ordered manufacturers of long-acting opioids to "[c]onduct one or more studies to provide <u>quantitative estimates</u> of <u>the</u> serious risks of misuse, abuse, addiction, overdose and death associated with long-term use of opioid analgesics for management of chronic pain," in recognition of the fact that it found "high rates of addiction" in the medical literature.

595.   Of course, the significant (and growing) incidence of abuse, misuse, and addiction to opioids also is powerful evidence that Defendants' statements regarding the low risk of addiction were and are untrue.  This was well-known to Defendants, who had access to sales data and reports, adverse event reports, federal abuse and addiction-related surveillance data, and other sources that demonstrated the widening epidemic of opioid abuse and addiction.

596.   Acting directly or through and with third parties, each of the Defendants claimed that the potential for addiction even from long-term use of its drugs was relatively small, or non-existent, even though that was false and there was no scientific evidence to support it.

Defendants' conduct included:

| **Actavis** | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction. |
| --- | --- | --- |
| | b. | Actavis caused a patient education brochure to be distributed in 2007 that claimed addiction is possible, but it is "less likely if you have never had an addiction problem."   Although the term "less likely" is not defined, the |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | | overall presentation suggests the risk is so low as not to be a worry. |
|---|---|---|
| **Cephalon** | c. | Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." |
| | d. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
| **Endo** | e. | Endo trained its sales force in 2012 that use of long-acting opioids resulted in increased patient compliance, without any supporting evidence. |
| | f. | Endo's advertisements for the 2012 reformulation of Opana ER claimed it was *designed to be crush resistant*, in a way that conveyed that it was less likely to be abused.  This claim was false; the FDA warned in a May 10, 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse" and Endo's "post-marketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of abuse."  Further, Endo instructed its sales representatives to repeat this claim about "design," with the intention of conveying Opana ER was less subject to abuse. |
| | g. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that: "[p]eople who take opioids as prescribed usually do not become addicted."   Although the term "usually" is not defined, the overall presentation suggests the risk is so low as not to be a worry.  The language also implies that as long as a prescription is given, opioid use will not become problematic.  Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | h. | Endo sponsored a website, PainAction.com, which stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." |
| | i. | Endo sponsored CMEs published by APF's NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult* and *Persistent Pain in the Older Patient*.  These CMEs claimed that opioids used by elderly |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

|  |  | patients present "possibly less potential for abuse than in younger patients[,]" which lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients. |
|  | j. | Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." |
|  | k. | Endo distributed a patient education pamphlet edited by key opinion leader Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*.  It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."  This implies that pain patients prescribed opioids will not become addicted, which is unsupported and untrue. |
|  | l. | Endo contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.  These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence.  Endo was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | m. | Endo provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."  Although the term "very unlikely" is not defined, the overall presentation suggests that the risk is so low as not to be a worry. |
| **Janssen** | n. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed.  This guide described a "myth" that opioids are addictive, and asserts as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."  Although the term "rarely" is not defined, the overall presentation suggests the risk is so low as not to be a worry.  The language also implies that as long as a prescription is given, opioid use is not a problem. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

|  |  |  |
|---|---|---|
|  | o. | Janssen contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.  These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  The study supporting this assertion does not analyze addiction rates by age and, as already noted, addiction remains a significant risk for elderly patients.  Janssen was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | p. | Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that [l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."  Although the term "very unlikely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
|  | q. | Janssen ran a website, *Prescriberesponsibly.com* (last modified July 2, 2015), which claims that concerns about opioid addiction are "overstated." |
|  | r. | A June 2009 Nucynta Training module warns Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded because "the risks . . . are much smaller than commonly believed." |
| **Purdue** | s. | Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which under the heading, "Indications of Possible Drug Abuse," shows pictures of the stigmata of injecting or snorting opioids—skin popping, track marks, and perforated nasal septa.  In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use.  Thus, these misrepresentations wrongly reassure doctors that as long as they do not observe those signs, they need not worry that their patients are abusing or addicted to opioids. |
|  | t. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids will become addicted.  This publication is still available online.  This publication also asserted that pain is undertreated due to "misconceptions about opioid addiction." |
|  | u. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to |

|  | | extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
|  | v. | A Purdue-funded study with a Purdue co-author claimed that "evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse." The study relied only on the 1980 Porter-Jick letter to the editor concerning a chart review of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid. Although the term "low" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
|  | w. | Purdue contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids and the claim is, in fact, untrue. Purdue was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | x. | Purdue sponsored APF's *Exit Wounds* (2009), which counseled veterans that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests it is so low as not to be a worry. |

597.    In addition to denying or minimizing the risk of addiction and abuse generally, and as laid out in, Defendants also falsely claimed that their particular drugs were safer, less addictive, and less likely to be abused or diverted than their competitors' or predecessor drugs. In making these claims, Defendants said or implied that because their drug had a "steady-state" and did not produce peaks and valleys, which cause drug-seeking behavior—either to obtain the high or avoid the low—it was less likely to be abused or addicting. Endo also asserted in particular that, because a reformulation of Opana ER was (or was designed to be) abuse-deterrent or tamper-resistant, patients were less likely to become addicted to them. Defendants had no

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

evidence to support any of these claims, which, by FDA regulation, must be based on head-to-head trials; the claims also were false and misleading in that they misrepresented the risks of both the particular drug and opioids as a class.

598.    Further, rather than honestly disclose the risk of addiction, Defendants, and the third parties they directed and assisted and whose materials they distributed, attempted to portray those who were concerned about addiction as unfairly denying treatment to needy patients.  To increase pressure on doctors to prescribe chronic opioid therapy, Defendants turned the tables; it was doctors who fail to treat their patients' chronic pains with opioids—not doctors who cause their patients to become addicted to opioids—who are failing their patients (and subject to discipline).  Defendants and their third-party allies claimed that purportedly overblown worries about addiction cause pain to be under-treated and opioids to be over-regulated and under-prescribed.  This mantra of under-treated pain and under-used drugs reinforced Defendants' messages that the risks of addiction and abuse were not significant and were overblown.

599.    For example, Janssen's website, *Let's Talk Pain*, warns in a video posted online that "strict regulatory control has made many physicians reluctant to prescribe opioids.  The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence."  The program goes on to say:  "Because of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients . . . .  This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."

600.    In the same vein, a Purdue website called *In the Face of Pain* complains, under the heading of "Protecting Access," that, through at least mid-2013, policy governing the prescribing of opioids was "at odds with" best medical practices by "unduly restricting the

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

amounts that can be prescribed and dispensed"; "restricting access to patients with pain who also have a history of substance abuse"; and "requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe."  This unsupported and untrue rhetoric aims to portray doctors who do not prescribe opioids as uncaring, converting their desire to relieve patients' suffering into a mandate to prescribe opioids.

### 3. Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or Managed.

601.    Defendants each continue to maintain to this day that most patients safely can take opioids long-term for chronic pain without becoming addicted.  Presumably to explain why doctors encounter so many patients addicted to opioids, Defendants and their third-party allies have come to admit that some patients could become addicted, but that doctors can avoid or manage that risk by using screening tools or questionnaires.  These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) so that doctors can more closely monitor patients at greater risk of addiction.

602.    There are three fundamental flaws in these assurances that doctors can identify and manage the risk of addiction.  First, there is no reliable scientific evidence that screening works to accurately predict risk or reduce rates of addiction.  Second, there is no reliable scientific evidence that high-risk or addicted patients can take opioids long-term without triggering addiction, even with enhanced monitoring and precautions.  Third, there is no reliable scientific evidence that patients without these red flags are necessarily free of addiction risk.

603.    Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so.  A recent Evidence Report by the Agency for Healthcare

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain" identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations on outcomes related to overdose, addiction, abuse or misuse." Furthermore, attempts to treat high-risk patients, such as those who have a documented predisposition to substance abuse, by resorting to patient contracts, more frequent refills, or urine drug screening are not proven to work in the real world, if busy doctors even in fact attempt them.

604.    Most disturbingly, despite the widespread use of screening tools, patients with past substance use disorders—which every tool rates as a risk factor—receive, on average, higher doses of opioids.

605.    As described below, each Defendant claimed that the risk of addiction could be avoided or managed, claims that are deceptive and without scientific support:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction. |
|---|---|
| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed." |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| Endo | c. Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice* and written by a Missouri-based doctor who later became a member of Endo's speakers bureau.  This publication, titled *Pain Management Dilemmas in Primary Care: Use of Opioids*, recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely (*e.g.*, without becoming addicted) receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. |
|---|---|
| Purdue | d. Purdue's unbranded website, *In the Face of Pain* (inthefaceofpain.com) states that policies that "restrict[] access to patients with pain who also have a history of substance abuse" and "requiring special government-issued prescription forms for the only medications that are capable of relieving pain that is severe" are "at odds with" best medical practices.<br><br>e. Purdue sponsored a 2012 CME program taught by a Missouri-based KOL titled *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*.  This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat a high-risk patient showing signs of potentially addictive behavior.<br><br>f. Purdue sponsored a 2011 webinar taught by Dr. Lynn Webster, titled *Managing Patient's Opioid Use: Balancing the Need and Risk*.  This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." |

### 4. Defendants and their Third-Party Allies Created Confusion By Promoting the Misleading Term "Pseudoaddiction."

606. Defendants and their third-party allies developed and disseminated each of the following misrepresentations with the intent and expectation that, by instructing patients and prescribers that signs of addiction are actually the product of untreated pain, doctors would prescribe opioids to more patients and would continue to prescribe, and patients to use, opioids despite signs that the patient was addicted.  The concept of pseudoaddiction was coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, who

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

consulted for Cephalon, Endo, Janssen, and Purdue.  Much of the same language appears in other Defendant Mallinckrodt's treatment of this issue, highlighting the contrast between "undertreated pain" and "true addiction," as if patients could not experience both.  As KOL Dr. Lynn Webster wrote: "[Pseudoaddiction] obviously became too much of an excuse to give patients more medication.  . . .  It led us down a path that caused harm.  It is already something we are debunking as a concept."

607.    Each of the publications and statements below, falsely states or suggests that the concept of "pseudoaddiction" is substantiated by scientific evidence and accurately describes the condition of patients who only need, and should be treated with, more opioids:

| | |
|---|---|
| **Actavis** | a.  Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction." |
| **Cephalon** | b.  Cephalon sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding are all signs of pseudoaddiction.  Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
| **Endo** | c.  Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007).  Endo's internal planning documents describe the purpose of distributing this book as to "[i]ncrease the breadth and depth of the Opana ER prescriber base."  The book claims that when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose *in most cases . . . should be the clinician's first response.*" (emphasis added).  <br><br>d.  Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force.  This book asserted that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of "pseudoaddiction." |
| **Janssen** | e.  Janssen's website, *Let's Talk Pain*, stated from 2009 through 2011 that |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| | "pseudoaddiction . . . refers to patient behaviors that may occur when *pain is under-treated*" and "[p]seudoaddiction is *different from true addiction* because such behaviors can be resolved with effective pain management." (emphasis added). |
| **Purdue** | f.  Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated." |
| | g.  Purdue distributed to physicians at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted 2005 and titled *Clinical Issues in Opioid Prescribing*.  This pamphlet included a list of conduct including "illicit drug use and deception" it defined as indicative of pseudoaddiction or untreated pain.  It also states: "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated. . . .*  Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief.  Pseudoaddiction can be *distinguished from true addiction* in that the behaviors resolve when the pain is effectively treated." (Emphasis added.) |
| | h.  Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name, "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction.  Purdue also spent over $100,000 to support distribution of the book. |
| | i.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states:  "Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated. . . .*  Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." (Emphasis added.) |

**5.     Defendants and their Third-Party Allies Claimed Withdrawal is Simply Managed.**

608.     Defendants and their third-party allies promoted the false and misleading

messages below with the intent and expectation that, by misdescribing the difficulty of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

withdrawing from opioids, prescribers and patients would be more likely to start chronic opioid therapy and would fail to recognize the actual risk of addiction.

609.    In an effort to underplay the risk and impact of addiction, Defendants and their third-party allies frequently claim that while patients become "physically" dependent on opioids, physical dependence can be addressed by gradually tapering patients' doses to avoid the adverse effects of withdrawal.  They fail to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—effects that also make it less likely that patients will be able to stop using the drugs.

610.    In reality, withdrawal is prevalent in patients after more than a few weeks of therapy, and common symptoms of withdrawal include:  severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, and pain.  Some symptoms may persist for months, or even years, after a complete withdrawal from opioids, depending on how long opioids were used.  Withdrawal symptoms trigger a feedback loop that drives patients to seek opioids, contributing to addiction.

611.    Each of the publications and statements below, which are further discussed, by Defendant, in Section V.E, falsely states or suggests that withdrawal from opioids was not a problem and they should not be hesitant about prescribing or using opioids:

| **Actavis** | a.  Documents from a 2010 sales training indicate that Actavis trained its sales force that discontinuing opioid therapy can be handled "simply" and that it can be done at home.  Actavis's sales representative training claimed opioid withdrawal would take only a week, even in addicted patients. |
| --- | --- |
| **Endo** | b.  A CME sponsored by Endo, titled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days. |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| **Janssen** | c.  A Janssen PowerPoint presentation used for training its sales representatives titled "Selling Nucynta ER" indicates that the "low incidence of withdrawal symptoms" is a "core message" for its sales force.  This message is repeated in numerous Janssen training materials between 2009 and 2011.  The studies supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days or at high doses and would therefore not be representative of withdrawal symptoms in the chronic pain population.  Patients on opioid therapy long-term and at high doses will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms.  In addition, in claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use, when Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window painted a misleading picture of the likelihood and severity of withdrawal associated with chronic opioid therapy. Janssen also knew or should have  known that the patients involved in the study were not on the drug long enough to develop rates of withdrawal symptoms comparable to rates of withdrawal suffered by patients who use opioids for chronic pain—the use for which Janssen promoted Nucynta ER.<br><br>d.  Janssen sales representatives told Missouri prescribers that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids. |
| **Purdue** | e.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. |

### 6.  Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant Additional Risks.

612.  Each of the following misrepresentations was created with the intent and expectation that, by misrepresenting and failing to disclose the known risks from high dose opioids, prescribers and patients would be more likely to continue to prescribe and use opioids,

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

even when they were not effective in reducing patients' pain, and not to discontinue opioids even when tolerance required them to reach even higher doses.

613.     Defendants and their third-party allies claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high," suggesting that patients would eventually reach a stable, effective dose.  Each of Defendants' claims also omitted warnings of increased adverse effects that occur at higher doses, and misleadingly suggested that there was no greater risk to higher dose opioid therapy.

614.     These claims are false.  Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses.  As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects.  Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.  The FDA has itself acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects.  Moreover, it is harder for patients to terminate use of higher-dose opioids without severe withdrawal effects, which contributes to a cycle of continued use, even when the drugs provide no pain relief and are causing harm—the signs of addiction.

615.     Each of the following claims suggests that high-dose opioid therapy is safe:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses "until patient reports adequate analgesia" and to "set dose levels on [the] basis of patient need, not on [a] predetermined maximal dose." Actavis further counseled its sales representatives that the reasons some |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| | physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian. |
| **Cephalon** | b.  Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed. |
| | c.  Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008.  The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations. |
| **Endo** | d.  Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that opioids may be increased until "you are on the right dose of medication for your pain," and once that occurs, further dose increases would not occur.  Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it. |
| | e.  Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. In Q&A format, it asked: "If I take the opioid now, will it work later when I really need it?"  The response was:  "The dose can be increased . . . .  You won't 'run out' of pain relief." |
| **Janssen** | f.  Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed.  This guide listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased doses from opioids.  The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time." |
| **Purdue** | g.  Purdue's *In the Face of Pain* website, along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe them what—in their view—is a sufficient dose of opioids, they should find another doctor who will.  In so doing, Purdue exerted undue, unfair, and improper influence over prescribers who face pressure to accede to the resulting demands. |
| | h.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain &* |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

|  | *Its Management*, which taught that dose escalations are "sometimes necessary," even indefinitely high ones, which suggested that high dose opioids are safe and appropriate and did not disclose the risks from high dose opioids.  This publication is still available online.<br><br>i.   Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.  The guide also claimed that some patients "need" a larger dose of the drug, regardless of the dose currently prescribed.  This language fails to disclose heightened risks at elevated doses.<br><br>j.   Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013.  The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that other drugs, but not opioids, are unsafe at high doses.  The 2013 version is still available for CME credit.<br><br>k.   Purdue sales representatives told Missouri prescribers that opioids were just as effective for treating patients long-term and omitted any discussion that increased tolerance would require increasing, and increasingly dangerous, doses. |
|---|---|

> **7.    Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment.**

616.    Each of the following misrepresentations was created with the intent and expectation that, by omitting the known, serious risks of chronic opioid therapy, including the risks of addiction, abuse, overdose, and death, and emphasizing or exaggerating risks of competing products, prescribers and patients would be more likely to choose opioids. Defendants and their third-party allies routinely ignored the risks of chronic opioid therapy. These include (beyond the risks associated with misuse, abuse, and addiction):  hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;" hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazapines, which are used to treat post-traumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions).

617.    Despite these serious risks, Defendants asserted or implied that opioids were appropriate first-line treatments and safer than alternative treatments, including NSAIDs such as ibuprofen (Advil, Motrin) or naproxen (Aleve).  While NSAIDs can pose significant gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks were deceptive in themselves, and also made their omissions regarding the risks of opioids all the more striking and misleading.  Defendants and their third-party allies described over-the-counter NSAIDs as life-threatening and falsely asserted that they were responsible for 10,000-20,000 deaths annually (more than opioids), when the real number is closer to 3,200.  This description of NSAIDs starkly contrasted with their representation of opioids, for which the listed risks were nausea, constipation, and sleepiness (but not addiction, overdose, or death).  Compared with NSAIDs, opioids are responsible for roughly four times as many fatalities annually.  In addition, as published March 6, 2018 in JAMA, the first randomized controlled clinical trial demonstrated that opioids are no more effective in treating pain over a 12 month period than NSAIDs.

618.    As with the preceding misrepresentations, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits.  While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

619.     Each of the following, which are further discussed, by Defendant, in Section V.E, reflects Defendants' deceptive claims and omissions about the risks of opioids, including in comparison to NSAIDs:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs. |
|---|---|
| | b. Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, in older persons. |
| Cephalon | c. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.  The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose.  *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
| Endo | d. Endo distributed a "case study" to prescribers titled *Case Challenges in Pain Management:  Opioid Therapy for Chronic Pain*.  The study cites an example, meant to be representative, of a patient "with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs" (over eight years), and recommends treating with opioids instead. |
| | e. Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called "Pain: Opioid Therapy."  This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.  Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | f. Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.  *Exit Wounds* also |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | |
|---|---|
| | contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| **Janssen** | g. Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed.  This publication described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page.  The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke."  The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation.<br><br>h. Janssen sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines.  Janssen's label for Duragesic, however, states that use with benzoidazepines "may cause respiratory depression, [low blood pressure], and profound sedation or potentially result in coma.  *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| **Purdue** | i. Purdue sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.  APF distributed copies of *Exit Wounds* to a non-profit in Missouri.  *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.<br><br>j. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.   The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose.  *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids.<br><br>k. Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013, and the 2013 version is still available for CME credit.  The CME, *Overview of Management Options*, was edited by KOL |

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

| | Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |
|---|---|

### 8. Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Pain Relief.

620.   In addition to making the deceptive statements above, Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action.

621.   Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body on a linear rate.  OxyContin works by releasing a greater proportion of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was, upon information and belief, adapted from Purdue's own sales materials:



Figure 1

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the 12 hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

622.    OxyContin tablets provide an initial absorption of approximately 40% of the active medicine.  This has a two-fold effect.  First, the initial rush of nearly half of the powerful opioid—OxyContin is roughly twice as powerful as morphine—triggers a powerful psychological response.  OxyContin thus behaves more like an immediate release opioid, which Purdue itself once claimed was more addicting in its original 1995 drug label.  Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing period, which results in the drug not lasting for a full 12 hours and precipitates withdrawal symptoms in patients, a phenomenon known as "end of dose" failure.  The combination of fast onset and end-of-dose failure makes OxyContin particularly addictive, even compared with other opioids.

623.    Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full 12 hours.  Its advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels Over 12 Hours."  That claim was accompanied by a chart depicting plasma levels on a logarithmic scale, which minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared to be half of 100 mg in the table's y-axis.  That chart, shown below,  depicts the same information as the chart above but does so in a way that makes the absorption rate appear more consistent:

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

**For moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time**

# Consistent Plasma Levels Over 12 Hours

**Plasma concentrations (ng/mL) over time of various dosage strengths**



- OxyContin® 80 and 160 mg Tablets FOR USE ONLY IN OPIOID-TOLERANT PATIENTS requiring minimum daily oxycodone equivalent dosages of 160 mg and 320 mg, respectively. These tablet strengths may cause fatal respiratory depression when administered to patients not previously exposed to opioids

*Steady state achieved within 24 to 36 hours*

624.    More recently, other Purdue advertisements also emphasized "Q12h" (meaning twice-daily) dosing.  These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message.  Other advertisements that ran in the 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin, with "Q12h" handwritten for emphasis.

625.    The information that OxyContin did not provide pain relief for a full 12 hours was known to Purdue, and Purdue's competitors, but was not disclosed to general practitioners. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two (which would have compensated for end-of-dose failure) was set out in Purdue's internal documents as early as 1999 and is apparent from MEDWATCH Adverse Event reports for OxyContin.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

F.     **The Result of Defendants' Deceptive Scheme**

626.    Through their direct promotional efforts, along with those of the third-party Front Groups and KOLs they assisted and controlled, and whose seemingly objective materials they distributed, Defendants accomplished exactly what they set out to do:  change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain.  As a result, Missouri doctors began prescribing opioids long-term to treat chronic pain—something most would never have considered prior to Defendants' campaign.

627.    But for the misleading information disseminated by Defendants, doctors would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain.  As outlined below, the impact of Defendants' deceptive marketing on doctors' prescribing and patients' use of opioids is evidenced by:  (a) the increase in opioid prescribing nationally in concert with Defendants' marketing; (b) the City's own increased spending on opioids resulting from Defendants' promotional spending; and (C) the consequences of opioid over prescription—including addiction, overdose, and death—that have been visited on Missouri and its residents, as confirmed by interviews with victims and addiction treatment programs.

## III.

V.     **THE PHARMACY DEFENDANTS' UNLAWFUL DISTRIBUTION OF FAILURE TO MONITOR AND REFUSING TO FILL OPIOID PRESCRIPTIONS.**

628.    The Pharmacy Defendants owe a duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74) and Missouri law (e.g., Mo. Code State Regs 20 CSR 2220 – 5.030; 2220 – 5.050; and 2220-5.060), to monitor, detect, investigate, refuse to fill, and report suspicious orders

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

of prescription opioids originating from Plaintiff's Community as well as those orders which the Pharmacy Defendants knew or should have known were likely to be diverted into Plaintiff's cities and counties.

629.    Pharmacy Defendants Walgreens, Express Scripts and CVS similarly had industry-specific knowledge of the particular risks and harms from filling prescriptions for non-medical purposes and the resulting widespread opioid abuse.

630.    The DEA has provided extensive guidance to pharmacists concerning their duties to the public, as have state pharmacy boards, and national industry associations.  The guidance teaches pharmacists how to identify red flags, which indicate that there may be a problem with the legitimacy of a prescription presented by a patient.  The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

631.    For instance, the industry guidance tells pharmacists how to recognize: (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

632.    Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

633.    In 2015, CVS publicly stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities.  Pharmacists have a legal obligation under  State and Federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

634.    Similarly, in 2016, Walgreens issues a press release captioned "Walgreens Leads Fights against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Death."

635.    Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur.  In failing to take adequate measures to prevent substantial opioid-related injuries to the nation, Pharmacy Defendants have breached their duties under the "reasonable care" standard of Missouri common law (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), professional duties under the relevant standards of professional practice, and requirements established by Missouri and Federal laws and regulations.

636.    Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the nation in part because of their history of being penalized for violating their duties in other jurisdictions.

637.    CVS has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ").  It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue (a) dispensing prescription opioids in quantities significantly higher than any plausible medical need would require, and (b) violating their recordkeeping and dispensing obligations under the FCSA.

638.    As recently as February 2016, CVS paid $8 million to settle allegations by the DEA and DOJ that its stores and pharmacists had been violating their duties under the FCSA and filling prescriptions with no legitimate medical purpose.  CVS has resolved similar allegation by settling with Florida ($22 million), Oklahoma ($11 million), Massachusetts and New Hampshire ($3.5 million), Texas ($1.9 million), and Rhode Island ($450,000).

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

639.    These cases included evidence that CVS filled prescriptions that were clearly forged.  For example, in 2016, CVS settled with the United States to resolve allegations stemming from two DEA investigations that revealed that over 50 CVS stores in Massachusetts and New Hampshire had filled patently forged prescriptions for addictive painkillers more than 500 times between 2011 and 2014.  The DEA estimated the street value of the diverted drugs to be over $1 million.  One forger successfully filled 131 prescriptions for hydrocodone at eight CVS stores.  One of those stores filled 29 prescriptions for the forger over the course of just six months, an inordinate amount under the circumstances.  At a different store, the same individual filled 28 prescriptions that she forged for herself and three other alleged patients, even though the prescriptions were identical in every aspect other than the patient name.  Additionally, 107 of the forged prescriptions bore the Massachusetts address of a dentist who had closed her Massachusetts practice and moved to Maine, something that should have been easily discovered by CVS pharmacists by checking the DEA website or calling the phone number on the prescriptions.  Plaintiffs have reason to believe and do believe that Defendant CVS has undertaken the same type of actions in Missouri, in the source city of St. Louis, and the counties party to this Petition thereby violating state and federal law

640.    CVS also settled allegations by the DEA and DOB that its stores and pharmacists had been violating their duty under the FCSA and filling prescriptions with no legitimate medical purpose.  As part of the settlement, CVS acknowledged that from 2008 to 2012, some of its stores in Maryland dispensed controlled substances, including prescription opioids, in a manner that was not fully consistent with the FCSA and relevant regulations, including failing to comply with a pharmacist's responsibility to ensure that these prescriptions were issued for a legitimate medical purpose.  CVS paid $8 million to settle these claims. Plaintiff have reason to believe and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

do believe that CVS committed the same type of acts in the source city of St. Louis and the counties and city who are party to this Petition thereby violating state and federal law.

641.   CVS also has settled allegations by the DOJ that some of its stores in Connecticut failed to maintain records in accordance with the FCSA.  On over 6,000 occasions, CVS stores in Connecticut failed to keep appropriate records of prescriptions and purchase invoices.  CVS settled these allegations for $600,000.  Plaintiffs have reason to believe and do believe that CVS committed the same type of acts in the source city of St. Louis and in the communities who are party to this Petition thereby violating state and federal law. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the FCSA by filling prescriptions signed by prescribers with invalid DEA registration numbers of non-prescribing practitioners, or substituted false DEA registration numbers in company computer systems, on paper prescriptions, and even in the information that the pharmacy reported to the State of Oklahoma's Prescription Drug Monitoring Program.

642.   Walgreens agreed to the largest settlement in DEA history - $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the FCSA, including negligently allowing controlled substances such as oxycodone and other prescription pain killers to be diverted for abuse and illegal black market sales.  As part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to cease compensating its pharmacists based on the volume of prescriptions filled.  The settlement resolved investigations into and allegations of FCSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions or prescription opioids into illicit channels.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

643.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids.  Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount.  They increased their orders over time, in some cases as much as 600% in the span of just two years, including, for example, supplying a town of 3,000 residents with 285,800 orders of oxycodone in a one-month period.  Yet Walgreens' corporate officers not only turned a blind eye, but also facilitated the opioid boom in Florida by providing Walgreens' pharmacists with incentives through a bonus program that compensated them based on the number of prescription filled at the pharmacy.  In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the FCSA or the health of communities."  Plaintiffs have reason to believe and do believe that Defendant Walgreens committed the same type of actions in the state of Missouri.

644.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).  The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the prescription opioid use of some Medicaid patients who were considered high-risk.  Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use.  Some of the state's 160 Walgreens accepted cash for controlled substances from patients in MassHealth (the state's combined program for Medicaid and Children's Health Insurance

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Program), rather than seeking approval from the agency.  In some cases, MassHealth had rejected the prescription; other times, MassHealth was never billed.  In response, Walgreens simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and do not accept cash payments from patients deemed high-risk.  Plaintiffs have reason to believe and do believe Walgreens committed the same type of acts in Missouri.

645.    Walgreens has also not properly monitored and detected their inventory of opioids located in Plaintiff counties and have failed to adequately keep safe their inventories of opioids from theft, improper transfer and for allowing their opioid inventories to illegally flow into Plaintiff communities thereby diverting these schedule II narcotics to the illegal street trade, in violation of both state law  (Mo. Code State Regs 20 CSR 2220-5.030; 2220-5.50; and 2220-5.060) and federal law (21 USC §823, 21 CFR 1301.74).

646.    Examples of such failure to monitor and secure and thereby endangering the Plaintiff communities are as follows:

a.    The Missouri State Board of Pharmacy ("Pharmacy Board) publicly censured Walgreens Co. d/b/a Walgreen #03598, located within Plaintiff City of Joplin, for failing to adequately secure its controlled substances, failing to adequately store and hold its controlled substances, and for failing to prevent losses of its controlled substances where a pharmacy technician adjusted inventory numbers and diverted the surplus units.

b.    Walgreens Co. d/b/a Walgreen #03338, located in Cape Girardeau, Missouri in Plaintiff Cape Girardeau County, was publicly censured by the Pharmacy Board for failing to maintain adequate security in order to deter theft and drug diversion in compliance with Missouri law when a pharmacy technician diverted 13,317 units of controlled substances, including hydrocodone.

c.    Walgreens Co. d/b/a Walgreen #04972, located in Arnold, Missouri in Plaintiff Jefferson County, was placed on probation for two (2) years by the Pharmacy Board for failing to adequately secure its controlled substances inventory and failing to report the theft of controlled substances to the Pharmacy Board after a pharmacy technician diverted 2,237 tablets of hydrocodone. In a related disciplinary action, a pharmacist employed by Walgreens Co. at the above

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

location in Plaintiff Jefferson County, was publicly censured by the Pharmacy Board for failing to conduct audits of inventory, to have adequate security and controls in place to detect and prevent diversion of controlled substances, and for not reporting employee theft to the Pharmacy Board after the same pharmacy technician diverted hydrocodone and other controlled substances.

d.    Walgreens Co. d/b/a Walgreen #03598, located in Plaintiff City of Joplin, Missouri, was publicly censured by the Pharmacy Board for failing to adequately control and secure its controlled substances inventory after a pharmacy technician diverted 4,872 units of controlled substances, including hydrocodone, methadone, and oxycodone.

e.    Walgreens Co. d/b/a Walgreen #03688, located in Springfield, Missouri in Plaintiff Greene County, was publicly censured by the Pharmacy Board for failing to maintain adequate security in order to deter theft and diversion of controlled substances after a pharmacy technician diverted significant quantities of Norco® and Lorcet® from the pharmacy.

647.    Despite their extensive understanding of the risks and harms of prescription opioid diversion set forth above, Pharmacy Defendants continue to fail to fulfill their obligations to prevent prescription opioid diversion.

648.    Pharmacy Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing prescription opioids.  That pattern and practice has also affected Missouri and its citizens.

649.    On information and belief, Pharmacy Defendants regularly filled opioid prescriptions in circumstances where red flags were present.

650.    On information and belief, Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

651.    On information and belief, Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid opioid prescriptions, or protect against corruption or theft by employees or others.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

652.     On information and belief, Pharmacy Defendants utilized monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed.  This type of compensation creates economic disincentives within the companies to change their practices.  For example, these have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of red flags presented.

653.     The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

654.     Each Pharmacy Defendants repeatedly and purposefully breached its duties under state and federal law.  Such breaches are a direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Cities and counties.

655.     The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and in Plaintiff's Cities and counties. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

656.     The opioid epidemic in Missouri, including inter alia in Plaintiffs' cities and counties, remains an immediate hazard to public health and safety.

657.     The opioid epidemic in Plaintiffs' cities and counties is a continuous public nuisance and remains unabated.

658.     The  Pharmacy Defendants' intentionally continued their  conduct, as  alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

659.    The Pharmacy Defendants and the Manufacturing Defendants acted pursuant to an agreement explicit or implied, in conspiracy and/or in concert of action with each other to illicitly promote and distribute opioids.

**1.    The Distributor Defendants have a Duty under Federal and State Law to Guard Against and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.**

660.    Opioids are a controlled substance under Missouri law.  *See* Mo. Rev. Stat. § 195.010 (26)(a).

661.    As wholesale drug distributors, each Distributor Defendants Cardinal, McKesson and AmerisourceBergen were required under Missouri law to obtain a license as a wholesaler of controlled substances from the state board of pharmacy.  Mo. CSR 20 CSR 2220-5.020, 5.030, and 5.050.   Each Distributor Defendant is licensed by the Missouri Board of Pharmacy and is a "registrant" or "licensee" as a wholesale distributor in the chain of distribution of Schedule II controlled substances and assumed a duty to comply with all security requirements imposed under the regulations adopted by the Missouri Board of Pharmacy.

662.    Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act.   See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.   Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Those requirements are adopted and incorporated into Missouri law.  Mo. CSR 2220-5.020.

663.    Each Defendant has an affirmative duty under federal and Missouri law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

"effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§823(b)(1).  Missouri incorporates these requirements through Missouri's Pharmacy Board Regulations, which mandate that "[w]holesale drug distributors shall operate in compliance with applicable federal, state, and local laws and regulations."  20 CSR 52220-5.030 (m) 5 and 7.

664.    The Missouri State Board of Pharmacy requires that "wholesale drugs and pharmacy distributors shall establish, maintain and adhere to  written policies and procedures, which shall be followed for the receipt, security, storage, inventory and distribution of prescription drugs, including policies and procedures for identifying, recording and reporting losses or thefts and for correction all errors and inaccuracies in inventories." *See* Mo. CSR 2220-5.20.

665.    A procedure for the mandatory reporting to the board and any other federal or state agency of all shortages or prescription drugs.

666.    Missouri law Mo. CSR 2220-5030 (m) 5 and 7, similarly imposes a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

667.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern.  (21 C.F.R. §1306).  These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

668.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

669.    These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

670.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.

671.    As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain.  If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

672.    The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.

673.    The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[98] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[99] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm.

674.    The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

675.    The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.

676.   Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff's Cities and counties and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff's Cities and counties.

677.   Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

678.   Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

679.   Each Distributor Defendant owes a duty under federal and state law to prevent the diversion of prescription opioids into illicit markets in the State and Plaintiff's Cities and counties.

680.   The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

681.   The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Plaintiffs' city and counties and the damages caused thereby.

**2.     The Distributor Defendants Breached Their Duties.**

682.   Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.

683.    The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's Cities and counties, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's city and counties, is excessive for the medical need of the cities and counties and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

684.    The Distributor Defendants failed to report "suspicious orders" originating from Plaintiff's Cities and counties, or which the Distributor Defendants knew were likely to be diverted to Plaintiff's Cities and counties, to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

685.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Plaintiff's Cities and counties, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiffs' city and counties.

686.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiffs' city and counties, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiffs' city and counties.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

687.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

688.    The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law.

689.    The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.

690.    The federal and state laws at issue here are public safety laws.

691.    The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under State law.

692.    The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

693.    The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor-Pharmacy Defendants refuse to abide by the duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

694.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

695.     Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.

696.     In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor-Pharmacy Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor-Pharmacy Defendants attempted to assure the public they were working to curb the opioid epidemic.

697.     For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity." Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results. Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

about curbing the opioid epidemic in our country." Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

698.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. The Plaintiffs did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

699.    Meanwhile, the opioid epidemic rages unabated in the Nation, the State of Missouri, and in Plaintiff's counties and city.

700.    The epidemic still rages because the fines and suspensions imposed by the DEA did not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

701.    The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

702.    The Distributor-Pharmacy Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State and Plaintiff's Cities and counties.

## V.    PHARMACY BENEFIT MANAGER DEFENDANTS

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

703.    The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below.  At all relevant times the PBM Defendants acted as the gatekeepers of prescription drugs including opioids.  Pharmacy Benefit Managers ("PBMs") negotiate with drug manufacturers to offer preferred drug formulary placement for the manufacturers' drugs.  PBMs establish reimbursement rates for the drugs dispensed.  PBMs earn revenue from at least the following sources: fees from health plans and insurers, fees related to formulary creation and drug placement from drug manufacturers administrative fees from drug manufacturers, rebates and other incentives such as volume target bonuses negotiated with drug manufacturers, and fees from maintaining pharmacy networks. The Defendant PBM's in this Petition are : Express Scripts, CVS, Caremark RX, ,Caremark PCS Health collectively known as "CVS", United Health Group and Optum RX.

## VI.    EXPRESS SCRIPTS

704.    ESHC and ESI are collectively referred to as "Express Scripts."

705.    In 2012, ESI acquired its rival, Medco Health Solutions, Inc., in a $29.1 billion deal.  As a result of the merger, ESHC was formed and became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.

706.    According to the Pharmacy Benefit Management Institute, in 2015, Express Scripts was the top ranking PBM nationwide with twenty-six (26%) of the industry market share.

707.    Express Scripts derives substantial revenue managing pharmacy benefits in Missouri  through several means, including, but not limited to, providing services to companies in managing their employees prescription benefit program.  Upon information and belief this is the primary method by which Express Scripts profits from-- the management and control of opioid traffic and the subsequent reimbursement by Medicaid and Medicare.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

708.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services, including mail order pharmacy services, nationwide and maintained a national formulary or formularies that are used nationwide, including in Missouri.  At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri, including the source city of St. Louis and the communities of Plaintiffs herein.

709.    CVS Health describes itself in a September 3, 2014 press release as a "pharmacy innovation company helping people on their path to better health.  Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manager health in more affordable, effective ways.  This unique integrated model increased access to care, delivers better health outcomes and lowers overall health care costs."  In 2016, CVS Health reported an operating income of $10 billion.

710.    In the above-referenced September 3, 2014 press release, CVS Health announced its change of name from CVS Caremark Corporation to CVS Health.  CVS Health explained that it was changing its name "to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."  CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark."  In that same press release, CHS Health touted, "[f]or our patients and customers, **health is everything** and…*we are advising on prescriptions* [and] helping manage chronic and specialty conditions' [emphasis supplied].

711.    According to the Pharmacy Benefit Management Institute, CVS Health (Caremark) was the second highest ranking PBM in 2015 with twenty-five percent (25%) of the industry market share.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

712.    At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide.  At all times relevant hereto, those formularies included opioids, including those at issue in this case.  At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri.

713.    At all times relevant hereto, CVS Health, though Caremark, derives substantial revenue providing pharmacy benefits in Missouri though several different companies and entities.

## VII.    UNITED HEALTHCARE INCORPORATED AND OPTUM

714.    Defendant UNITEDHEALTH GROUP INCORPORATED ("UnitedHealth"), a Delaware Corporation with its principal place of business located in Minnetonka, Minnesota, is a diversified managed health care company with two business platforms.  UnitedHealth serves approximately 115 million individuals throughout the United States.  For 2016, UnitedHealth reported an operating income of $12.9 billion.

715.    Upon information and belief, UnitedHealth is the parent company of UNITED HEALTHCARE OF THE MIDWEST, INC., a Missouri corporation with its headquarters in Maryland Heights, Missouri. United Healthcare of the Midwest, Inc. may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105 for diversity of citizenship purposes United Healthcare of the Midwest, Inc. is a citizen of the state of Missouri.

716.    Defendant OPTUM, Inc., is a Delaware corporation.  OPTUM, Inc. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OPTUMRX, INC.  On information and belief, OPTUM, INC is a subsidiary of UnitedHealth.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

717.    Defendant OPTUMRX, INC. ("OptumRx"), is a California corporation with its principal place of business located in Irvine, California.  OptumRx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of OPTUM, INC.  OptumRx operates as the PBM for UnitedHealth.

718.    UnitedHealth and OPTUM, INC. may be served through their registered agent: CT Corporation System, Inc., 1010 Dale Street North, St. Paul, Minnesota 5517.

719.    According to the Pharmacy Benefit Management Institute, OptumRx (UnitedHealth) was the third highest ranking PBM in 2015 with twenty-two (22%) of the industry market share.

720.    In one case, OptumRx, which is owned by UnitedHealth, suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release morphine, according to a letter provided by the member.  Mr. Wiggin, the UnitedHealthcare spokesman, said the company's rules and preferred drug list "are designed to ensure members have access to drugs they need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried."

721.    Upon information and belief, UnitedHealth and its subsidiaries, including United Healthcare of the Midwest, Inc., "place[] morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans.  And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."

722.    At all times relevant hereto, OptumRx derives substantial revenue providing pharmacy benefits in Missouri through several different means, and based upon information and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

believe Optum administered these plans through Missouri corporations, business, and municipal entities based in the party Plaintiff communities.

723.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide. At all times relevant hereto, those formularies included opioids, including those at issue in this case.  At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri.

724.    The opioids at issue in this case were reimbursed by the PBM Defendants. Without the PBM Defendant reimbursement for the opioids at issue herein, the opioids would not have entered the marketplace and the entire scheme would have failed.

## VIII.   THE PBM DEFENDANTS ENSURED THAT OPIOIDS WERE REGULARLY PRESCRIBED AND FLOODED THE MARKET

725.    PBMs are brokers between payers (representing patients), drug manufacturers, and retailers and they influence which drug products are used most frequently and set prices for pharmacies.

726.    The big three PBMs manage the drug benefits for nearly 95% of the population. They control what drugs are covered by virtually all health insurance providers for over 260 million people.  PBMs made almost $260 billion last year.  In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States.  They are key participants and play a crucial role in the administration and reimbursement of prescription drugs.

727.    PBM influence is notable especially considering the lack of competition in the PBM space.  Market concentration is an important indicator of a company's ability to earn

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.

728.    With this kind of monopolistic structure, the top three PBMs have the almost exclusive control over the dissemination of opioids.  In concert with drug manufacturers who provide them with assorted complicated payments as incentives, PBMs choose which drugs appear on their formularies, thus determining which drugs will be reimbursed.  No drug will leave a pharmacy if it is not paid for.  Thus, PBMs control which drugs are dispensed and which drugs enter communities.

729.    Every PBM Defendants' formulary is influenced by its financial arrangements with drug manufacturers.

730.    For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto," OptumRx then proceeds to define its formulary as follows:

> "A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary')…[T]he drugs included on the PBM's formulary may be modified by PBM, with prior approval by [client], from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations." [emphasis added].

731.    Notably, Optum Rx does not explain how "manufacturer rebate arrangements" impact its formulary design.

732.    Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement.  Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client.  In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above.  *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments.  The administrative fees paid to Express Scripts by manufacturers for participating in the rebate program do not exceed 3.5% of the AWP of the rebated products.

733.    It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees.  Nor does it explain all of the services for which it receives the administrative fees.  Nor does it explain how any of these payments actually influence its formulary design.  Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any Express Scripts customer pays for any drug.

734.    Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> [I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers].  *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, [*customer*] *acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possess any beneficial interest in, any such fees or revenues.*"

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

735.    A standard Caremark PBM contract reflects similar perverse incentives.  It explains that "Manufacturer" means a pharmaceutical company that has contracted with Caremark (or its affiliate or agent) *to offer discounts for pharmaceutical products in connection with Caremark's  Formulary Services.*" [emphasis added].

736.    And, "Manufacturer Payments" include revenues received by Caremark:

> "from each of the following sources: 1) payments received in accordance with agreements with pharmaceutical manufacturers for formulary placement and, if applicable, drug utilization ; 2) rebates, regardless of how categorized; 3) market share incentives; 4) commissions; 5) any fees received for the sale of utilization data to a pharmaceutical manufacturer; 6) educational grants; 7) administrative management fees; and 8) all compensation from manufacturers including rebates paid by a manufacturer as a result of product inflation caps and/or guarantees negotiated by the Service Provider."

737.    Caremark's standard PBM contract further explains:

> "that in lieu of billing Member County a 'per Claim' fee for Services, Caremark shall retain 100% of the Rebates as reasonable compensation for the Services. Customer and Member County understand and agree that neither they nor any Participant will share in the Rebate monies collected from Manufacturers by Caremark."

738.    Caremark also explains that it will encourage the use of its "Preferred  Drugs" (those where is has the most lucrative arrangement with a drug manufacturer) over "non-Preferred" drugs.  Its standard contract language states that Caremark will encourage the use of "Preferred Drugs" by:

> "(i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Participant and the prescriber to request that the prescription be changed to the Preferred Drug.  A Preferred Drug is one on the Performance Drug List, which has been developed by Caremark as a clinically appropriate and *economically advantageous subset of the Caremark Formulary*, as revised by Caremark from time to time."  [emphasis added].

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

739.    People with chronic pain thus are at the mercy of PBMs and their self-serving formularies.  Yet PBMs make it more difficult to get pain medication that is less addictive while making it easier to get opioids, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives, as described above. According to a study by the New York Times and ProPublica of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.

740.    Even when they were asked to limit accessibility to opioids, PBMs refused.  The seeds of the opioid epidemic were sown with early over prescription of OxyContin.  In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused.  Using the financial quid pro quo it had with the state's PBM, it paid Merci Medco (now Express Scripts) to prevent insurers from limiting access to the drug.  Plaintiffs have reason to believe and do believe

741.    PBMs are driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies.

742.    Not only do PBMs place roadblocks in the way of limiting excessive opioid prescriptions, they also make it more difficult to obtain Abuse Deterrent Formula (ADF) opioids. These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.  The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, which CVS Caremark, which has nearly 90 million members, carries none.  A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

743.     This denial was endorsed by the Institute for Clinical and Economic Review, a

private organization funded in part by some of the largest health plans and PBMs, that claimed

that ADF opioids provided neither financial nor societal benefits, even though they were given

data showing that ADF OxyContin could prevent 4,300 cases of abuse and save $300 million

over a five-year period.

> ICER ignored research that demonstrated abuse deterrent Oxy reduced abuse by
> 20% and reduced the average daily dose of OxyContin from 80 mg to 60 mg.
> Perhaps even more important, it reduced sharing and selling of the drug for
> getting high ("diversion") by nearly 90 percent.  The diversion of generic
> painkillers is responsible for as many as 63 percent of fatal prescription drug
> overdoses.  ICER consciously decided to ignore the human cost of this deadly
> behavior.
>
> What the ICER report ignores entirely is that one of the factors driving abuse and
> addiction is the inappropriate use of generic opioids for conditions that have non-
> opioid, on-label options.  Fifty-two percent of patients diagnosed with
> fibromyalgia and 42 percent of patients with diabetic peripheral neuropathy.

744.     What is inconceivable is that PBMs, while making it easy to obtain generic highly

addictive opioids, make it *harder* to obtain *treatment*.  The NY Times/ProPublica study found

that insurers have erected more hurdles to approving addiction treatments than for the addictive

substances themselves.  Only after being subject to much public pressure and congressional

investigations did some insurers remove the barriers to addiction treatment.

745.     A 2008 study by the Mayo Clinic found that patients who were weaned off

opioids and followed a non-drug treatment experienced less pain than when they were on opioids

and had improved functioning.  Some plans cover these costs but others do not.

746.     The efforts to artificially increase the number of opioid prescriptions, implanted

by PBMs, directly and predictably caused a corresponding increase in opioid abuse.  In a 2016

report, the CDC explained explained that "[o]pioid pain reliever prescribing has quadrupled

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

since 1999 and *has increased in parallel with [opioid]* overdoses.  Many abusers start with legitimate prescriptions.  For these reasons, the CDC concluded that efforts to rein the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."  The PBMs' role in increasing prescriptions played an enormous role in the current opioid epidemic.

747.    There are steps the PBMs could take.  They could make it easier to access other non-opioid drugs in the current opioid epidemic.  They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort.  They could cover alternative, non-medication treatments for pain.  They could make addiction treatment more accessible.  They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons.  No single actor is to blame for this epidemic, but PBMs play a unique role in controlling which pain medications reach the marketplace – and which do not – through their self-serving formulary design.

### W.    THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT AND PREVENT SUSPICIOUS ORDERS.

748.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor and Pharmacy Defendants were also legally required of the Manufacturer Defendants under state and federal law.

749.    Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

opioids.  A requirement of such registration is the: maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted  supply  of  these substances  under  adequately  competitive conditions for legitimate medical, scientific, research, and industrial purposes . . . .

750.    Additionally, under Missouri state and federal law as "registrants," the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances: The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.  Like the Distributor Defendants, the Manufacture Defendants breached these duties.

751.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.  The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at  a  price  below  a  specified  rate.  After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.   Thus, the Manufacturer

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled.  The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

752.    Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion."

753.    The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.

754.    In the press release accompanying the Mallinckrodt settlement, the  Department of  Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . "Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . .

755.    In April 2017, Mallinckrodt agreed to pay a $35 million fine as part of a guilty plea.

756.    Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders.

757.   The Memorandum of Agreement entered into by Mallinckrodt ("2017 Mallinckrodt MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA.  One of two Mallinckrodt opioid plants is located in the City of St. Louis.

758.   Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees  to  notify  Missouri Board Pharmacy and the DEA  of  any  diversion and/or suspicious  circumstances  involving  any Mallinckrodt controlled substances that Mallinckrodt discovers.

759.   Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to "downstream" registrants."  Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

760.    The same duties imposed by Missouri law on Mallinckrodt were imposed upon all Distributing Defendants.

761.    The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Distributor Defendants.

762.    Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

763.    To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach" is urgently needed.

764.    A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.

765.    These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels.

766.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the Plaintiff and Plaintiff's Community.

## X.    PAIN MANAGEMENT / PILL MILL CLINIC

767.    The motivation for operating a "pill mill" is profit.  Dr. Padda, through the named businesses, supervised, directed and performed a business under the guise of a being Doctor

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

wherein he performed cursory physical exams of his "patients", accepted cash payments or focused on primarily Medicaid patients, allowed his customers to select what opioid they enjoyed the most, and never suggested alternative methods of solving the customers pain. Patients have been seen waiting in long lines from the second story office he occupies, with some of his customers becoming unruly thereby disturbing the peace of other business owners and residents.

768.    Dr. Padda's customers consisted of residents of Jefferson, Cape Girardeeau, Iron, Washington, and Crawford counties

769.    Dr. Padda's practice has created a Public nuisance in Jefferson, Cape Girardeau, Iron, Washington, and Crawford counties.

770.    Dr. Gurpeet Padda operates a "pain management clinic" in the City of St. Louis under various and different names.

## COUNT I[1]
## PUBLIC NUISANCE
## (ALL DEFENDANTS)

771.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

772.    Plaintiffs bring an action under Missouri's common law, which provides that cities and counties in Missouri have the power to suppress all nuisances which are, or may be, injurious to the health and welfare of the inhabitants as well as to recover costs associated with the nuisance.

773.    Each Defendant has caused actual harm in each of the Plaintiffs' cities and counties which is connected to the product they manufactured or sold and marketed misbranded,

---

[1] All Counts alleged herein for Christian County have elected not to seek any recovery from the Walgreens and CVS Defendants.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

off-label and through deceptive practices causing a nuisance, known as "the opioid epidemic," it was reported to have killed 908 people in Missouri in 2016, including citizens in every Plaintiffs' cities and counties.

774.    In addition and in the alternative, Defendants engaged in an agreement and conspiracy to illicitly market and sell opioids in Missouri and/or not report illegal diversions of opioids and the Plaintiffs' cities and counties and Defendants are jointly and severally liable for the public nuisance.  Some of this evidence is set forth *intra* regarding the funding of organizations like the American Pain Association to mislead doctors and the public about the safety and efficacy of opioids.

775.    Plaintiffs allege that the Manufacturing and Distributing Defendants, acted in concert of action with one another pursuant to an agreement with a common intent and purpose with such actions contributing to the damages of Plaintiffs and that each Defendant is jointly and severally liable for the public nuisance.

776.    Plaintiffs allege that the Pharmacy and Prescription benefit managers, while not acting in concert with the other Defendants, failed to monitor their suspicious orders and knew or should have known that their orders had no legitimate medical purpose and continued to fill such orders and distribute opioids thereby contributing to the damages of Plaintiff and each Defendant is jointly and severally liable to the public nuisance.

777.    Defendant Dr. Padda, while not acting in concert with other Defendants , was able to take advantage of Defendants failure to monitor their suspicious orders, and was permitted to write an inordinate amount of opioid prescriptions without detection.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

778.     Dr. Padda's actions have contributed to the public nuisance in St. Louis, by and through his failure to monitor and control the injection of opioids in to the St. Louis community, thereby causing a public nuisance.

779.     Plaintiff alleges that Defendants are jointly and severally liable for the public nuisance creating a public nuisance in each of Plaintiffs' cities and counties because their conduct at issue has caused an offense against the public order and economy of the cities and counties and violates the public's right to life and health.

800.     The residents of Plaintiffs' counties and city have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

801.     Defendants, in concert, and/or conspiracy, intentionally, unlawfully and/or recklessly manufactured, marketed, distributed and sold prescription opioids that Defendants know, or reasonably should know, will be improperly diverted, causing widespread distribution of prescription opioids in and/or to Plaintiffs' cities and counties, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiffs' cities and counties, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's cities and counties, and direct and indirect costs to Plaintiffs' counties and city.

802.     Defendants have unlawfully and or intentionally caused and permitted dangerous drugs under their control to be diverted in a way to injure residents in Plaintiffs' cities and counties.

803.     Defendants have unlawfully and or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion.  Such conduct

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

was illegal.  Defendants' failures to maintain effective controls against diversion include Defendant failure to effectively monitor for suspicious orders, report suspicious orders and/or stop shipment of suspicious orders, which has created an opioid epidemic in Missouri and the Plaintiffs' cities and counties.

804.    As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiffs' residents suffered from physical and mental injuries and death.  The full extent of the destruction caused by the misrepresentations of these schedule II drugs, has not been quantified as of yet because the loss of human lives, resources devoted to administering and trying to save those lives and costs for the dealing with the problem in these cities and counties is so deep and far reaching, and as of yet have not been fully identified and it continues each day.  As a direct and proximate result from the aforesaid conduct of defendants, Plaintiffs have sustained in the past and will sustain in the future, costs to address and attempt to abate the nuisance including, but not limited to:

a.    Costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

b.    Costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various related costs to combating the illegal diversion of opioids, fentanyl and heroin trafficking;

c.    Costs for treatment counseling and drug rehabilitation services;

d.    Costs for taking kids out of the care of their parent(s) who are addicted to opioids, heroin and fentanyl, including providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

e.    Juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior in order to fund their drug addiction habit to opioids, heroin and fentanyl;

f.    Drug Court costs;

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

g.      Costs for Drug Education programs for children;

h.      Increased workers' compensation costs and health insurance for their employees; and

i.      Costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for:

A.      A fair and just amount of damages in excess of $25,000;

B.      A fair and just amount for future damages for abatement;

C.      For their costs herein incurred; and

D.      Such other and further relief which may in the premises be just and proper.

**COUNT II**
**NEGLIGENCE PER SE – ILLEGAL DIVERSION**
**(ALL DEFENDANTS)**

805.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

806.    At all times mentioned herein Defendants were under a duty to exercise due care in the reasonable care in the manufacturing and distribution of their schedule II narcotic product opioids.

807.    Missouri and Federal law mandate that the Defendants implement effective controls and procedures in their supply chains to guard against theft, diversion and the abuse of prescription opioids, and Defendants failed to adequately design and operate  a system to detect, halt and report suspicious orders of prescription opioids. (See MO. 20 CSR 2220-5.060 and USC sect. 801 et seq).

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

808.    That these laws were implemented to protect the population of Plaintiffs cities and counties, and that by failing to report, control, and set up a system of controls, Defendants harmed the very people the laws were meant to protect.

809.    As a result, Defendants negligently disseminated massive quantities of prescription opioids into Plaintiffs cities and counties.  Defendants' actions and failure to act transferred legal prescription drugs from lawful to unlawful channel of distribution or use.

810.    As a result of their failure, Plaintiffs cities and counties have been overwhelmed by the illegal opioid market, creating an addiction problem leading to death and economic damages of Plaintiffs cities and counties.

811.    Manufacturing Defendants negligently distributed huge amounts of opioids into the illegal street market, acting as a supply to illegal drug dealers, allowing these pills to be illegally trafficked and sold.

812.    The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used.  The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.  Without the Manufacturer Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse and addiction that now exists would have been averted.

813.    The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funded massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

814.    The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion and abuse of prescription opioids.

815.    The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

816.    The Manufacturer Defendants knowingly and intentionally incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

817.    The Distributor – Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

818.    The Distributor – Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

819.    The PBM Defendants knowingly and intentionally chose to include opioids that were more addictive to users because they generated greater profits.  This failure led directly to the increased likelihood of addiction.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

820.    The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of Abuse Deterrent Formulations ("ADFs") which tended to be more expensive.  This choice directly led to the ease with which the pills could be misused.

821.    The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain.  This led directly to the increased sale and use of opioids.

822.    The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

823.    The PBM Defendants chose not to cover, or provide less coverage for, drug treatment.

824.    The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

825.    This diversion in the secondary criminal market and the increase in Plaintiffs cities and counties of addicts because of this diversion has placed unnecessary and excessive demands on the medical, public safety, juvenile, courts and financial resources of Plaintiff cities and counties.

826.    As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiffs' residents suffered from physical and mental injuries and death.  The full extent of the destruction caused by the misrepresentations of these schedule II drugs, has not been quantified as of yet because the loss of human lives, resources devoted to administering and trying to save those lives and costs for the dealing with the problem in these cities and counties is so deep and far reaching, and as of yet have not been fully identified.  As a direct and proximate result from

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

the aforesaid conduct of defendants, Plaintiffs have sustained in the past and will sustain in the future, costs to address and attempt to stem the problem including but not limited to:

j.     Costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

k.     Costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various related costs to combating the illegal diversion of opioids, fentanyl and heroin trafficking;

l.     Costs for treatment counseling and drug rehabilitation services;

m.     Costs for taking kids out of the care of their parent(s) who are addicted to opioids, heroin and fentanyl, including providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

n.     Juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior in order to fund their drug addiction habit to opioids, heroin and fentanyl;

o.     Drug Court costs;

p.     Costs for Drug Education programs for children;

q.     Increased workers' compensation costs; and

r.     Costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for:

A.     A fair and just amount of damages in excess of $25,000;

B.     A fair and just amount for future damages for abatement;

C.     For their costs herein incurred; and

D.     Such other and further relief which may in the premises be just and proper

**COUNT III**
**NEGLIGENCE**
**(ALL DEFENDANTS)**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

827.    Plaintiffs repeat and reiterate the allegations previously set forth herein

828.    At all times mentioned herein, Manufacturing Defendants Purdue, Cephalon, Teva, Janssen, Endo, Allergan, Mallinckrodt, Mylan, Depomed, Insys, Norancon, Watson, now known as Actavis, SpecGX and their manufacturing subsidiaries, were under a duty to exercise reasonable care in advertising, marketing, promotion and labeling of their opioid products to ensure that the use of their products did not result in avoidable injuries.

829.    At all times Distributor Defendants McKesson, Cardinal Health and AmerisourceBergen and their distributor subsidiaries were under a duty to exercise reasonable care in advertising, marketing, promotion and labeling of their opioid products.

830.    In addition, Express Scripts, Walgreens, CVS, Caremark, Optum and United Health Care and the entities owned and run by Dr. Padda in St. Louis City were under a duty to exercise reasonable care in monitoring, reviewing, tracking, filling and dispensing their opioid products.

831.    Plaintiffs' injuries as described herein were caused by the duties under Missouri state and federal law and the breach of Defendants working with one another, in concert with each other, acting within the course and scope of their employment, including among other things.

a.    Carelessly and negligently researching, manufacturing, selling, merchandising, advertising, promoting, labeling, analyzing, testing, distributing, and marketing their opioid products;

b.    Failing to fully disclose the results of the testing and other information in its possession regarding the possibility opioids were addictive and subjecting a user to withdrawal symptoms;

c.    Knew that withdrawal was not easily managed and failed to instruct this;

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

     d.     That OxyContin was in fact not a 12 hour relief pain pill, and that instructing doctors to up the dosage to reach 12 hours increased the likelihood that a patient would become addicted to the drug, thereby increasing the dangers from higher doses of opioids;

     e.     That opioids had adverse effects and failing to warn that opioids do not increase function, and in fact leads to lesser function in the patient; and

832.    At all times mentioned herein mentioned, upon information and belief, the above described culpable conduct by Defendants was a proximate cause of Plaintiffs' damages. Defendants knew or should have known that opioids would have the devastating impact that it has had on the Plaintiffs' cities and counties, and could be dangerous and unsafe for the residents of these cities and counties, and the failure to report diversions and over prescribing would result in this opioid epidemic.

833.    As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiffs' suffered damages as set forth Intra.  The full extent of the destruction caused by the misrepresentations of these schedule II drugs quantified as of yet because the loss of human lives, resources devoted to administering and trying to save those lives and costs for the dealing with the problem in these cities and counties is so deep and far reaching, and as of yet have not been fully identified.  As a direct and proximate result from the aforesaid conduct of defendants, Plaintiffs have sustained in the past and will sustain in the future, costs to address and attempt to stem the problem including but not limited to:

     a.     Costs for providing medical care and other treatments such as Narcan, including for overdoses and deaths;

     b.     Costs for public safety, including law enforcement, jail space, drug task forces, over time hours, and various related costs to combating the illegal diversion of opioids, fentanyl and heroin trafficking;

     c.     Costs for treatment counseling and drug rehabilitation services;

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

d.     Costs for taking kids out of the care of their parent(s) who are addicted to opioids, heroin and fentanyl, including providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

e.     Juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior in order to fund their drug addiction habit to opioids, heroin and fentanyl;

f.     Costs for Drug Education programs for children;

g.     Increased workers' compensation costs and health insurance costs; and

834.    The forgoing actions of Defendants were done with reckless indifference to Plaintiffs' citizens and their public safety and welfare, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for:

A.     A fair and just amount of damages in excess of $25,000;

B.     A fair and just amount for future damages;

C.     A fair and just amount of punitive damages in an amount to compensate Plaintiffs and deter such conduct in the future.

D.     For their costs herein incurred; and

E.     Such other and further relief which may in the premises be just and proper.

## COUNT IV
## FRAUD IN THE OMISSION
## (MANUFACTURING DEFENDANTS)

835.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

836.    The Manufacturing and Distributing Defendants, having undertaken the development, manufacturing, marketing, dispensing, distribution, and promotion of their various

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

opioid products as described herein, owed a duty to provide accurate and complete information regarding these products.

837.    The manufacturers through their use of front groups, KOLS and advertising perpetuated to the residents of Plaintiffs' cities and counties and the treating physicians omitted to disclose material facts about the lack of evidence of safety and efficacy for treating chronic pain and the addictiveness of opioids. (See Petition at ¶¶108-129, 135, 141-159, 446-458).

838.    At all times pertinent the manufacturing and distributing Defendants acted in a conspiracy with each other and/or within a concert of action in that their deceptive omissions misrepresented the true nature of their opioid products, were done with a common intent and purpose to deceive Plaintiffs' residents and treating physicians and their deceptive omissions were an efficient cause and contributing to the damage of Plaintiffs.

839.    Defendants acted together and jointly in their marketing, advertising and distribution by and through the use of KOLS, and bogus front organizations funded by Defendants to perpetuate the following material omissions that were material and which were relied upon by residents and treating physicians in Plaintiffs cities and counties:

a.    They omitted that in the use of opioids that sustained exposure would deteriorate the patients function, knowing that long term use would lead to less function;

b.    Concealed the link between long term use and addiction;

c.    Concealed the fact that there were no studies showing that opioids were a safe and effective treatment for chronic pain;

d.    Omitted the material fact that withdrawal symptoms for a patient were harsh, debilitating and a problem for most users, and the Defendants never advised of such;

e.    Omitted the fact that opioid use could lead to addiction and possibly death; and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

f.   Defendant Purdue omitted the fact to treating physicians and the public that OxyContin was not a 12 hour pain relief pill, and in fact lasted at most 6 -8 hours, but omitted to tell physicians and patients.

840.   These omissions were material to the residents and treating physicians of Plaintiffs cities and counties.

841.   The aforementioned omissions were reasonably relied upon by residents and treating physicians in Plaintiffs' cities and counties.

842.   As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiffs' residents suffered injuries including but not limited to severe opioid addiction ultimately leading to death for many.

843.   As a direct result of Defendants' actions Plaintiffs' cities and counties have had to expend funds for health, public safety, juvenile care, juvenile delinquency, medical examiner costs (autopsies), drug treatment and education, etc.  Plaintiffs' cities and counties have sustained these damages in the past and will in the future.

844.   The forgoing actions of Defendants were done with evil motive or with reckless indifference to Plaintiffs' residents' public safety and welfare, justifying an award of punitive damages.

845.   Defendants have caused a  significant and  unreasonable interference with  the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

826.   Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally Plaintiff's Community is of a continuing nature.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

847.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

848.    A violation of any rule or law controlling the distribution of a drug of abuse in Plaintiff's Community and the State is a public nuisance.

849.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

850.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Community will be diverted, leading to abuse, addiction, crime, and public health costs.

851.    Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

852.    Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

853.    Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

854.    Defendants are aware, and at a bare minimum certainly should have been aware, of the unreasonable interference that their conduct has caused in Plaintiff's Community. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under state and federal law.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

855.    Defendants' conduct in marketing, distributing, selling and filling prescription opioids which the defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Plaintiff's Community and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

856.    It is, or should be, reasonably foreseeable to defendants that their conduct will cause deaths and injuries to residents in Plaintiffs' Community, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

857.    The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Plaintiffs' Community not only causes deaths and injuries, but also creates a palpable climate of fear among residents in Plaintiffs' Community where opioid diversion, abuse, addiction are prevalent and where diverted opioids tend to be used frequently.

858.    Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

859.    Defendants' actions were, at the least, a cause or contributing cause in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

860.    The presence of diverted prescription opioids in Plaintiffs' Community, and the consequence of prescription opioids having been diverted in Plaintiffs' Community, proximately results in significant costs to the Plaintiff and to Plaintiffs' Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

861.    Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Plaintiffs' Community a safer place to live.

862.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of Plaintiffs' Community, costs borne by Plaintiffs' Community and the Plaintiffs, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

863.    Defendants' actions created  and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction.   Defendants knew the dangers to public health and safety that diversion of opioids would create in Plaintiffs' Community, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids, which there are obligations to monitor and notify the authority under state and federal law that to the extent everyone agrees it has reached epidemic proportions and killed about 60,000 a year. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

864.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Plaintiff's Community.

865.    Defendants acted with actual malice because Defendants acted with evil motives or a great probability of causing substantial harm, thereby creating a basis for punitive damages..

866.    The damages available to the Plaintiffs include, inter alia, recoupment of governmental costs, flowing from an ongoing and costs the Plaintiffs must incur as a result of their actions.   Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct.

867.    As a direct result of Defendants' conduct, the Plaintiffs have suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services. The Plaintiff here seeks recovery for its own harm.

868.    The Plaintiffs have sustained  specific  and  special injuries because its damages include, inter alia, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

869.    Plaintiffs seek all legal and equitable relief as allowed by law, including inter alia (compensatory damages), future damages and punitive damages from the Defendants.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

870.    Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

871.    Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the entire community that includes, but is not limited to:

a.    The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

b.    Even children have fallen victim to the opioid epidemic.  Easy access to prescription opioids made opioids a recreational drug of choice among teenagers;

c.    Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

d.    Even those residents of Plaintiffs' cities and counties who have never taken opioids have suffered from public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions.  Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids;

e.    The opioid epidemic has increased healthcare costs;

f.    Employers have lost the value of productive and healthy employees;

g.    Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse and injury in violation of its statutes under state and federal law;

h.    Defendants' fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

addicts to buy them.  More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin.  People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result;

i.    The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on healthcare services and law enforcement;

j.    The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiffs' cities and counties; and

k.    Defendants' interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiffs' cities and counties.

872.    The Plaintiffs have sustained  specific  and  special injuries because its damages include inter alia health services and law enforcement expenditures, as described in this Complaint.

WHEREFORE**,** Plaintiffs pray for judgment against Defendants jointly and severally for:

A.    A fair and just amount of actual damages in excess of $25,000;

B.    A fair and just amount for future damages for abatement;

C.    Their costs expended herein incurred; and

D.    Such other and further relief which may in the premises by just and proper.

**COUNT V**
**FRAUD**
**(MANUFACTURING AND DISTRIBUTING DEFENDANTS)**

873.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

874.    At all times pertinent in this petition manufacturing and distributing Defendants acted within a concert of action in that their deceptive and misrepresentative actions were done with a common intent and purpose to deceive the Plaintiffs' residents and physicians and their

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

deception and misrepresentations were an efficient cause contributing to the damages of Plaintiffs.

875.    Defendants acted together and jointly in their marketing, advertising, and distribution by and through the use of KOL's and bogus front organizations funded by Defendants to perpetuate the following false and unfounded benefits and claims of opioids:

   a.    That opioids improve function;

   b.    By concealing the link between long term use of opioids and addiction;

   c.    Misrepresenting that addiction can be managed;

   d.    Falsely claiming that withdrawal can easily be managed;

   e.    Misrepresenting the greater dangers of higher doses of opioids;

   f.    Downplayed the use of NSAIDs and other therapies while downplaying the use of opioids; and

   g.    Falsely claiming that OxyContin was a 12 hour pain relief pill.

876.    Defendants having undertaken the manufacturing, marketing, dispensing, distribution and promotion of opioids described herein owed a duty to provide accurate and complete information regarding these products.

877.    Defendants' promotional, marketing, and distribution plan, where they all worked in a concert of action towards the goal of increasing market share of all opioids, was meant to create the image and impression that opioids were the proper use for chronic pain, safe,  non-addictive, and functional by not interfering with daily life.

878.    Through their concert of action, the Defendants working together towards their goal of increased sales of opioids and through pooling their vast resources did fund, direct and

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

guide KOL's and false front groups to tout the false benefits of opioids and downplay the harsh side effects such as addiction and death.

879.    The material disseminated by Defendants through promotional materials, medical journal articles, advertising, both print and media,  testimonials, social media, and KOL's falsely and deceptively misrepresented or omitted a number of material facts regarding the previously stated in this count.

880.    The aforementioned misrepresentations by Defendants, working in concert of action were reasonably relied upon prescribing doctors and patients in Plaintiffs' cities and counties, which created the damages Plaintiffs seek.

881.    As a direct and proximate result of the aforesaid conduct of Defendants, Plaintiffs' residents suffered physical injuries including but not limited to severe opioid addiction, with a large percentage of residents dying.  This addiction and death in turn has led the cities and counties to spend large sums of tax payer funds attempting to contain the problem in their communities.  As a direct result of Defendants' actions Plaintiffs' cities and counties have had to expend funds for health, public safety, juvenile care, medical examiner costs, drug treatment and education.  Plaintiffs' cities and counties have sustained these damages in the past and will in the future.

882.    The forgoing actions of Defendants were done with evil motive or with reckless indifference to Plaintiffs and to the public safety of Plaintiffs' residents' safety and welfare, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray for a judgment against Defendants jointly and severally for:

A.    A fair and just amount of damages in excess of $25,000;

Page 271

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

B.      A fair and just amount for future damages for abatement;

C.      A fair and just amount of punitive damages in an amount to compensate

Plaintiffs and punish Defendants;

D.      For their costs herein incurred; and

E.      Such other and further relief which may in the premises be just and proper.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**(MANUFACTURING AND DISTRIBUTING DEFENDANTS)**

883.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

884.    Defendants made many misrepresentations to doctors, patients, and the public in their advertising which as set forth previously, which is misbranded, misleading and contrary to the label.

885.    Defendants are liable for negligent misrepresentation because they supplied information in the course of their business to a class of persons including Plaintiffs.  Because the speakers referred to in this Petition were employed or supplied by the Manufacturing Defendants and to some extent the Distributor Defendants, their failure to exercise reasonable care the information was false.  In particular, it was false regarding the fact that opioids were tested and safe and effective for long term use for chronic pain, that Oxycontin would last 12 hours, that opioids were not addictive but pseudoaddictive, etc.  *See infra.*

886.    The information was intentionally provided by the Manufacturing Defendants through their agents and employees, as well as organizations that they jointly funded to spread misleading information about opioids.  Consequently, this information was provided for the guidance of a limited class of persons in a particular business transaction including Plaintiffs.

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

887.    The hearer, being the doctors, the public, and other professionals justifiably relied on the truth of the information.

888.    Due to the hearer's reliance on the information, the hearer suffered a pecuniary loss which caused or contributed to cause the loss by the Plaintiffs herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants jointly and severally for:

D.    A fair and just amount of actual damages in excess of $25,000;

E.    A fair and just amount for future damages for abatement;

F.    Their costs expended herein incurred; and

D.    Such other and further relief which may in the premises by just and proper

Respectfully Submitted,

**CAREY DANIS & LOWE**

By: */s/ Jeffrey J. Lowe*
Jeffrey J. Lowe, #35114
John F. Garvey, #35879
Sarah Shoemake Doles, #45747
Alyson M. Petrick, #68323
Attorneys for Plaintiffs
8235 Forsyth Blvd
St. Louis, MO 63105
(314) 725-7700
(314) 721-0905 - Facsimile
jlowe@careydanis.com
jgarvey@careydanis.com
sdoles@careydanis.com
apetrick@careydanis.com

Electronically Filed - City of St. Louis - August 01, 2018 - 10:22 AM

CHURMAN, HOWALD, WEBER,
SENKEL & NORRICK, L.L.C.
Derek Good, #50300
P.O. Box 800 – 301 Main Street
Hillsboro, MO 63050
(636) 797-2601
(636) 797-2904 - Facsimile
good@thurmanlaw.com

MARLER SCHRUM
Sara L. Marler, #55056
Scott J. Schrum, #67310
Ramona Gau, #58686
406 E. Karsch Blvd.
Farmington, Missouri 63640
(573) 747-4573
(573) 747-4940 - Facsimile
smarler@marlerschrum.com
sschrum@marlerschrum.com
rgau@marlerschrum.com

STYRON & SHILLING
Patricia J. Shilling, #36356
302 E. Church Street
Ozark, Missouri  65721
(417) 581-3646
pjs@styronlaw.com

STRONG-GARNER-BAUER, P.C.
Steve Garner, #35899
Neil Chanter, #49507
Jeff Bauer, #48902
415 E. Chestnut Expressway
Springfield, MO 658002
(417) 887-4300
(417) 887-4385 – Facsimile
sgarner@stronglaw.com
neilchanter@stronglaw.com
jbauer@stronglaw.com

*Attorneys for Plaintiffs*



Judicial Links | eFiling | Help | Contact Us | Print     GrantedPublicAccess **Logoff CHRISTOPHERLANG**

1822-CC10883 - JEFFERSON COUNTY ET AL V PURDUE PHARMA L P ET AL (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

**Click here to eFile on Case**
**Click here to Respond to Selected Documents**

Sort Date Entries: ● Descending ○ Ascending

Display Options: [ All Entries ▼ ]

---

**08/29/2018** ☐ **Order Granting Ext of Time**
THE COURT GRANTS DISTRIBUTOR DEFENDANTS MOTION AND DISTRIBUTOR DEFENDANTS HAVE UNTIL NOVEMBER 12, 2018 TO FILE THEIR RESPONSIVE PLEADINGS OT ANSWER SO ORDERED: JUDGE MICHAEL MULLEN

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2713, for CAREMARK L L C.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2712, for CAREMARKPCS HEALTH L L C.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2711, for CAREMARK RX L L C.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2710, for CVS HEALTH CORPORATION.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2709, for DEPOMED INC.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2708, for MYLAN N V.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2707, for MYLAN PHARMACEUTICALS INC.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2706, for CVS HEALTH CORPORATION.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2705, for THE PURDUE FREDERICK COMPANY CEPHALON INC.

☐ **Summ Issd- Circ Pers Serv O/S**
Document ID: 18-SMOS-2704, for PURDUE PHARMA L P.

**08/20/2018** ☐ **Jury Trial Scheduled**
Scheduled For: 02/25/2019; 9:00 AM; MICHAEL KELLAN MULLEN; City of St. Louis

**08/09/2018** ☐ **Judge/Clerk - Note**
COPIES PREPARED FOR ROBIN COLE

☐ **Summons Returned Non-Est**
Document ID - 18-SMCC-12788; Served To - MALLINCKRODT LLC; Server - W IRBY SERVICE DEPUTY; Served Date - 08-AUG-18; Served Time - 10:15:00; Service Type - Sheriff Department; Reason Description - Moved

**08/06/2018**   ☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13156, for UNITED HEALTHCARE OF THE MIDWEST INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13155, for UNITEDHEALTH GROUP INCORPORATED.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13154, for PHARMA INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13153, for INSYS.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13152, for AMERISOURCEBERGEN COMPANY.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13151, for WALGREENS COMPANY.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13150, for AMERISOURCEBERGEN DRUG CORPORATION.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13149, for CARDINAL HEALTH INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13148, for MCKESSON CORPORATION.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13146, for SPECGX LLC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13145, for ACTAVIS LLC ACTAVIS PHARMA INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13144, for WATSON PHARMACEUTICALS INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13143, for WATSON LABORATORIES.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13142, for ALLERGAN PLC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13141, for ENDO HEALTH SOLUTIONS INC..

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13140, for ENDO PHARMACEUTICALS INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13139, for NORAMCO INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13138, for JANSSEN PHARMACEUTICA INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13137, for ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13136, for JOHNSON & JOHNSON.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13135, for JANSSEN PHARMACEUTICALS INC.

☐ **Summons Issued-Circuit**
Document ID: 18-SMCC-13134, for TEVA PHARMACEUTICALS USA INC.

**08/01/2018**    ☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2553, for CAREMARK L L C.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2552, for CAREMARKPCS HEALTH L L C.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2551, for CAREMARK RX L L C.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2550, for CVS HEALTH CORPORATION.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2549, for DEPOMED INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2548, for MYLAN N V.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2547, for MYLAN PHARMACEUTICALS INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2546, for CVS HEALTH CORPORATION.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2545, for THE PURDUE FREDERICK COMPANY CEPHALON INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMOS-2544, for PURDUE PHARMA L P.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12798, for UNITED HEALTHCARE OF THE MIDWEST INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12797, for MISSOURI CVS LLC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12796, for CENTER FOR INTERVENTIONAL PAIN MANAGEMENT.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12795, for PADDA INSTITUTE.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12794, for INTERVENTIONAL CENTER FOR PAIN MANAGEMENT P C.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12793, for PADDA, GURPREET S.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12792, for EXPRESS SCRIPTS INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12791, for EXPRESS SCRIPTS HOLDING COMPANY.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12790, for EXPRESS SCRIPTS PHARMACY INC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12789, for MALLINCKRODT PLC.

☐   **Summons Issued-Circuit**
Document ID: 18-SMCC-12788, for MALLINCKRODT LLC.

☐   **Order**
ORDER APPROVING WALK THROUGH SUMMONS.

**Memorandum Filed**

Memorandum and to Clerk Requesting Walk Through Summons; Petition.

    **Filed By:** JEFFREY J LOWE

    **On Behalf Of:** JEFFERSON COUNTY CIRCUIT COURT, CAPE GIRARDEAU COUNTY, CHRISTIAN COUNTY, CITY OF JOPLIN, CRAWFORD COMPANY, GREENE COUNTY, IRON COUNTY, JASPER COUNTY, STONE COUNTY, TANEY COUNTY, WASHINGTON COUNTY

**Filing Info Sheet eFiling**

    **Filed By:** JEFFREY J LOWE

**Pet Filed in Circuit Ct**

Petition.

    **Filed By:** JEFFREY J LOWE

    **On Behalf Of:** JEFFERSON COUNTY CIRCUIT COURT, CAPE GIRARDEAU COUNTY, CHRISTIAN COUNTY, CITY OF JOPLIN, CRAWFORD COMPANY, GREENE COUNTY, IRON COUNTY, JASPER COUNTY, STONE COUNTY, TANEY COUNTY, WASHINGTON COUNTY

**Judge Assigned**

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

FILED

AUG 2 9 2018

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

| | |
|---|---|
| JEFFERSON COUNTY, CAPE GIRARDEAU COUNTY, CHRISTIAN COUNTY, CITY OF JOPLIN, CRAWFORD COUNTY, GREENE COUNTY, IRON COUNTY, JASPER COUNTY, STONE COUNTY, TANEY COUNTY, WASHINGTON COUNTY, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Cause No:  1822-CC10883 ) ) Division 1 |
| PURDUE PHARMA L.P., et al., | ) ) |
| Defendants. | ) |

## *ORDER GRANTING EXTENSION OF TIME*

This Court, being duly advised in the premises, does hereby grant Defendants Express Scripts Holding Company, Express Scripts, Inc., Express Scripts Pharmacy, Inc., UnitedHealthcare of the Midwest, Inc., United Health Group Incorporated, Optum, Inc., and OptumRx, Inc.'s joint request for an extension deadline of ninety (90) days each to file their respective responsive pleadings from the date when each of the respective Defendants would otherwise need to file an answer or other response.

SO ORDERED: _____

DATE: _____

**1822-CC10883**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:33 AM

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND  JUDICIAL CIRCUIT**
**ST. LOUIS CITY**

**JEFFERSON COUNTY, et al.,**

                              Plaintiffs,                    Cause No.

        v.                                                   Division No.

**PURDUE PHARMA L.P., et al.,**

                    Defendants.

**MEMORANDUM AND ORDER TO CLERK REQUESTING**
**WALK THROUGH SUMMONS**

        COME NOW Plaintiffs, by and through their attorneys of record, and respectfully request

that the Clerk issue walk-through summons to be served by a special process server on the

following Defendants:

**MALLINCKRODT, PLC**
**Serve: CT Corporation**
        **120 S. Central**
        **St. Louis, MO 63105**

**MALLINCKRODT LLC**
**Serve: CT Corporation**
        **120 S. Central**
        **St. Louis, MO 63105**

**EXPRESS SCRIPTS PHARMACY, INC.**
**Serve: Corporation Services Company**
         **221 Bolivar St.**
         **Jefferson City, MO 65101**

**EXPRESS SCRIPTS HOLDING COMPANY**
**Serve: Corporation Services Company**
        **221 Bolivar St.**
        **Jefferson City, MO 65101**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:33 AM

**EXPRESS SCRIPTS, INC.**
**Serve: CSC –Lawyers Incorporating Service**
   **221 Bolivar St.**
   **Jefferson City, MO 65101**

**GURPREET S. PADDA, M.D.**
**Serve: Harjot Padda**
   **3915 Brannon Ave.**
   **St. Louis, MO 63109**

**INTERVENTIONAL CENTER FOR PAIN MANAGEMENT, P.C., d/b/a CENTER FOR INTERVENTIONAL PAIN MANAGEMENT**
**Serve: Harjot Padda**
   **3915 Brannon Ave.**
   **St. Louis, MO 63109**

**PADDA INSTITUTE**
**Serve: Harjot Padda**
   **3915 Brannon Ave.**
   **St. Louis, MO 63109**

**CENTER FOR INTERVENTIONAL PAIN MANAGEMENT, d/b/a COMPREHENSIVE PAIN ASSOCIATES, LLC**
**Serve: Harjot Padda**
   **3915 Brannon Ave.**
   **St. Louis, MO 63109**

**MISSOURI CVS LLC**
**Serve: CT Corporation System**
   **120 South Central Ave**
   **Saint Louis, MO 63105**

**UNITED HEALTHCARE OF THE MIDWEST, INC.**
**Serve:  CT Corporation System**
   **120 South Central**
   **St. Louis, MO 63105**

   In order to expedite service of process, Plaintiff asks that this request be walked through the Writs Department and delivered or forwarded to the undersigned forthwith.  Service copies of Plaintiffs' Petition are attached hereto.

Respectfully Submitted,

**CAREY DANIS & LOWE**

By: _/s/ Jeffrey J. Lowe_
Jeffrey J. Lowe, #35114
John F. Garvey, #35879
Sarah Shoemake Doles, #45747
Alyson M. Petrick, #68323
Attorneys for Plaintiffs
8235 Forsyth Blvd
St. Louis, MO 63105
(314) 725-7700
(314) 721-0905 - Facsimile
**jlowe@careydanis.com**
**jgarvey@careydanis.com**
**sdoles@careydanis.com**
**apetrick@careydanis.com**

**CHURMAN, HOWALD, WEBER, SENKEL & NORRICK, L.L.C.**
Derek Good, #50300
P.O. Box 800 – 301 Main Street
Hillsboro, MO 63050
(636) 797-2601
(636) 797-2904 - Facsimile
**good@thurmanlaw.com**

**MARLER SCHRUM**
Sara L. Marler, #55056
Scott J. Schrum, #67310
Ramona Gau, #58686
406 E. Karsch Blvd.
Farmington, MO 63640
(573) 747-4573
(573) 747-4940 - Facsimile
**smarler@marlerschrum.com**
**sschrum@marlerschrum.com**
**rgau@marlerschrum.com**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:33 AM

**STYRON & SHILLING**
Patricia J. Shilling, #36356
302 E. Church Street
Ozark, Missouri  65721
(417) 581-3646
**pjs@styronlaw.com**

**STRONG-GARNER-BAUER, P.C.**
Steve Garner, #35899
Neil Chanter, #49507
Jeff Bauer, #48902
415 E. Chestnut Expressway
Springfield, MO 658002
(417) 887-4300
(417) 887-4385 – Facsimile
**sgarner@stronglaw.com**
**neilchanter@stronglaw.com**
**jbauer@stronglaw.com**

*Attorneys for Plaintiffs*

**SO ORDERED:**

_____
**DATE**

_____
**JUDGE**

IN THE CIRCUIT COURT
STATE OF MISSOURI
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)

**FILED**

AUG 29 2018

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

JEFFERSON COUNTY, CAPE GIRARDEAU )
COUNTY, CHRISTIAN COUNTY, CITY OF )
JOPLIN, CRAWFORD COUNTY, GREEN )
COUNTY, IRON COUNTY, JASPER )
COUNTY, STONE COUNTY, TANEY )
COUNTY, WASHINGTON COUNTY, )
                                )
      Plaintiffs, )
                                  )
vs. )
                                  )
PURDUE PHARMA L.P., et al., )
                                  )
      Defendants. )

Cause No.  1822-CC10883

**ENTERED**

AUG 29 2018

**LK**

## <u>ORDER GRANTING UNOPPOSED MOTION FOR AN EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS</u>

      This matter is before the Court on the Unopposed Motion for An Extension of Time to File Responsive Pleadings filed by Defendants Cardinal Health, Inc., McKesson Corporation, AmerisourceBergen Drug Corporation, and AmerisourceBergen Company[1] ("Distributor Defendants"). Upon review of the record, the Court GRANTS Distributor Defendants' Motion, and Distributor Defendants have until November 12, 2018, to file their responsive pleadings, or otherwise answer.

IT IS SO ORDERED.

DATED: _8/29/18_                                        
                                                           JUDGE

---

[1] AmerisourceBergen Company does not concede that it is a proper party to this action

**1822-CC10883**

Electronically Filed - City of St. Louis - August 01, 2018 - 10:33 AM

### MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
### ST. LOUIS CITY

**JEFFERSON COUNTY, et al.,**

                Plaintiffs,

      v.

**PURDUE PHARMA L.P., et al.,**

                Defendants.

Cause No. *1822-CC10883*

Division No. *1*

### MEMORANDUM AND ORDER TO CLERK REQUESTING
### WALK THROUGH SUMMONS

    COME NOW Plaintiffs, by and through their attorneys of record, and respectfully request

that the Clerk issue walk-through summons to be served by a special process server on the

following Defendants:

**MALLINCKRODT, PLC**
Serve: CT Corporation
     120 S. Central
     St. Louis, MO 63105

**MALLINCKRODT LLC**
Serve: CT Corporation
     120 S. Central
     St. Louis, MO 63105

**EXPRESS SCRIPTS PHARMACY, INC.**
Serve: Corporation Services Company
     221 Bolivar St.
     Jefferson City, MO 65101

**EXPRESS SCRIPTS HOLDING COMPANY**
Serve: Corporation Services Company
     221 Bolivar St.
     Jefferson City, MO 65101



FILED

AUG 0 1 2018



CLERK, CIRCUIT COURT
BY_____DEPUTY

**FILED**

**JUL 31 2018**

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**EXPRESS SCRIPTS, INC.**
**Serve: CSC –Lawyers Incorporating Service**
    **221 Bolivar St.**
    **Jefferson City, MO 65101**

**GURPREET S. PADDA, M.D.**
**Serve: Harjot Padda**
    **3915 Brannon Ave.**
    **St. Louis, MO 63109**

**INTERVENTIONAL CENTER FOR PAIN MANAGEMENT, P.C., d/b/a CENTER FOR INTERVENTIONAL PAIN MANAGEMENT**
**Serve: Harjot Padda**
    **3915 Brannon Ave.**
    **St. Louis, MO 63109**

**PADDA INSTITUTE**
**Serve: Harjot Padda**
    **3915 Brannon Ave.**
    **St. Louis, MO 63109**

**CENTER FOR INTERVENTIONAL PAIN MANAGEMENT, d/b/a COMPREHENSIVE PAIN ASSOCIATES, LLC**
**Serve: Harjot Padda**
    **3915 Brannon Ave.**
    **St. Louis, MO 63109**

**MISSOURI CVS LLC**
**Serve: CT Corporation System**
    **120 South Central Ave**
    **Saint Louis, MO 63105**

**UNITED HEALTHCARE OF THE MIDWEST, INC.**
**Serve:  CT Corporation System**
    **120 South Central**
    **St. Louis, MO 63105**

In order to expedite service of process, Plaintiff asks that this request be walked through the Writs

Department and delivered or forwarded to the undersigned forthwith.  Service copies of Plaintiffs' Petition are

attached hereto.



FILED

JUL 31 2018

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
_____ DEPUTY

Respectfully Submitted,

**CAREY DANIS & LOWE**

By: */s/ Jeffrey J. Lowe*
Jeffrey J. Lowe, #35114
John F. Garvey, #35879
Sarah Shoemake Doles, #45747
Alyson M. Petrick, #68323
Attorneys for Plaintiffs
8235 Forsyth Blvd
St. Louis, MO 63105
(314) 725-7700
(314) 721-0905 - Facsimile
**jlowe@careydanis.com**
**jgarvey@careydanis.com**
**sdoles@careydanis.com**
**apetrick@careydanis.com**

**CHURMAN, HOWALD, WEBER,
SENKEL & NORRICK, L.L.C.**
Derek Good, #50300
P.O. Box 800 – 301 Main Street
Hillsboro, MO 63050
(636) 797-2601
(636) 797-2904 - Facsimile
**good@thurmanlaw.com**

**MARLER SCHRUM**
Sara L. Marler, #55056
Scott J. Schrum, #67310
Ramona Gau, #58686
406 E. Karsch Blvd.
Farmington, MO 63640
(573) 747-4573
(573) 747-4940 - Facsimile
**smarler@marlerschrum.com**
**sschrum@marlerschrum.com**
**rgau@marlerschrum.com**

**STYRON & SHILLING**
Patricia J. Shilling, #36356
302 E. Church Street
Ozark, Missouri  65721
(417) 581-3646
**pjs@styronlaw.com**

**STRONG-GARNER-BAUER, P.C.**
Steve Garner, #35899
Neil Chanter, #49507
Jeff Bauer, #48902
415 E. Chestnut Expressway
Springfield, MO 658002
(417) 887-4300
(417) 887-4385 – Facsimile
**sgarner@stronglaw.com**
**neilchanter@stronglaw.com**
**jbauer@stronglaw.com**

*Attorneys for Plaintiffs*

FILED

JUL 31 2018

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
_____ DEPUTY

**SO ORDERED:**

__8-1-2018__
**DATE**

_____
**JUDGE**

# Robinson + Cole

One Boston Place, 25th floor
Boston, MA 02108-4404
Main (617) 557-5900
Fax (617) 557-5999

# Facsimile Transmission

Date:   August 8, 2018          Number of Pages (including cover):   1

Name:   Katherine McGuire          Re:       Copy of Complaint

Recipient(s) List

| Name | Company | Fax Number | Phone Number |
| --- | --- | --- | --- |
| Clerk | | 314-613-7486 | |

Message:

Could I get a copy of this complaint:

JEFFERSON COUNTY ET AL V PURDUE PHARMA L P ET AL
Case: 1822-CC10883 on Aug. 1, 2018

Of you can fax to me at 617-557-5999 it would be greatly appreciated. Please bill us for any copy costs.
Thank you!

Note:   If transmission is not clearly or completely received, please call us at 617-557-5900.

Confidentiality Note: The documents accompanying this facsimile transmission may contain confidential or privileged information from the law firm of Robinson & Cole LLP. This information is intended for use by the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange retrieval of the faxed documents.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Process Server 1<br><br>Process Server 2 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  PURDUE PHARMA L P
           Alias:
THE PRENTICE-HALL CORPORATION
251 LITTLE FALLS DRIVE
WILMINGTON, DE  19808

*COURT SEAL OF*

         You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

*CITY OF ST LOUIS*

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by:  (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐ other (describe) _____.

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

         **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
         I am: (check one) ☐ the clerk of the court of which affiant is an officer.
                       ☐ the judge of the court of which affiant is an officer.
*(Seal)*               ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
                       ☐ authorized to administer oaths. (use for court-appointed server)

_____
Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (_____ miles @ $ _____ per mile) |
| Total | $_____ |

         See the following page for directions to clerk and to officer making return on service of summons.

### Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54. The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered. The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service. The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy. The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy. If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons. This form is not for use in attachment actions. (See Rule 54.06, 54.07 and 54.14)

### Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Process Server 1 |
| vs. | | Process Server 2 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  THE PURDUE FREDERICK COMPANY CEPHALON INC
                **Alias:**
THE PRENTICE-HALL CORPORATION
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

*CITY OF ST LOUIS*

Further Information:

## Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by: (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐ other (describe) _____.

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____        _____
Printed Name of Sheriff or Server        Signature of Sheriff or Server

          **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                  ☐ the judge of the court of which affiant is an officer.
*(Seal)*             ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
                  ☐ authorized to administer oaths. (use for court-appointed server)

_____
Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____ (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

See the following page for directions to clerk and to officer making return on service of summons.

### Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

### Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Process Server 1 |
| vs. | | Process Server 2 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

 The State of Missouri to:  CVS HEALTH CORPORATION
                    Alias:
CORPORATION TRUST COMPANY
1209 ORANGE STREET
WILMINGTON, DE  19801

*COURT SEAL OF*

       You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve
a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this
summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you
for the relief demanded in this action.

*CITY OF ST LOUIS*

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.   I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.   My official title is _____ of _____ County, _____ (state).
3.   I have served the above summons by:  (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
      _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
      _____ (name) _____ (title).
   ☐ other (describe) _____
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____          _____
   Printed Name of Sheriff or Server                      Signature of Sheriff or Server

       **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
       I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                      ☐ the judge of the court of which affiant is an officer.
                      ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                         (use for out-of-state officer)
                      ☐ authorized to administer oaths.  (use for court-appointed server)

*(Seal)*

_____
         Signature and Title

| Service Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Mileage | $_____ | (_____ miles @ $ _____ per mile) |
| **Total** | $_____ | |

See the following page for directions to clerk and to officer making return on service of summons.

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54. The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered. The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service. The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy. The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy. If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons. This form is not for use in attachment actions. (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100 | Process Server 1 |
| vs. | SAINT LOUIS, MO 63105 | Process Server 2 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | SAINT LOUIS, MO 63101 | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  **MYLAN PHARMACEUTICALS INC**
        **Alias:**
**CORPORATION SERVICE COMPANY**
**600 N 2ND ST SUITE 401**
**HARRISBURG, PA 17101**

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐ other (describe) _____

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server        Signature of Sheriff or Server

Subscribed and Sworn To me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                ☐ the judge of the court of which affiant is an officer.
                ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
                ☐ authorized to administer oaths.  (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| Service Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Mileage | $_____ | (_____ miles @ $_____ per mile) |
| **Total** | $_____ | |

**See the following page for directions to clerk and to officer making return on service of summons.**

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Process Server 1 |
| | | Process Server 2 |
| vs. | | |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  MYLAN N V
           Alias:
CORPORATION SERVICE COMPANY
600 N 2ND ST SUITE 401
HARRISBURG, PA  17101

*COURT SEAL OF*

   You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

*CITY OF ST LOUIS*

**August 1, 2018**
_____
Date

_____
Thomas Kloeppinger
Circuit Clerk

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
    ☐  delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
    ☐  leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
    ☐  (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
    ☐  other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

           **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐  the clerk of the court of which affiant is an officer.
           ☐  the judge of the court of which affiant is an officer.
*(Seal)*  ☐  authorized to administer oaths in the state in which the affiant served the above summons.
            (use for out-of-state officer)
           ☐  authorized to administer oaths.  (use for court-appointed server)

_____
Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (____ miles @ $____ per mile) |
| **Total** | $_____ |

See the following page for directions to clerk and to officer making return on service of summons.

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



**IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI**

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100 | Process Server 1 |
| vs. | SAINT LOUIS, MO  63105 | Process Server 2 |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | SAINT LOUIS, MO  63101 | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  **DEPOMED INC**
 **Alias:**

C/O ARTHUR HIGGINS
7999 GATEWAY BLVD SUITE 300
NEWARK, CA  94560

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

*CITY OF ST LOUIS*

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.   I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.   My official title is _____ of _____ County, _____ (state).
3.   I have served the above summons by:  (check one)
   ☐   delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐   leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐   (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐   other (describe) _____
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

**Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)   ☐   the clerk of the court of which affiant is an officer.
   ☐   the judge of the court of which affiant is an officer.
   ☐   authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
   ☐   authorized to administer oaths.  (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

See the following page for directions to clerk and to officer making return on service of summons.

### Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54. The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered. The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service. The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy. The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy. If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons. This form is not for use in attachment actions. (See Rule 54.06, 54.07 and 54.14)

### Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| | |
|---|---|
| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 |
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 |
| Nature of Suit:<br>CC Other Tort | |

Process Server 1

Process Server 2

Process Server 3

(Date File Stamp)

**vs.**

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  CVS HEALTH CORPORATION
                                   Alias:
THE CORPORATION TRUST CO
1209 ORANGE STREET
WILMINGTON, DE  19801

*COURT SEAL OF*

    You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Thomas Kloeppinger
Circuit Clerk

*CITY OF ST LOUIS*

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
  ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
  ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
  ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
  _____ (name) _____ (title).
  ☐ other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

    **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
    I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                             ☐ the judge of the court of which affiant is an officer.
*(Seal)*                     ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                                (use for out-of-state officer)
                             ☐ authorized to administer oaths.  (use for court-appointed server)

_____
Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

See the following page for directions to clerk and to officer making return on service of summons.

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



## IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Process Server 1<br><br>Process Server 2 |
| vs. | | |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  **CAREMARK RX L L C**
**Alias:**
THE CORPORATION TRUST CO
1209 ORANGE STREET
WILMINGTON, DE  19801

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

*CITY OF ST LOUIS*

**August 1, 2018**
_____
Date

_Thomas Kloeppinger_
_____
Thomas Kloeppinger
Circuit Clerk

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
    ☐  delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
    ☐  leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
    ☐  (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
    ☐  other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐  the clerk of the court of which affiant is an officer.
☐  the judge of the court of which affiant is an officer.
☐  authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
☐  authorized to administer oaths.  (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| Service Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Mileage | $_____ | (_____ miles @ $ _____ per mile) |
| **Total** | $_____ | |

See the following page for directions to clerk and to officer making return on service of summons.

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54. The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered. The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service. The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy. The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy. If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons. This form is not for use in attachment actions. (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



## IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100 | Process Server 1 |
| vs. | SAINT LOUIS, MO  63105 | Process Server 2 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | SAINT LOUIS, MO  63101 | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  CAREMARKPCS HEALTH L L C
　　　　　　　　　　　　　Alias:

CT CORPORATION SYSTEM
4701 COX ROAD STE 285
GLEN ALLEN, VA  23060

**COURT SEAL OF**

        You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**

_____
　　　　　　Date

_Thomas Kloeppinger_
Thomas Kloeppinger
Circuit Clerk

**CITY OF ST LOUIS**

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.　I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.　My official title is _____ of _____ County, _____ (state).
3.　I have served the above summons by:  (check one)
　　☐　delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
　　☐　leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
　　　　_____, a person of the Defendant's/Respondent's family over the age of 15 years.
　　☐　(for service on a corporation) delivering a copy of the summons and a copy of the petition to
　　　　_____ (name) _____ (title).
　　☐　other (describe) _____ .
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____　　　_____
　Printed Name of Sheriff or Server　　　　　　　Signature of Sheriff or Server

　　　　　　　**Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
　　　　　　　I am: (check one)　☐　the clerk of the court of which affiant is an officer.
　　　　　　　　　　　　　　　　☐　the judge of the court of which affiant is an officer.
　_(Seal)_　　　　　　　　　☐　authorized to administer oaths in the state in which the affiant served the above summons.
　　　　　　　　　　　　　　　　　　 (use for out-of-state officer)
　　　　　　　　　　　　　　　☐　authorized to administer oaths.  (use for court-appointed server)

　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____ (_____ miles @ $ _____ per mile) |
| **Total** | $_____ |

**See the following page for directions to clerk and to officer making return on service of summons.**

## Directions to Clerk

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and motion to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



# IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address:<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>vs.   SAINT LOUIS, MO  63105 | Process Server 1 |
| | | Process Server 2 |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | Process Server 3 |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  CAREMARK L L C
                        Alias:

CT CORPORATION SYSTEM
4701 COX ROAD STE 285
GLEN ALLEN, VA  23060

*COURT SEAL OF*

          You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**August 1, 2018**
_____
         Date

*Thomas Kloeppinger* (signature)
_____
         Thomas Kloeppinger
         Circuit Clerk

*CITY OF ST LOUIS*

Further Information: _____

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by: (check one)
     ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
     ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
     ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
     ☐ other (describe) _____

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____      _____
Printed Name of Sheriff or Server      Signature of Sheriff or Server

       **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
       I am: (check one) ☐ the clerk of the court of which affiant is an officer.
                    ☐ the judge of the court of which affiant is an officer.
                    ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
*(Seal)*                    ☐ authorized to administer oaths. (use for court-appointed server)

_____
                    Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____  (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

          See the following page for directions to clerk and to officer making return on service of summons.

**Directions to Clerk**

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54. The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered. The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service. The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy. The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy. If the Plaintiff's/Petitioner's has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons. This form is not for use in attachment actions. (See Rule 54.06, 54.07 and 54.14)

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent. If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

SPECIAL PROCESS SERVER

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  MALLINCKRODT LLC<br>Alias: | |
|---|---|
| CT CORPORATION SYSTEM<br>120 S CENTRAL AVENUE<br>CLAYTON, MO 63105<br>*COURT SEAL OF*<br><br>CIRCUIT COURT OF MISSOURI<br><br>*CITY OF ST LOUIS* | You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.<br><br>**August 1, 2018**                                    *Thomas Kloeppinger*<br>————————————                    ————————————<br>Date                                                Clerk<br>Further Information: |

## Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                      Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                      Date                                    Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**SPECIAL PROCESS SERVER**

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

### Summons in Civil Case

The State of Missouri to:  MALLINCKRODT PLC
　　　　　　　　　　　Alias:

CT CORPORATION
120 S CENTRAL
ST LOUIS, MO 63105

*COURT SEAL OF*

*CIRCUIT COURT OF MISSOURI*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**　　　　　　　*Thomas Kloeppinger*

————————————————　　　————————————————
　　　　　　Date　　　　　　　　　　　　　　Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

————————————————————　　　————————————————————
　　Printed Name of Sheriff or Server　　　　　　Signature of Sheriff or Server
**Must be sworn before a notary public if not served by an authorized officer:**
　　　　Subscribed and sworn to before me on _____ (date).
*(Seal)*
　　　　My commission expires: _____　_____
　　　　　　　　　　　　　　　　　Date　　　　　　　　Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SPECIAL PROCESS SERVER

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: **EXPRESS SCRIPTS PHARMACY INC**
                 **Alias:**

CORPORATION SERVICES COMPANY
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

*CITY OF ST LOUIS*

**August 1, 2018**

_____
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

_____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SPECIAL PROCESS SERVER

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| | | |
|---|---|---|
| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100 | Special Process Server 2 |
| vs. | SAINT LOUIS, MO 63105 | Special Process Server 3 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD | |
| Nature of Suit:<br>CC Other Tort | SAINT LOUIS, MO 63101 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: **EXPRESS SCRIPTS HOLDING COMPANY**
             **Alias:**

CORPORATION SERVICES COMPANY
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

*CITY OF ST LOUIS*

**August 1, 2018**
_____
Date

_Thomas Kloeppinger_
_____
Clerk

Further Information:

## Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of
15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server               Signature of Sheriff or Server
**Must be sworn before a notary public if not served by an authorized officer:**
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                          Date                  Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SPECIAL PROCESS SERVER

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | |
|---|---|---|
| | | Special Process Server 1 |
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

### Summons in Civil Case

The State of Missouri to:  EXPRESS SCRIPTS INC
                Alias:

CSC LAWYERS INC SERVICE CO
221 BOLIVAR ST
JEFFERSON CITY, MO 65101

*COURT SEAL OF*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

*CITY OF ST LOUIS*

**August 1, 2018**
_____
Date

*Thomas Kloeppinger*
_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server
**Must be sworn before a notary public if not served by an authorized officer:**
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                            Date                                          Notary Public

| **Sheriff's Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**SPECIAL PROCESS SERVER**

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Special Process Server 2<br><br>Special Process Server 3 |
| vs. | | |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: GURPREET S PADDA M D
   Alias:

SERVE HARJOT PADDA
3915 BRANNON AVE
ST LOUIS, MO 63109

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**

_____
Date

_Thomas Kloeppinger_
_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
   Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $    10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (06-18) SM30 (SMCC) *For Court Use Only:* Document Id # 18-SMCC-12793          1 of 1          Civil Procedure Form No. 1; Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**SPECIAL PROCESS SERVER**

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2<br><br>Special Process Server 3 |
| vs. | | |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  **INTERVENTIONAL CENTER FOR PAIN MANAGEMENT P C**
Alias:  **DBA CENTER FOR INTERVENTIONAL PAIN MANAGEMENT**

SERVE HARJOT PADDA
3915 BRANNON AVE
ST LOUIS, MO  63109
*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**

_____
Date

*Thomas Kloeppinger*
_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**SPECIAL PROCESS SERVER**

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number:  1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2<br><br>Special Process Server 3 |
| vs. | | |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

### Summons in Civil Case

The State of Missouri to:  PADDA INSTITUTE
Alias:

SERVE HARJOT PADDA
3915 BRANNON AVE
ST LOUIS, MO  63109

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**

_____
Date

_Thomas Kloeppinger_

_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

_____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**SPECIAL PROCESS SERVER**

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Special Process Server 2<br><br>Special Process Server 3 |
| vs. | | |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to: CENTER FOR INTERVENTIONAL PAIN MANAGEMENT**
**Alias: DBA COMPREHENSIVE PAIN ASSOCIATES LLC**

HARJOT PADDA
3915 BRANNON AVE
ST LOUIS, MO 63109

*COURT SEAL OF*

*CIRCUIT COURT OF MISSOURI*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**

_____
Date

_____
Further Information:

*Thomas Kloeppinger*

_____
Clerk

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

_____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SPECIAL PROCESS SERVER

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br>PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  MISSOURI CVS LLC<br>Alias: | |
|---|---|
| CT CORPORATION SYSTEM<br>120 S CENTRAL<br>ST LOUIS, MO 63105<br>*COURT SEAL OF*<br><br>*CITY OF ST LOUIS* | **You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**<br><br>**August 1, 2018**     *Thomas Kloeppinger*<br>———————————     ———————————<br>Date                              Clerk<br>Further Information: |

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
                                        Date                              Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $    10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SPECIAL PROCESS SERVER

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | |
|---|---|---|
| | | Special Process Server 1 |
| Plaintiff/Petitioner:<br> JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br> PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  UNITED HEALTHCARE OF THE MIDWEST INC
   Alias:

CT CORPORATION SYSTEM
120 S CENTRAL AVENUE
ST LOUIS, MO 63105
*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 1, 2018**

_____
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of
15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $        10.00 | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| Total | $_____ | |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all
classes of suits, see Supreme Court Rule 54.

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL KELLAN MULLEN | Case Number: 1822-CC10883 | |
|---|---|---|
| | | Special Process Server 1 |
| Plaintiff/Petitioner:<br>  JEFFERSON COUNTY CIRCUIT COURT | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br>  PURDUE PHARMA L P | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  TEVA PHARMACEUTICALS USA INC |
|---|
| Alias:  DBA IVAX PHARMACEUTICALS |

CORPORATE CREATIONS NETWORK IN
12747 OLIVE BLVD SUITE 300
ST LOUIS, MO 63141

*COURT SEAL OF*

**CITY OF ST LOUIS**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**August 6, 2018**

_____
Date

*Thomas Kloeppinger*

_____
Clerk

Further Information:

## Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.